IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| APRIL ORTIZ, on her own behalf | ) | |
| and as administrator of the | ) | |
| ESTATES OF MAY MOLINA and MICHAEL | ) | |
| ORTIZ, and SHANNON GUZMAN, | ) | 04 C 7423 |
| | ) | |
| Plaintiffs, | ) | Judge Grady |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT ON THE MEDICAL ISSUES**

Arthur Loevy
Jon Loevy
Mark Loevy-Reyes
Loevy & Loevy
312 North May
Suite 100
Chicago, IL 60607

### Introduction

Plaintiff May Molina died after roughly 30 hours in a cell in a Chicago Police Department lockup facility. Before her death, the guards ignored her pleas for help, telling her to "shut the f--- up." Another detainee, too, tried unsuccessfully to summon assistance, particularly after Ms. Molina's breathing slowed and then eventually stopped. According to this detainee, the guards ignored her too, continuing to talk and laugh among themselves as Ms. Molina slowly died.

There is no dispute that Ms. Molina was not well. As described below, she was taking numerous powerful medications for her various life-threatening health conditions, medications from which Ms. Molina was involuntarily separated upon her arrest. This was because by rule, no medications are allowed in the Lockup. Defendants admit that Ms. Molina's family called five to ten times, seeking permission to deliver her medications -- each of which was refused, as was Ms. Molina's daughter when she physically brought the medicines to the station and explained that her mother needed the medications to "save her life."

Meanwhile, as Ms. Molina began slipping into either a diabetic or thyroid-related coma, she became groggy and began having trouble walking, breathing, and speaking. When her attorney came to the Lockup to meet with her roughly half-way through her stay in the Lockup, Ms. Molina could barely breathe or even talk, and would have fallen flat on her face but for her leaning on the table in the interview room.

Recognizing the obvious symptoms, Ms. Molina's attorney asked her if she was a diabetic (which she was) and whether she had access to her medicines. Though she could not speak, Ms. Molina gestured that she did not.

Ms. Molina's attorney terminated the meeting and informed various Lockup personnel that Ms. Molina was clearly in distress and needed to go to the hospital. The Lockup employees told Ms. Molina's attorney they were "working on it."

Apparently, they were not "working on it." Ms. Molina was found dead in her cell during the early morning hours of the following day.

For purposes of this motion, Defendants dispute much of the forgoing, insisting that Ms. Molina appeared fine to many of them during their 15-minute "cell checks." The point is sharply contested. Plaintiffs proffer evidence from a detainee, who told OPS and eventually testified that there were no cell checks that night in the women's Lockup until after Ms. Molina died.

Plaintiffs have submitted expert testimony from a doctor who opined to a reasonable degree of medical certainty, Ms. Molina died as a result of being deprived of her necessary medications. Had Ms. Molina been hospitalized as late as when her attorney put the Lockup on notice that she required medical attention, timely intervention would have saved her.

Defendants have a different view of Ms. Molina's death. Based on *no competent evidence*, Defendants surmise that Ms. Molina must have died of opiate intoxication. As discussed below, Defendants have no admissible evidence to support that hypothesis, but even assuming *arguendo* that it was true, summary judgment is equally inappropriate. Specifically, Plaintiffs have submitted expert testimony from a qualified forensic pathologist that timely medical intervention would have prevented someone in Ms. Molina's position from dying, even assuming for the sake of argument that the cause was a drug overdose.

Given the foregoing, Defendants' motion must be denied. There are numerous material disputes that only a trier of fact can properly resolve.

i.      **Summary of the Factual Record**

The following facts relevant to Defendants' Motino are drawn from Plaintiff's Local Rule 56.1 Statement (hereafter, "P. 56.1 Stmt.").

**Background**

On May 24, 2004, Plaintiff May Molina and her son, co-Plaintiff Michael Ortiz, were arrested in their respective apartments at 3526 North Halsted in Chicago, Illinois. See P. 56.1 Stmt. ¶ 1. The police recovered a number of tinfoil packets from Ms. Molina's apartment, and charged both Plaintiffs with possession of illegal drugs. Id. ¶ 2.

However, when the substances recovered from Ortiz' apartment was tested by the Illinois State Police Forensic Crime Laboratory, the results were that the substance was *not* illegal drugs, much less heroin. Id.[1]

### The Lockup

Following her arrest, Ms. Molina was taken to the 23rd District station of the Chicago Police Department before being transported to the women's lockup at the Chicago Police Department's 19th District station, located at Belmont and Western (the "Lockup"). P. 56.1 Stmt. ¶ 4.

Per procedures, all arrestees are searched upon entry to Lockup in order to make sure that no arrestee has drugs, weapons, or other contraband. Id. ¶ 45. Ms. Molina was searched thoroughly when she entered the women's Lockup; there were no drugs or contraband on her person. Id.

### Ms. Molina's Medical Needs

By all accounts, Ms. Molina was not well at the time of her arrest; she was obese, sickly, and in poor health. See Defendants Local Rule 56.1 Statement ("D. 56.1 Stmt.") ¶¶ 8-9. She had difficulty walking and, according to the arresting officers, "became winded by walking even a short distance within the apartment." P. 56.1 Stmt. ¶ 5.

To survive, Ms. Molina was dependent on regular access to a large number of powerful drugs to treat her various life-threatening conditions, including diabetes, a thyroid condition, hypertension, and heart/liver diseases. P. 56.1 Stmt. ¶¶ 3, 46. Specifically, Ms. Molina had type 2 diabetes Mellitus which required medication and monitoring to ensure that her blood sugar was in check, otherwise she risked slipping into either a hyperglycemic or hypoglycemic state, either

---

[1]    When the authorities discovered that the substance from Ortiz' apartment was not drugs, the drug charges against Ortiz were dropped, but not before he spent a month in jail. On that basis, Ortiz has his own claims in this lawsuit relating to (a) Defendants' inability or unwillingness to try to justify the probable cause for their search, hiding to date behind purported "anonymous" sources; and (b) Defendants caused Ortiz to be held long after they discovered the substance taken from his apartment was not drugs.

of which could lead to a fatal coma. P. 56.1 Stmt. ¶ 46(b). Ms. Molina also suffered from life-threatening hypertensive and thyroid conditions, both of which required medication and monitoring. Id. ¶ 46. To counteract some of these conditions and medications, Ms. Molina took a powerful diuretic that depletes potassium, which can be fatal, and thus also requires careful medical supervision. Id. ¶ 46(b). Without her medications, Ms. Molina would die. Id.

It is the Chicago Police Department's policy that no medications are allowed to be taken in the Lockup. P. 56.1 Stmt. ¶¶ 26-27. Upon arresting Ms. Molina, Defendant Spencer thus informed her that she was not permitted to bring her medications with her to the police station. P. 56.1 Stmt. ¶ 3. Because Ms. Molina could not live without her medications, she never previously permitted herself to be separated from them voluntarily. Id.

**Defendants' Actual Notice of
Ms. Molina's Medical Needs**

When Ms. Molina first arrived at the Lockup at or around 4:25 a.m. on May 25, 2004, she was interviewed by Defendant Jamison, who created the Lockup Keeper's Arrestee Questionnaire, also referred to as the Screening Record For Arrestee to be Held in Lockup (hereafter, "Screening Record"). P. 56.1 Stmt. ¶ 6.

When asked if she had any "serious medical [] problems," Ms. Molina answered "yes" -- an answer that was recorded thusly by Defendant Jamison on the Lockup Screening Record. Id. ¶ 7. The Screening Record requires further explanation where the intake person checks "yes" for people with "serious medical [] problems." P. 56.1 Stmt. ¶ 7. Ms. Molina described her medical problems, and the Lockup screener duly noted that Ms. Molina was taking medicine for diabetes, as well as "thyroid meds" and pain medication for her legs. Id.

At that time, Jamison noted on this written Lockup Screening Record that Ms. Molina did not appear to be under the influence of any drugs, nor was she showing any sign of withdrawal. P. 56.1 Stmt. ¶ 6.

4

### The Chicago Police Department Policies And
### Practices For Documenting Medical Needs

Per Department, Lockup keepers are neither required nor trained to inquire about the need, type, or frequency of use for any medications that incoming detainees might be taking. P. 56.1 Stmt. ¶ 9. Accordingly, although Ms. Molina told Defendant Jamison that she took her diabetes medication for her "serious medical [] need," Jamison gathered no further information, such as the type or frequency of the medication, or when she last took it. Id. ¶ 10. In her words, Defendant Jamison did not inquire as to how often she needed the diabetes medication because that is not something that officers usually ask. Id.

After Defendant Jamison created the Screening Record confirming that Ms. Molina had a "serious medical [] condition" and that she needed medications for her diabetes, thyroid, and pain, Jamison then took that information to the front desk, where it is accessible to all front desk personnel. P. 56.1 Stmt. ¶ 11.

### Ms. Molina's Deterioration And
### Attorney Bischoff's Request To Provide
### Her With Medical Assistance

At approximately 4:00 p.m. on May 25, 2004, Defendants Yost and Gilchrist escorted Ms. Molina to see Attorney Jerry Bischoff, a lawyer since 1986, who had come to meet with her. P. 56.1 Stmt. ¶ 13.

By this time, Yost observed that it took Molina one to two minutes to walk a few feet. P. 56.1 Stmt. ¶ 14. Similarly, Bischoff observed that it took Ms. Molina one to two minutes to walk 10 to 15 feet. Id. According to Defendant Yost, Ms. Molina held onto the wall and counter while taking a few minutes to walk from her cell to the meeting with Bischoff. Id.

As he tried to interact with her, Attorney Bischoff observed that Ms. Molina was groggy, out of breath, breathing rapidly, and could not stand up without leaning on the table. P. 56.1 Stmt. ¶ 15. During the approximately 10 minute meeting, Ms. Molina never caught her breath; she was having difficulty breathing in a way he had never seen her breathing on prior occasions. Id. ("She was having difficulty breathing.").

5

After observing Ms. Molina's distress, Attorney Bischoff concluded it was pointless to try to talk to her about her case and became concerned about her health. P. 56.1 Stmt. ¶ 16. For the most part, Ms. Molina was not even able to answer orally to all of his questions, but she gestured. Id. From what Attorney Bischoff observed, the only thing that prevented Ms. Molina "from falling flat on her face" was the table in the interview room. P. 56.1 Stmt. ¶ 17.

Mr. Bischoff asked Ms. Molina if she was a diabetic, to which she responded yes. P. 56.1 Stmt. ¶ 18. Mr. Bischoff asked Ms. Molina how she took her medication and Ms. Molina gestured that she did so orally. Id. Attorney Bischoff then asked if the police were letting her take her medication, to which Ms. Molina gestured with her head that they were not. Id.

Because Ms. Molina could not communicate, Attorney Bischoff terminated the meeting, concluding that she belonged in a hospital. P. 56.1 Stmt. ¶ 19.

Bischoff proceeded to inform two female officers (now known to be Gilchrest and Yost) that Ms. Molina was "clearly sick" and to take her to Cermak Hospital because she "clearly is not well." P. 56.1 Stmt. ¶ 20. In response to that request, one of the Lockup keepers said they were working on it. Id. As a matter of practice, however, Chicago Police Department personnel will never consider a request for hospitalization from people other than detainees. Id. ¶ 21.

### Ms. Molina's Family's Attempts
### To Provide Ms. Molina Her Medicine

Ms. Molina was never taken to the hospital. Meanwhile, during the evening of May 25, 2004, Defendant Ramirez was working at the front desk at the 19th District. P. 56.1 Stmt. ¶ 22. Ramirez received five to ten telephone calls from multiple callers who advised her that Ms. Molina had medical needs and needed to take medication. Id. ¶ 22. The requests to bring Ms. Molina were rejected because no medicine is allowed in the Lockup. Id. ¶ 25.

Defendant Ramirez told her supervisor about the five to ten calls, but did not take any other action to ensure that Ms. Molina received medical care; according to Ramirez, this was because it was not her job to do so. Id. ¶ 23.

During the time Ms. Molina was in the Lockup, her daughter, April Ortiz brought her diabetes and thyroid medications to the facility and explained to a sergeant in a white

supervisor's uniform that Ms. Molina needed the medications "to save her life." P. 56.1 Stmt. ¶ 24. This sergeant refused to accept any medications, and told Ms. Ortiz that Ms. Molina would instead be taken to a doctor or a hospital. Id.

As it turns out, the rejection of Ms. Molina's medications was procedure. Per the policies and practices of the Chicago Police Department, lockup personnel are never allowed to provide medications to detainees in the Lockup of the Chicago Police Department; instead, medications can only be dispensed off-site, in a hospital. P. 56.1 Stmt. ¶ 25.[2]

### Ms. Molina's Deterioration

Sometime around 5:30 a.m. on May 25, 2004, Defendant Ziemba was present in the Lockup at the end of Jamison and Pryor's shift and the beginning of her own. P. 56.1 Stmt. ¶ 13. At this time, Ms. Molina was finishing her telephone call and walking back to her cell, whereupon Defendant Pryor observed that Ms. Molina was walking very slowly, taking approximately seven minutes to walk 25-30 feet and that she was out of breath after doing so. Id. ¶ 13. Pryor then told Ziemba that Ms. Molina had a thyroid condition. Id.

### Ms. Molina's Pleas For Help

Another detainee (named Jasmine Vaccarello) arrived in the Lockup around 11:00 p.m. on May 25. P. 56.1 Stmt. ¶ 28. While she was being processed, Vaccarello heard Ms. Molina yelling to try to get the Lockup keepers attention. Id. ¶ 28. Although they were in ear-shot (because they were with Vaccarello, who could hear Ms. Molina's calls) the Lockup keepers ignored her. Id.

As Vaccarello was being led to her cell in the Lockup, she heard Ms. Molina ask the Lockup keeper about her medications and a telephone call. P. 56.1 Stmt. ¶ 29. The Lockup keeper's response was that Ms. Molina was only entitled to one phone call. Id.

---

[2]    Attorney Bischoff, who has criminal defense clients, has been frustrated by this policy for more than a decade; in his words: "I can't get medication to people who are in lockup. It's just their policy. They will not give it. . . And I don't understand the policy for the life of me. If you're not going to give someone who requires daily medication their medication, then send them to the hospital where they can get it. It baffles me. You just asked me a question I actually have, you know, strong opinions on. I don't understand that policy. It defies logic." Id. ¶ 26.

While Vaccarello was in her cell, she heard Ms. Molina call out for help, but no one responded. P. 56.1 Stmt. ¶ 30. On at least two occasions, Vaccarello herself called out for the guards to help. Id. In response, the Lockup keepers stated words to the effect of: "Shut the f— up." Id. Vaccarello could hear the Lockup keepers talking and laughing. Id.

### Ms. Molina's Death

Thereafter, Vaccarello heard Ms. Molina making loud snoring noises. P. 56.1 Stmt. ¶ 31. The snoring turned shallow and softer, and then Vaccarello could no longer hear her at all. Id.

When Ms. Molina stopped making any snoring noises altogether, Vaccarello called out loudly two or three times "Ma'am, are you o.k.," or words to that effect. P. 56.1 Stmt. ¶ 32. At that point, Vaccarello again tried to summon the guard. Id. ¶ 33. The Lockup keepers ignored Vaccarello's pleas for help, though she could hear them talking and laughing. Id. All of the aforementioned communications to the Lockup keepers could be heard where the Lockup keepers were stationed because the door is kept open and voices can be heard through the door. P. 56.1 Stmt. ¶ 34.

### Nonexistent "Cell Checks"

Notwithstanding Defendants' claims that they checked on Ms. Molina every 15 minutes and confirmed that she was purportedly fine, the truth was that none of the required "15-minute cell checks" occurred in the Women's Lockup prior to Ms. Molina's death. P. 56.1 Stmt.¶¶ 35-36. The only time Vaccarello saw any Lockup keepers in the Lockup during the entire night was when they brought in another detainee, and after Ms. Molina died at 2:45 a.m. on May 26. Id.

It was unusual that Ms. Molina was still in the lockup during the early morning of May 26, 2004. P. 56.1 Stmt. ¶ 38. Felony cases usually went to court the day following an arrest. Id.

### Cause of Death: Dr. Choi

The Cook County Medical Examiner who conducted the autopsy was Dr. Eupil Choi. Dr. Choi concluded that part of the reason Ms. Molina died was that her liver stopped functioning due to cirrhosis (even though he saw none of the signs associated with death by that cause); heart problems due to her obesity (even though her cardiac condition was not identified);

and opiate intoxication (even though the amount of morphine in her system was not high, but rather on the low side of the intoxication range). P. 56.1 Stmt. ¶ 42.[3]

Ms. Molina did not die of "opiate intoxication." P. 56.1 Stmt. ¶ 43. Ms. Molina was on prescription pain medications, and as Dr. Choi himself acknowledged, 72 ng/ml was not a high level of morphine in Ms. Molina's blood. It is in fact in the therapeutic range, which is 65-80 ng/ml. Id. The toxic range, by contrast, is 200-5000 ng/ml, and, according to the scientific literature, people who die from ruptured drug packets may have heroin and morphine levels greater than 100,000 ng/m. . .[and mean] free morphine levels were 222 ng/ml. Id.[4]

### Cause of Death:
### Deprivation Of Necessary Medications

According to Plaintiffs' expert medical doctor, Ms. Molina's death was caused by the deprivation of her medications. P. 56.1 Stmt. ¶¶ 46(a)-(d), 48. Her life-threatening health problems were detailed above, and they required her to take powerful medications on a regular basis, including the following (see P. 56.1 Stmt.¶ 46):

Diabetes drugs called Glipizide (10 mg tabs) and Metformin (1000 mg), which helped prevent the hyperglycemic or hypoglycemic state described above. Id. at pp 1-2.

Furosemide (80 mg) a diuretic used to treat hypertension and excessive fluid build up and swelling (edema) caused by cirrhosis or heart failure, among other things. The drug depletes potassium, which can be fatal, and thus requires careful medical supervision. Id.

Potassium Chloride (20 mEq.), to counteract the effects of the Furosemide. Id. at p 2.

Albuterol Inhaler, which was critical to treat Ms. Molina's asthma and apnea. Id. at p.2.

Enalapril tabs (5 mg), another drug to treat hypertension and heart failure. Id. at p 3.

---

[3] Dr. Choi found a foil packet lodged in Ms. Molina's throat, which likely would have caused a gag reflex. P. 56.1 Stmt. ¶ 44. However, nobody, including Defendant Jamison, heard Ms. Molina gagging or choking before she died. Id. Moreover, as stated, Ms. Molina was searched thoroughly when she entered the women's Lockup and no contraband was found. Id. ¶ 45.

[4] As discussed more fully below, Dr. Choi knew virtually nothing about Ms. Molina at the time he determined the cause of death, such as what medications she was taking, when she last took them, whether any were narcotic, and what the impact would be if she did not take them. P. 56.1 Stmt. ¶¶ 39-40. Dr. Choi also did not consult any of Ms. Molina's medical records prior to determining his opinion about the cause of death, even though he admits that such a history is needed to determine if a decedent died from natural causes. Id. ¶ 41. Dr. Choi reached an opinion even though he did not know that Ms. Molina had been diagnosed with congestive heart failure, sleep apnea, asthma, or even what type of diabetes she suffered. Id.

Denial of her diabetes medications was a fatal concern; the danger was that denial of access to these medicines (and monitoring thereof) risked either a hyperglycemic or hypoglycemic state, either of which was life-threatening and could lead to a fatal coma. P. 56.1 Stmt. ¶ 46. Moreover, the photographs and recorded body proportions from Ms. Molina's autopsy are also typical of a fatal thyroid condition called myxedema. Id. ¶ 46(c). Thyroid medications typically replace a vital hormone (thyroxine), without which Ms. Molina could well have slipped into a comatose state brought about by lack of thyroid function. Id. On his autopsy examination, Dr. Choi specifically noted that Ms. Molina's thyroid had been surgically removed. Id.

In the opinion of Plaintiff's expert, therefore, to a high degree of medical certainty, the deprivation of these powerful and vital medications ultimately led to her death. Id. ¶¶ 46, 48. See Jahn v. Equine Services, PSC, 233 F.3d 382, 390 (6th Cir. 2000) ("In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury"); Ambrosini v. Labarraque, 101 F.3d 129, 140 (D.C.Cir. 1996) ("The fact that several possible causes might remain 'uncliminated' ... only goes to the accuracy of the conclusion, not to the soundness of the methodology").

### Effect of Failure To
### Provide Medical Attention

Assuming *arguendo* that the cause of Ms. Molina's death was an opiate intoxication, expert witness Dr. Joy Carter opines to a reasonable degree of medical certainty that she likely would have lived if she received proper treatment. P. 56.1 Stmt. ¶ 47. In a medical setting, the foil packets would have appeared with auscultation and on the chest x-ray, and even if they did not, given the symptoms, the potential for narcotic ingestion is high on the differential list of problems that trained medical professionals would have considered under these circumstances. Id. Dr. Carter further opines that even assuming Ms. Molina could not speak or did not claim to have ingested drugs, worsening respiratory effort would have provided the opportunity for early intervention with narcotic antgonistic drugs, such as Narcan to reverse the effects of narcotics on the central nervous system. According to Dr. Carter's testimony, Narcan is routinely administered in medical settings during advanced life saving codes and resuscitation efforts. Id.

Assuming the cause of Ms. Molina's death was deprivation of her critical medications, the conclusion is the same. Had she received proper treatment, she would have likely lived had she been brought to the hospital even as late as the time her lawyer (Bischoff) visited her. P. 56.1 Stmt. ¶ 48. Treatment of her condition in the form of monitoring her blood sugar and titrating her oral antidiabetic and other medications likely would have prevented her fatal coma. Id.

**II.     Based on this Record, Summary Judgment Is Inappropriate**

At trial, Defendants are obviously entitled to argue, as they do in support of summary judgment, that "Molina never displayed any outward signs of needing medical attention." See Def. Memo at 7. However, given the factual record described above (including evidence that Ms. Molina could not move, breathe, or talk, except to beg for assistance), this is simply not an appropriate basis for summary judgment.

**A.     Contrary to Defendants' Argument, the Proper Legal Test Is Not the Eighth Amendment's Punishment Standard, but Rather the Fourth Amendment's "Objectively Unreasonable Conduct Under the Circumstances" Test**

As Defendants are forced to acknowledge, the Seventh Circuit recently made plain that the Fourth Amendment's "objectively unreasonable" test governs claims of "pretrial detainees who have not yet had a judicial determination of probable cause." See Def. Memo at 21, citing Williams v. Rodriguez, 509 F.3d 392, 402-03 (7th Cir. 2007). Defendants' summary is proper and correct. The Seventh Circuit clarified in late 2006 that where the plaintiff has not yet had a judicial determination of probable cause, the "district court should have analyzed the detectives' conduct under the Fourth Amendment and its 'objectively unreasonable' standard." Lopez v. City of Chicago, 464 F.3d 711, 718 (7th Cir. 2006) ("[T]he protections of the Fourth Amendment apply at arrest and through the Gerstein probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction") (citations omitted).

Despite paying lip services to the Seventh Circuit's recent teachings, Defendants nonetheless ask this Court to (mis)analyze Plaintiffs' claims under the Eighth Amendment's punishment standard. Even after recognizing Lopez, Defendants state--without any explanation--

11

that they "do not believe that this [Fourth Amendment's objectively unreasonable test] is the correct standard given the facts of this case." Def. Memo at 21 ("Defendants will address it [anyway] in the interests of thoroughness").

Defendants' position notwithstanding, the Court should apply the correct standard: the reasonableness test of the Fourth Amendment. Rodriguez, 509 F.3d at 403 ("[c]laims regarding conditions of confinement for pretrial detainees. . . who have not yet had a judicial determination of probable cause (a Gerstein hearing), are instead governed by the Fourth Amendment and its objectively unreasonable standard"). The difference is material and improperly raises the bar on what Plaintiffs have to prove. Lopez, 464 F.3d at 718 ("The district court's application of the deliberate indifference standard made things more difficult for Lopez; the Fourth Amendment requires only proof that the defendants' conduct was objectively unreasonable under the circumstances"), citing Abdullahi v. City of Madison, 423 F.3d 763, 768 (7th Cir. 2005); Rodriguez, 509 F.3d at 403 ("we do note that the deliberate indifference standard under the Eighth and Fourteenth Amendments requires a higher showing on a plaintiff's part than is necessary to prove an officer's conduct was 'objectively unreasonable under the circumstances'").

In support of their suggestion that the Court should apply the wrong legal standard, Defendants argue that Plaintiff must be bound to the Eighth Amendment test rather than the Fourth because they supposedly pled the latter. There are two problems with this argument.

First, the operative Complaint in this matter (the Fourth Amended Complaint) pleads neither the Eighth nor the Fourth Amendment.[5] The Complaint does, however, specifically allege that Defendants' conduct was "objectively unreasonable." See Fourth Amended Complaint, ¶ 34. The fact that the Complaint did not specifically reference the Fourth Amendment is of no legal significance. See Slaney v. The Intern. Amateur Athletic Fed'n, 244 F.3d 580, 600 (7th Cir. 2001) ("plaintiffs are not required to plead legal theories"). Rule 8

_____

[5]    In fact, the only Amendment specifically referenced is the Fourteenth, under which most of the Bill of Rights is incorporated and applied to the States.

requires that a complaint need only provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a)(2). The Seventh Circuit made this plain in NAACP v. American Family Mut. Ins. Co., 978 F.2d 287 (7th Cir. 1992):

> Identifying legal theories may assist defendants and the court in seeing how the plaintiff hopes to prevail, but this organization does not track the idea of "claim for relief" in the federal rules. Putting each legal theory in a separate paragraph is a throwback to code pleading, perhaps all the way back to the forms of action; in both, legal theory and facts together created a "cause of action." The Rules of Civil Procedure divorced factual from legal aspects of the claim and replaced "cause of action" with "claim for relief" to signify the difference. [Citation omitted]. A complaint should limn the grievance and demand relief. It need not identify the law on which the claim rests, and different legal theories therefore do not multiply the number of claims for relief. One set of facts producing one injury creates one claim for relief, no matter how many laws the deeds violate.

Id. at 292. See also Simpson v. Nickel, 450 F.3d 303, 305 (7th Cir.2006) (plaintiff need only "plead claims, which is to say, grievances, rather than legal theories and factual specifics"); Doe v. Smith, 429 F.3d 706, 708 (7th Cir. 2005) (plaintiffs "need not plead law; they plead claims for relief. Usually they need do no more than narrate a grievance simply and directly, so that the defendant knows what he has been accused of").

Second, even if the Complaint could have been more clear, it was filed before Lopez, and Plaintiff does not waive reliance on the Fourth Amendment in briefing this summary judgment motion. In the case relied upon heavily by the defense, Williams v. Rodriguez, 509 F.3d 392 (7th Cir. 2007), by contrast, the Seventh Circuit analyzed the failure to provide medical attention claim under the Eighth Amendment deliberate indifference standard only because that is how the plaintiff argued it at summary judgment and on appeal. Id. at 402-03. As the Seventh Circuit pointed out, however, "it is worth noting that while this suit was before the district court, this court recognized in [Lopez] that the Fourteenth Amendment's due process protections only apply to a pretrial detainee's confinement conditions after he has received a judicial determination of probable cause." Id., citing Lopez, 464 F.3d at 719. Because Lopez came out months before the district court granted summary judgment in Rodriguez, the Seventh Circuit concluded that the plaintiff "has waived any Fourth Amendment claim by failing to amend or *supplement his motion for summary judgment or raise the issue on appeal.*" Id. at 403 (emphasis added).

In this case, Plaintiffs make no such waiver. In response to summary judgment, Plaintiffs are unambiguously asking this Court to apply the proper legal standard to assess claims for denial of necessary medical attention, which is whether Defendants acted "objectively unreasonable" under the Fourth Amendment. See Plaintiffs' Fourth Amended Complaint, ¶ 34 (alleging Defendants' conduct was both "objectively unreasonable" and "deliberately indifferent"). At the end of the day, the Seventh Circuit teaches that cases should be decided on the facts and the merits, not "gottcha" arguments that the Complaint is not sufficiently clear. E.E.O.C. v. Concentra Health Serv., Inc., 496 F.3d 773, 779 (7th Cir. 2007) ("the intent of the liberal notice pleading system is to ensure that claims are determined on the merits rather than through missteps in pleadings"), citing 2 Moore's Federal Practice, § 8.04 (3d ed. 2006).[6]

**B. If Plaintiffs' Evidence Is Credited, Plaintiffs Have Met the Legal Standard Necessary to State a Claim**

For Defendants' conduct to have been objectively unreasonable under the circumstances, Plaintiffs must meet the following test.

**First,** "the officer [must] be given notice of the arrestee's medical need, whether by word . . . or through observation of the arrestee's physical symptoms." Williams v. Rodriguez, 509 F.3d 392, 403 (7th Cir. 2007), citing Sides v. City of Champaign, 496 F.3d 820, 823 (7th Cir. 2007). **Second,** the Court must consider "the seriousness of the medical need," the severity of which "under this standard need not, on its own, rise to the level of objective seriousness required under the Eighth [] Amendment." Id. "Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the **third** factor -- the scope of the requested treatment." Id. Each of the elements is easily satisfied here.

---

[6] To remove any doubt, Plaintiffs hereby move for leave to amend the Complaint in order to make plain that the Fourth Amendment is the source of the claim here. While Plaintiffs do not believe that amendment is necessary given the allegations already in the operative pleading, Plaintiffs do not want to be in a position of being accused of not having moved to amend. See Bressner v. Ambroziak, 379 F.3d 478, 484 (7th Cir. 2004) (leave to amend should be granted liberally at any time before judgment); United States v. Security Pacific Bus. Credit, Inc., 956 F.2d 703, 707-08 (7th Cir. 1992) ("No harm is claimed in this case apart from the burden of additional research to meet the claim and the burden would have been the same if the claim had been in the original complaint").

14

### 1.    Notice of the Arrestee's Medical Need

There is no legitimate dispute that Defendants were on notice of Plaintiffs' medical needs. For starters, Ms. Molina expressly told Defendants that she had a "serious medical [] need" requiring medications. That alone is enough. Reed v. McBride, 178 F.3d 849, 854 (7th Cir. 1999) (plaintiff's letters describing condition were sufficient to put defendants on notice); Sherrod v. Lingle, 223 F.3d 605, 608-611 (7th Cir. 2000) (knowledge element demonstrated by medical chart). Indeed, this factor distinguishes this case from the Rodriguez case on which Defendants rely, in which the defense had no way to know that the plaintiff was an asthmatic. Compare Williams v. Rodriguez, 509 F.3d 392, 397 (7th Cir. 2007) ("Williams did not mention his medical condition at any other time during processing to Officer Rodriguez or any of the other four or five officers nearby").

Express notice aside, Defendants were also on notice because Ms. Molina's condition became so obvious that even lay persons recognized the need for a doctor's attention. As described in the statement of facts, various disinterested people testified that Ms. Molina could barely walk, breathe, or talk, and was about to fall on her face. Even assuming that she was doing better at the beginning of her stay in Lockup than she was a few hours later, the deterioration of Ms. Molina's condition was objectively serious. Foelker v. Outagamie County, 394 F.3d 510, 513 (7th Cir. 2005) (reversing summary judgment in deliberate indifference case because jury could find that risk was obvious); See also United States v. Cunningham, 54 F.3d 295, 299 (7th Cir. 1995) ("Circumstantial evidence of intent is just as probative as direct evidence. . . . Juries may use common sense to evaluate the evidence and make reasonable inferences from it").

Defendants' evidence coming back the other way consists of nothing but their own insistence that Ms. Molina was doing "just fine" the entire time she was in Lockup. Unfortunately Ms. Molina is not alive to rebut this testimony herself, but two independent witnesses -- a fellow detainee and her attorney -- both recognized the need for medical attention,

and both implored the Defendants to arrange it because she could not talk or breathe. If the need for hospitalization was that undeniably apparent to these two independent witnesses, Defendants' self-interested denials cannot be accepted at face value. Farmer v. Brennan, 511 U.S. 825, 842 (1994) (knowledge of risk in deliberate indifference case can be inferred from circumstantial evidence). Only a finder of fact can properly decide whether Ms. Molina's symptoms were observable and apparent, depending on whose version the jury credits.[7]

Defendants also argue that Ms. Molina supposedly refused medical help. See Def. Memo at 7 ("Each time she was asked, Molina refused medical assistance"). Leaving aside the fact that this argument contradicts Defendants' insistence that Ms. Molina supposedly never displayed any symptoms which would have prompted any of them to inquire whether Ms. Molina needed assistance, the claim is actually very misleading.

Viewed properly, Defendants' evidence establishes only that upon *being initially processed* into the Lockup, Ms. Molina originally said she did not need to go to the hospital; rather, she wanted to be processed, go to court, and go home. See Plaintiffs' Resp. to D. 56.1 Stmt. ¶¶ 12, 20. A far cry from Defendants' contention that Ms. Molina refused all medical attention while in custody, this only demonstrates her intent and desire to leave Defendants custody and take care of herself.[8]

Despite the impression conveyed by Defendants' Memo, there is no evidence that after this initial processing, Ms. Molina ever refused any treatment. To the contrary, Vacarello heard Ms. Molina asking for assistance and her medications. And this is hardly dubious testimony:

---

[7]  Defendants' various attempts to dismiss Attorney Bischoff's testimony as a "passing remark" and a "purported off-hand comment" (Def. Memo at 20) are improper attempts to give themselves the benefit of the doubt, which is of course inconsistent with Rule 56.

[8]  Indeed, when she first came into the lockup on May 24, Ms. Molina had no reason to believe that she would have to be there until May 26, when she died, and no one seems to be able to explain why she was not brought to court sooner. P. 56.1 Stmt. ¶¶ 37-38. Defendant Jamison admitted that it was highly unusual for a woman to be detained for an extra day, and she was surprised that Ms. Molina was still there the following evening when she returned to the Lockup. Id. At Defendants' request (and over Plaintiffs' objections) discovery on this part of the case was stayed for the vast majority of the time this case has been pending, but there are presently interrogatories outstanding which will shed light on this issue.

there is no dispute that Ms. Molina was both dying and without her critical medicine, medicine she knew that she needed to survive. Thus, even if the Court were to assume (without any evidence) that Ms. Molina died of an overdose, Defendants will have to persuade a jury that once she started slipping into a coma, Ms. Molina was still supposedly refusing access to a hospital, where she would have access to medications and treatment for her (undisputed) life-threatening health issues. Cf. Plakas v. Drinski, 19 F.3d 1143, 1147 (7th Cir. 1994) ("[t]he award of summary judgment to the defense in deadly force cases may be made only with particular care if the officer defendant is the only witness left alive to testify"); Bazan v. Hidalgo County, 246 F.3d 481, 492 (5th Cir. 2001) (where victim was killed, courts "must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of the experts to decide whether the officer's testimony could reasonably be rejected at trial").[9]

## 2. The Severity of Ms. Molina's Medical Need Easily Outweighs The Imposition of the Scope of the Requested Treatment

Defendants have admitted that Ms. Molina had a serious medical condition, and properly so: it killed her. See Def. Memo at 10, conceding "[t]here is no question" Ms. Molina suffered from a "serious medical condition."

Without competent evidence, the defense suggest that Ms. Molina's "serious medical condition" was due to a heroin overdose, but the fact that this condition – whatever it was – caused her death removes any question that the need for medical assistance was severe. Id.

Ms. Molina's serious medical need, and Defendants' admission of the same, affect the balancing analysis, requiring an even greater interest on the part of the defense to have withheld treatment. Rodriguez, 464 F.3d at 719. This is not a case, in other words, where the plaintiff

---

[9]    Though the Fourth Amendment applies, Plaintiffs also note that their proof suffices to establish deliberate indifference as well. Regardless of the cause, Ms. Molina's distress was sufficiently apparent that other witnesses pleaded with various Defendants to get her help and/or hospitalize her. Sherrod v. Lingle, 223 F.3d 605, 611 (7th Cir. 2000) (appendicitis with symptoms of diminished bowel activity, swollen abdomen, temperature and worsening pain is a serious condition); Zentmeyer v. Kendall County, 220 F.3d 805, 810 (7th Cir. 2000) (ear infection is objectively serious where it "inflicted prolonged suffering" and required extensive treatment). As for their response, a jury could easily conclude that telling Ms. Molina to "shut the f— up" and skipping the cell checks qualifies as deliberate indifference.

failed to receive attention for asthma, a toothache, or another relatively minor inconvenience. The denial of medical attention here was fatal, and under the <u>Rodriguez</u> sliding scale, Defendants cannot point to any sufficiently weighty interest that could have justified the failure to act.

For summary judgment purposes, at least four people (Ms. Molina, her daughter, Attorney Bischoff, and detainee Vacarello) all requested medical assistance for Ms. Molina. The requested medical attention was nothing other than access to her medications, which apparently required a ride to the hospital because of the rules governing the Lockup. Ms. Molina did not choose to be separated from her critical medications: the reason she was denied them was because medicines are apparently not allowed in the Lockup. But having denied Ms. Molina the liberty to care for herself, Defendants were unjustified in simply allowing her to die. <u>Compare Sides</u>, 496 F.3d at 828 (plaintiff was partially responsible for his lengthy detention outdoors, since he insisted that the officers not charge him).

In this case, a jury could obviously conclude that the requested medical care was not burdensome to Defendants compared to the need. Defendants may or may not have had a right to arrest Ms. Molina and separate her from her medications, but they did not have a right to leave her in a cell for 30 hours while she slowly died.

### 3. For Summary Judgment Purposes, Timely Medical Assistance Would Have Prevented Ms. Molina's Death

As is often the case, no one can be sure what killed Ms. Molina, nor will anyone ever know the answer with certainty. Such diagnoses are necessarily inferential and circumstantial.

What cannot be disputed, though, is that with proper medical intervention, Ms. Molina in all likelihood would have lived. That is enough to survive summary judgment. <u>See Rosen v. Ciba-Geigy Corp.</u>, 78 F.3d 316, 318 (7th Cir. 1996) (even a small chance of averting a serious harm may be compensable under Illinois law); <u>Spencer v. Sheahan</u>, 158 F.Supp. 2d 837 (N.D. Ill. 2001) (increased risk of harm based on delay in providing treatment precluded summary judgment in deliberate indifference case).

On that point, the summary judgment record contains testimony from three medical professionals. Plaintiffs summarize this evidence as follows.

### a.    Dr. Adelman's March 2007 Opinion

At Defendants' insistence, discovery in this case proceeded in an awkward, disjointed, and inefficient manner. By persuading the Court to stay everything except what they narrowly called "cause of death," Defendants forced Dr. Adelman to render a series of opinions before the factual record was complete.

To take an example, Dr. Adelman's initial opinions were rendered <u>before</u> Defendants even turned over the Department's C.R. file relating to Ms. Molina's death. Dr. Adelman thus did not have access to the statements of detainee Vacarello (describing Ms. Molina's breathing patterns) or Attorney Bischoff (describing Ms. Molina's symptoms of a diabetic coma). Citing the series of discovery stays, Defendants withheld the critical C.R. file until Plaintiffs' successfully moved to compel the defense to produce it in May 2006 (<u>see</u> R. 77 & 82), which was more than eighteen months after the case was filed.[10]

Plaintiffs objected strongly that Defendants' proposal for handling discovery was not an efficient way to proceed. As a result, Dr. Adelman was forced to render a series of opinions in relative darkness, modifying them as more depositions and other discovery proceeded, as he was gradually able to make more sense of the record.

In March 2007, Dr. Adelman issued his penultimate opinion. In it, Dr. Adelman opined that Ms. Molina's untreated diabetic condition played a significant role in her death. Dr. Adelman relied on witnesses descriptions of somnolence, breathing difficulties, and lethargy, all of which are consistent with someone lapsing into a diabetic coma. According to Dr. Adelman, if Ms. Molina had been hospitalized, a doctor could have noted, for example, whether her skin was cold and clammy, and whether her breathing was in fact Kussmaul Respirations, at which point treatment would have saved her. Dr. Adelman also knocked down the defense argument about the glucose levels noted at the autopsy, noting with citations to the literature (and without

---

[10]    Only recently were Plaintiffs lucky enough to track down Ms. Vacarello, who is referenced in the C.R. file. The other detainees from that night, however, have apparently long since scattered in the winds during the months Defendants maintained unilateral access over their identities and contact information.

contradiction by any defense expert) that the 112 mg/dl vitreous humor reading does not reflect the blood glucose level at the time of Ms. Molina's death, which may well have been considerably higher and reflective of her diabetic state. Id. (citing *Third Edition of Knight's Forensic Pathology Textbook* in which the authors Bernard Knight and Pekka Saukko state on page 90: "In relation to glucose, a common problem is the autopsy diagnosis of uncontrolled diabetes and of hypoglycaemia. The vitreous glucose usually falls after death and can reach zero within a few hours.").

On Defendants' motion, this Court struck Dr. Adelman's March 2007 report. See R. 183, Mem. Op. dated 10/2/07. For purposes of appeal, Plaintiffs preserves their arguments that Dr. Adelman's March 2007 report and the opinions therein were proper and admissible, Jahn, 233 F.3d at 390 ("Medical opinions need not be unchallengeable in order to be admissible. Medical experts are just witnesses, and they need not be purveyors of ultimate truth in order to be allowed on the stand."), but Plaintiffs recognizes that Dr. Adelman's March 2007 opinions were stricken.

### b. The Opinion Of The Medical Examiner, Dr. Choi

Cook County Medical Examiner Dr. Choi concluded that part of the reason Ms. Molina died was that her liver stopped functioning due to cirrhosis (even though he saw none of the signs associated with death by that cause); heart problems due to her obesity (even though her cardiac condition was not identified); and opiate intoxication (even though the amount of morphine in her system was not particularly elevated). P. 56.1 Stmt. ¶ 42.

At the time he determined the cause of death, Dr. Choi did not know or inquire what medications Ms. Molina was taking (including whether she was on any narcotic pain medication), and did not know when Ms. Molina had last taken her medications. P. 56.1 Stmt. ¶ 39. Nor did Dr. Choi know the impact of Ms. Molina missing her medications, though Dr. Choi admits that all of the foregoing information has an impact on evaluating cause of death. Id. ¶¶ 39-40.

Dr. Choi also did not consult any of Ms. Molina's medical records prior to rendering an opinion on the cause of death, even though he admits that such a history is needed to determine if

a decedent died from natural causes. P. 56.1 Stmt. ¶ 41. Dr. Choi reached an opinion even though he never knew that Ms. Molina had been diagnosed with congestive heart failure, sleep apnea, asthma, or what type of diabetes she suffered. Id.

Given the foregoing, if Dr. Adelman's March 2007 opinion was insufficient, there is no way Dr. Choi's opinion would survive Daubert, assuming Defendants disclose it. Every single criticism of Dr. Adelman's March 2007 opinion identified by the defense and the Court in its 10/2/07 Order (i.e., gaps in his knowledge base) applies exponentially to Dr. Choi, who had far less information then Dr. Adelman did in March 2007. Defendants cannot with a straight-face even pretend to suggest otherwise.

Where that leaves things is that Defendants' claim that Ms. Molina died of a heroin overdose is entirely unsupported by the record. There is no competent evidence of that. According to Defendants' own Screening Record, Ms. Molina was taking prescription pain medication, and the morphine levels detected in her body at the time of her death were in the range of therapeutic, not toxic. P. 56.1 Stmt. ¶¶ 8, 42-43.

Thus, all of Defendants' suggestions that Ms. Molina died of a heroin overdose must therefore be stricken. There is no valid evidence in the record to support that claim.[11]

c.    **Dr. Adelman's January 2008 Opinions**

Dr. Adelman rendered new opinions in January 2008. Before going any further, Plaintiffs need to make clear that there is no dispute that Adelman's January 2008 report is timely.

In that regard, the parties presented the Court an agreed motion to extend all expert discovery until February 15, 2008. R. 201. The Court granted that motion. R. 222. At Defendants' request, that date has been pushed back again to March 15. See Exhibit U. Both sides have thus stipulated in writing that any report (by Plaintiff or the Defendants) served on or before March 15 is timely. Id.

---

[11]    This distinguishes our case from the Sixth Circuit case relied upon so heavily by the defense. See Weaver v. Sahoan, 340 F.3d 398 (6th Cir. 2003) (undisputed cause of plaintiff's death was lethal ingestion of cocaine).

Defendants' incentive to make that agreement was obvious: they served <u>no</u> expert opinions before the Court's deadlines. They have now gotten multiple extensions to disclose experts. But this obviously has to be a two-way street. Defendants have received more time to disclose experts, but in the process, they have agreed that Plaintiffs' reports are equally timely. Thus, by agreement of the parties, Adelman's January 2008 report is timely, and must be considered for purposes of summary judgment.[12]

Turning to the substance, Dr. Adelman's January 2008 opinions (which have cured the Daubert problems previously raised by the defense) are that Ms. Molina's death was attributable to the denial of her medications. For the reasons described above, Ms. Molina's heart, thyroid, and diabetic conditions required powerful medications and careful monitoring, without which she would die. P. 56.1 Stmt. ¶¶ 46, 48. According to Dr. Adelman, Ms. Molina would likely have lived had she been brought to the hospital even as late as the time her lawyer (Bischoff) visited her. P. 56.1 Stmt. ¶ 48. Treatment of her condition in the form of monitoring her blood sugar and titrating her oral antidiabetic and other medications likely would have prevented her fatal coma. <u>Id.</u> Defendants have offered no evidence to rebut that opinion.[13]

### d. Dr. Carter's Opinions

Plaintiffs have proffered Dr. Carter in the alternative. A qualified pathologist, Dr. Carter opines that even if the Court were to assume that Ms. Molina died of a heroin overdose, the fact that Defendants denied her medical attention was nevertheless a proximate cause of her death. As described more fully above, according to Dr. Carter's testimony, had Ms. Molina received the treatment associated with a drug overdose at around the time her lawyer demanded medical

---

[12]    Plaintiffs appreciate that the Court may resent having been asked by the defense to spend the judicial resources in resolving a premature <u>Daubert</u> motion, only to have the defense keep pushing back the final deadline for expert reports. Plaintiffs, too, have been complaining that Defendants have turned the entire case on its head over the past four years by continually trying to put the cart (*e.g.*, summary judgment) before the horse (discovery).

[13]    Dr. Adelman also opined about why Dr. Choi's overdose theory was incorrect, but that discussion is not necessary because Dr. Choi does not come anywhere close to meeting the threshold <u>Daubert</u> test set forth by the Court in its order barring Dr. Adelman's March 2007 opinion.

attention for her, she would have lived. P. 56.1 Stmt. ¶ 47. This is because timely medical intervention is effective at preventing death due to opiate intoxication.

As stated, for purposes of summary judgment, there is no competent evidence that Ms. Molina died of drug overdose. None. That said, Dr. Carter's testimony closes the loop. Even if the drugs were part of the cause of Ms. Molina's death, it was still unreasonable to deny her medical attention because under that scenario, medical attention would have saved her life. Carroll v. Morgan, 17 F.3d 787, 790 (5th Cir. 1994) ("The plaintiff's argument that three testifying pathologists disagreed with Dr. Bennett's opinion as to the cause of Carroll's death does not disqualify Bennett as an expert; the conflict among the expert testimony was grist for the jury").

**C.      Plaintiff Has Alleged Sufficient Personal Responsibility on the Part of the Various Defendants to Survive Summary Judgment**

Defendants in this case have asserted a classic "hot potato" defense: for nearly four years, Plaintiff has been frustrated in trying to ascertain exactly who was responsible for failing to provide Ms. Molina medical attention. This has proved no easy task. The arresting officers and intake people insist they passed off responsibility to the Lockup people, who in turn claim not to have known that Ms. Molina previously disclosed medical problems or the need for medication. The desk worker who took the "five to ten calls" from Ms. Molina's family trying to bring the medications insists that she did nothing about that information because it was "not her job." Meanwhile, the supervisory people all hide behind the fact that they never actually laid eyes on Ms. Molina. All of the above insist their hands were tied by the Department's counter-intuitive policies, prohibiting, for example, medications in the Lockup.

In response to Interrogatories seeking to identify the parties responsible for Ms. Molina's medical care, Defendants took the cautious approach and incorporated documents listing all of the employees on duty at the time. Unable to get any satisfactory narrowing by the defense, Plaintiffs took the cautious approach and named them all, particularly when statutes of limitations became a factor.

On the positive side, such an approach protects Plaintiffs from the undesirable situation where Defendants point to an empty chair, blaming unnamed personnel as being the supposedly responsible party. As it stands, Defendants cannot blame anyone on summary judgment or at trial; if you credit their position, literally *no one* was responsible for the decision not to take Ms. Molina to the hospital.

On the negative side, at least two undeserving personnel have been named in a lawsuit. In fairness, Defendants' own pursuit of so many discovery stays prevented Plaintiff from conducting all of the necessary discovery before the statute of limitations became an issue, and things might have been different had discovery proceeded without the defense-imposed discovery restrictions. But the net result of all of this has been that, in retrospect, two of the Defendants have no culpability and did not deserve to be sued, which is unfortunate. To these two individuals, Plaintiffs apologize.[14]

With respect to the remaining Defendants, it is Plaintiffs' position that a jury could find the following individual liable under Section 1983 for the tort alleged by Plaintiffs here.

### 1. The Lockup Keeper Personnel

There is sufficient evidence that Defendants Jamison, Pryor, Lemon, Ziemba, Gilchrist, Yost, Ramirez, and Gomez had direct notice of Ms. Molina's medical condition.

Defendant Jamison and Pryor processed Ms. Molina and learned of her serious medical need at that time. Jamison documented and distributed a Screening Record stating that Ms. Molina said she had a "serious" medical condition. That report also indicated that Ms. Molina took medications for diabetes, a thyroid condition, and for pain. P. 56.1 Stmt. ¶¶ 6-8. Both Jamison and Pryor also observed Ms. Molina's labored movements and deteriorating condition. Id. ¶ 13.

---

[14] Specifically, Elpercy Nichols, who had been identified by Defendants as someone who might have had a role in Ms. Molina's treatment in custody, was in the male lockup, not the women's. Similarly, desk officer Connolly claims to have had no interaction with the case other than taking the call that Ms. Molina was dead. Plaintiffs do not oppose summary judgment in favor of either of these two Defendants.

Molina's lawyer, Jerry Bischoff, came to the 19th District lockup and visited with Ms. Molina and saw that she was groggy, could not talk, and became winded after taking one to two minutes to slowly walk 10-15 feet. Defendants Gilchrist and Yost were present when Attorney Bischoff saw her in that condition, and a jury could conclude that they too were, therefore, on notice of her need for medical attention. P. 56.1 Stmt. ¶ 14-16, 21.

Moreover, after meeting with Ms. Molina, Attorney Bischoff put Defendants Yost and Gilchrist on notice that Ms. Molina was obviously in distress and needed to get to a hospital because of her medical condition. Crediting Plaintiffs' evidence, Defendants Yost and Gilchrist admitted to him that they knew Ms. Molina needed medical help because they told him that they were working on it.

As for Defendant Ramirez, she admits to having received as many as ten phone calls over the 30 hour period from people attempting to get Ms. Molina her medications. According to Ramirez, she did nothing with this information because it was not part of her job. P. 56.1 Stmt. ¶¶ 23-24. See also Def. Memo at 18 (arguing that Ramirez "was not overly concerned"). Ramirez is entitled to explain her sentiments to a jury, but summary judgment in her favor is not appropriate.

As described in P. 56.1 Stmt., Defendant Ziemba arrived in the lockup shortly after that processing and also learned about Ms. Molina's medical needs. Id. ¶¶ 12-13. Defendants Jamison and Gomez were both Lockup keepers working in the Belmont and Western women's Lockup from May 25, 2004 at 9:30 a.m. to May 26 at 5:30 a.m., i.e., during the same early morning hours that Ms. Molina died. P. 56.1 Stmt. ¶ 36.

Ms. Molina herself reported her medical need during the evening of May 25 when a new arrestee was brought to the lockup, and Ms. Molina asked Defendant Gomez about her medication. Her request was ignored. Just before her death, Ms. Molina and a fellow inmate each called out for assistance from the guards, but those calls were answered by indifference, when Gomez and/or Jamison told them to "shut the f--- up." P. 56.1 Stmt. ¶ 30.

25

Were there any lingering doubt, Plaintiffs have proffered evidence that various Defendants lied about their purported observations. Lemon and Gomez, for instance, claim to have conducted regular cell checks during which Plaintiff appeared "fine," but for purposes of resolving this motion, these assertions are lies. Cf. United States v. Schwartz, 787 F.2d 257, 263 (7th Cir. 1986) ("false denials may be the basis for an inference of guilt").

At trial, these cell-check Defendants should not be permitted to assist the other Defendants by testifying that they saw Plaintiff in no distress without also admitting that they were ones responsible for making that assessment. To the extent they insist (falsely) that they did conduct the disputed cell checks, during which Plaintiff was supposedly in good shape, summary judgment is unavailable to them on this record. Cf. United States v. Smith, 223 F.3d 554, 577 (7th Cir. 2000) ("the false information on the loan application permitted the jury to infer that Wilson had something to hide about the source of the funds [and] could legitimately have been interpreted by the jury" to draw circumstantial inferences).

### 2. The Arresting Officers

There is evidence that the officers who searched Ms. Molina's home and arrested her were on notice of Ms. Molina's fragile medical condition as they took her into their custody during the evening of May 24, 2004. These include Spencer; Haljean; Stasch; Saldana; Isakson; Gaynor; Nasser; Baeza; Espinosa; and Dejesus.

As a threshold matter, it would be fundamentally unfair to dismiss Plaintiffs' claims against the searching/arresting officers before Plaintiffs have been allowed to complete discovery with respect to those Defendants. Discovery as to all issues outside of the cause of Ms. Molina's death was stayed until November 14, 2007, and then (after a change of attorneys by the Defendants and some time to get up to speed) the arresting officers are only now being produced by Defendants for their depositions.

With respect to what has been discovered so far, Defendant Spencer has admitted that the arresting officers did not permit Ms. Molina to bring her medications with her to Lockup. P. 56.1 Stmt. ¶ 3. That may or may not be the policy of the Department, but a jury could find that it

was objectively unreasonable, particularly if these arresting Defendants took no steps to ensure that something was done to address the situation.

With respect to Spencer's story, two of Ms. Molina's family members have sworn affidavits that Ms. Molina could not live without her medications, which she took regularly at the prescribed doses and times, and that Ms. Molina never went anywhere for more than a few hours without them because it was a matter of life and death. Id. In a classic summary judgment dispute, Spencer has sworn an affidavit stating that "Ms. Molina assured me that she did not need any of her medications." Id. Only a jury can resolve this dispute.

### 3. The Supervisory Defendants

Defendants Wallace (watch commander), Holmes (watch secretary), Torres (acting desk sergeant), Giorango (lieutenant), Becker (captain), and DeFranco (desk sergeant) were the supervisors on duty at the time Ms. Molina descended into a coma and died without any of their subordinates responding.

Defendants are undoubtedly correct that none of these supervisors were responsible in the first instance for monitoring Ms. Molina's condition, performing cell checks, or the like. That said, these are the individuals with whom "the buck stops" for the decisions that were made over the 30 hours that preceded Ms. Molina's death. If the Court were to allow them out of the case, the Lockup Defendants would undoubtedly turn around at trial and argue: "don't blame me, the decision not to take Ms. Molina to the hospital was up to the boss." See P. 56.1 Stmt. ¶ 26 (supervisors are responsible for the decision to transport).

### III. The City Is Not Entitled To Summary Judgment

In this case, like many others, the City was very anxious to avoid subjecting its policies and practices to constitutional scrutiny. Accordingly, at a hearing before your Honor, the City offered, and Plaintiff has accepted, a stipulation that would avoid the need to try the Monell claims in exchange for an agreement that Plaintiff could have what he would have had if he had proved a Monell claim: a stipulation by the City that it will allow judgment to be taken if Plaintiff can prove at trial that "any employee" violated his rights.

27

Pursuant to their agreement, the parties have exchanged drafts of this stipulation, which has not yet been reduced to writing and filed. In any event, to the extent the present motion seeks judgment in the City's favor, that has been superceded by the parties' agreement.

## IV.  Qualified Immunity Is Unavailable On This Record

This is simply not a qualified immunity case. State actors have long been on notice that detainees have a right to necessary medical care. E.g., Estelle v. Gamble, 429 U.S. 97, 104 (1976).

Indeed, by their own admission, Defendants' half-hearted qualified immunity position collapses into the suggestion that they were not indifferent to Ms. Molina's needs because, according to them, she displayed no "outward appearances of physical distress." See Def. Memo at 22-23. That a contention that cannot be maintained without ignoring large swathes of the record, rendering summary judgment unavailable on this basis.

## V.  Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Claim For Intentional Infliction of Emotional Distress

In order to prove this claim, Plaintiffs must establish: (1) extreme and outrageous conduct; (2) intent to inflict severe emotional distress or knowledge that there was a high probability that her conduct would do so; and (3) severe emotional distress suffered by Plaintiff. Feltmeier v. Feltmeier, 207 Ill. 2d 263, 268-269 (2003). Based on the evidence discussed above, there is more than enough to support each element here.

As to the first and second elements, Defendants ignored the pleas of Ms. Molina, her fellow detainee, her family, and her lawyer for help. The only response Ms. Molina received was to "shut the f--- up," coupled with laughter. Defendants told her lawyer they were "working on" getting her to a hospital, but what they were really doing was letting her slowly die in her cell. Even when her breathing became more shallow and then stopped, a fellow detainee was unable to summon help. A reasonable jury could conclude that letting a helpless person die in that manner is "outrageous in character" and "extreme in degree" such that it "go[es] beyond all possible bounds of decency." Public Finance Corp. v. Davis, 360 N.E.2d 765, 767 (1976).    F

Finally, there is presumably no dispute that letting someone die in a cell will inflict (or is highly probable to inflict) emotional distress. Accordingly, summary judgment is not proper.

## V.    Defendants Have Misconstrued Plaintiffs' Claim For Respondeat Superior

Defendants claim correctly that a municipality cannot be held liable under Section 1983 merely because it employs a tortfeasor. Plaintiffs do not claim otherwise. Rather, under Illinois law, the City of Chicago is liable for all of the torts committed by its employees in the course of their employment. See Brown v. King, 328 Ill. App. 3d 717, 722, 767 N.E.2d 357 (1 Dist. 2001).

### Conclusion

Regardless of the cause of her death, May Molina had a constitutionally-protected right to receive necessary medical care while in Defendants' custody. Despite warnings from Ms. Molina herself, a concerned family member, a fellow prisoner, and her lawyer that she needed immediate medical assistance, Defendants allowed Ms. Molina to deteriorate and die in her cell -- all because it was easier than arranging a ride to the hospital.

Defendants concede, as they must, that Ms. Molina had a serious medical condition before she died, and Plaintiffs have more than enough evidence for a reasonable jury to find that Defendants identified above were on notice of the need for assistance. Only a jury can properly resolve the disputes of fact in this record, and Defendants' summary judgment motion must be denied.


RESPECTFULLY SUBMITTED,

S/ Mark Reyes

Attorneys for Plaintiff
Arthur Loevy
Mark Reyes
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607

CERTIFICATE OF SERVICE

I, Mark Reyes, an attorney, certify that on February 11, 2008, I served this document by ECF electronic filing as to each party who is represented by counsel who uses electronic filing.

S/Mark Reyes
Attorneys for Plaintiff