IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

APRIL ORTIZ, on her own behalf     )
and as administrator of the           )
ESTATES OF MAY MOLINA and MICHAEL   )
ORTIZ, and SHANNON GUZMAN,       )     04 C 7423
                            )
           Plaintiffs,           )     Judge Grady
                            )
           v.                )
                            )
CITY OF CHICAGO, et al.          )
                            )
           Defendants.         )

## PLAINTIFFS' LOCAL RULE 56.1(b)(3)(A)
## STATEMENT OF ADDITIONAL FACTS

Now come Plaintiffs, by their attorneys, LOEVY & LOEVY, pursuant to Local Rule

56.1(b)(3)(A), and in opposition to Defendants' Motion for Summary Judgment hereby submit

the following Response to Defendant's Statement of Material Facts:

### THE PARTIES

1.    Plaintiffs the Estate of Michael Ortiz ("Ortiz"), Shannon Guzman, April Ortiz and the Estate of May Molina ("Molina") (collectively "Plaintiffs") and All Individual Defendants are citizens of the state of Illinois and the City of Chicago is an entity subject to jurisdiction in the state of Illinois.

**Response**:    Plaintiffs admit.

### JURISDICTION AND VENUE

2.    Plaintiffs assert that subject matter jurisdiction exists with respect to their civil rights violation claims pursuant to 28 U.S.C. § 1331.

**Response**:    Plaintiffs admit.

3.    Plaintiffs assert that venue is proper pursuant to 28 U.S.C. § 1391(b).

**Response**:    Plaintiffs admit.

4.    Defendants Spencer, Haljean, Gaynor, Baeza, Isakson, Espinosa, Nasser, DeJesus, Saldana and Stasch executed a warrant at Plaintiff Molina and Mr. Ortiz's homes on May 24, 2004.

**Response:**    Plaintiffs object to the inclusion of this statement and move under Rule 56(f) to be excused from answering it at this time because, on Defendants' motion and the serial discovery "stays" they persuaded the Court to approve, Plaintiffs have been stayed from conducting depositions and other discovery concerning these allegations.  Plaintiffs deny that the above Defendants executed a valid search warrant at May Molina's or Michael Ortiz' home because they have not yet been permitted to take the depositions of all of the above Defendants, much less identify the basis under which the warrant is supposedly valid.

5.    Plaintiff Molina exhibited no apparent signs of physical distress and made no requests for medical attention or medication prior to her transportation to the 19th District lockup.

**Response:**    Plaintiffs deny.  May Molina showed signs of shortness of breath and had difficulty moving during and after her arrest.  Exhibit A, Shannon Guzman affidavit.  Defendant Spencer also observed May Molina during the evening of May 24, 2004 and noted that she had difficulty walking and that she "became winded by walking even a short distance within the apartment." *Exhibit 2 to Defendant's Rule 56.1 Statement.*

6.    Prior to taking Molina to the 23rd District to begin processing, Defendant Spencer asked Molina if she needed to take any of the prescription medication that he saw on her dresser during the execution of the warrant. She responded that she did not, even though Spencer told her that he could not predict how long she would be held in lockup.

**Response:**    Plaintiffs object to the inclusion of this statement and move under Rule 56(f) to be excused from answering it because, on Defendants' motion and the serial discovery "stays" they persuaded the Court to approve, Plaintiffs have not yet been permitted a full and fair opportunity to complete discovery on these issues.

Plaintiffs further deny this statement based on the Affidavits of April Ortiz and Shannon Guzman. *See Exhibits A and S.*  Shannon Guzman, who was present when May Molina was arrested, heard nobody ask May Molina about her medications. *See Exhibit A.*  April Ortiz avers based on personal knowledge that her mother would never voluntarily refuse to be away from her prescription medication, which Ms. Molina needed to stay alive. *See Exhibit S.*

7.    Defendants Spencer, Haljean, Stasch, Saldana, Isakson, Gaynor, Nasser, Baeza, Espinosa and DeJesus did not see Plaintiff Molina after she was arrested and processed in the early morning hours of May 25, 2004.

**Response:**    Plaintiffs object to the inclusion of this statement and move under Rule 56(f) to be excused from answering it because, on Defendants' motion and the serial discovery "stays" they persuaded the Court to approve, Plaintiffs have not yet been permitted a full and fair opportunity to complete discovery on these issues.

### Plaintiff Molina at the 19th District's Lockup

8.    Plaintiff Molina was sickly and generally in poor health.

**Response:**    Plaintiffs admit.

9.    Plaintiff Molina was extremely obese, measuring approximately 5'5" and weighing 326 lbs.

**Response:**    Plaintiffs admit that May Molina was obese and that she weighed around 300 lbs. at her death. Plaintiffs deny that the citations record May Molina's height at 5'5."

10.    When Molina first arrived at the District 19 lockup, Defendant Jamison processed her by completing the arrest report. During that process, Molina informed Defendant Jamison that she took medication for diabetes, a thyroid condition, and pain in her legs.

**Response:**    Plaintiffs admit.

11.    Defendant Jamison observed that Molina did not have any trouble speaking or breathing.

**Response:**    Plaintiffs denies. Instead, the evidence supports that Ms. Molina had difficulty breathing after any limited movement on the night of her death from the time she was arrested through the time she died. *Exhibit A, Shannon Guzman affidavit.* Defendant Spencer also observed Ms. Molina during the evening of May 24, 2004 and noted that she had difficulty walking and that she "became winded by walking even a short distance within the apartment." *Exhibit 2 to Defendant's Rule 56.1 Statement.* Attorney Jerry Bischoff, a lawyer since 1986, observed Ms. Molina at approximately 4:00 p.m. on May 25, 2004; as he tried to interact with her, Attorney Bischoff observed that Ms. Molina appeared groggy and tired, was out of breath,

breathing rapidly, and could not stand up without leaning on the table. *Exhibit B, Bischoff Dep.* *at 12-13, 15-16, 19, 37-39, 47, 51-52.* During the approximately 10 minute meeting, Ms. Molina never caught her breath. *Id. at 12-13, 16. See also id. at 38 ("She was having difficulty breathing.")* Her breathing was so bad she could barely talk (*Id. at 14, 16*) and the only thing that prevented Ms. Molina "from falling flat on her face" was the table in the interview room. *Id. at 46-47.*

12. When Defendant Jamison asked Molina if she needed to go to the hospital during the intake process, Molina responded that she did not need to go to the hospital and that she was fine. Plaintiff Molina never told Defendant Jamison that she needed to see a doctor.

**Response:** Plaintiffs denies. Ms. Molina never said she was "fine" during the intake process; to the contrary, the document created by Jamison indicates Ms. Molina said she had a "serious medical [] need" which required medications. *Exhibit R.* Moreover, at best, the evidence shows that Ms. Molina declined to go to the hospital during the intake process because she wished to quickly conclude the intake process quickly so that she could go to court and then home. *Exhibit G, Pryor Dep., 17:12-16; 27:16-28:1; 35:21-36:11, 61:11-62.5.*

13. Defendant Jamison observed Molina's legs during the intake procedure but could not ascertain whether Plaintiff Molina's legs were swollen. Defendant Torres also was unable to ascertain if Molina's legs were swollen.

**Response:** Plaintiffs object to this statement based on foundation and relevance. Without waiving those objection, Plaintiffs admit that the citations support that both Defendants Jamison and Torres testified that they had no basis to determine whether Ms. Molina's were swollen or not.

14. When Defendant Jamison processed Molina, she did not think that Molina was under the influence of alcohol or drugs because Molina was not behaving in an unusual manner, there were no visible signs of intoxication, she did not smell like an intoxicated person, she was calm, polite and cooperative, and she generally appeared fine to Defendant Jamison.

**Response:** Plaintiffs admit that Ms. Molina did not appear to be under the influence of illegal drugs, but denies the remainder of this Paragraph. First, on the Screening Record,

Jamison checked the box "Serious Medical [] Need." *Exhibit R*. Second, Ms. Molina could barely breathe and was in obvious need of hospitalization. *See Plaintiffs' Response to Paragraph 11 and the record citations therein.* Furthermore, Attorney Bischoff observed Ms. Molina, and concluded that she was "clearly sick" and needed to be taken to Cermak Hospital because she "clearly is not well." *Exhibit B, Bischoff Dep. at 17, 30-31.*

15.     Plaintiff Molina did not tell Defendants Jamison or Pryor how frequently she had to take any of her medication.

**Response:**     Plaintiffs deny that the citations state these facts. Rather, the citations are admissions by Defendants Jamison and Pryor that Defendants never inquired about the nature or frequently of Ms. Molina's medications. *See also Exhibit D, Jamison Dep. at 30:16-31:10.* This is because there is no Chicago Police Department policy to require a Lockup officer taking control of a detainee to ask about the need, type, or frequency of medication that an incoming detainee is taking. *Exhibit D, Jamison Dep. at 24:8-18, 25:20-24, 27:18-21, 28:2-29:8.* Nor has the Chicago Police Department trained its officers to ask about the name or type of medication or the frequency that the medication needs to be taken by a person who enters its custody is taking. *Id. at 25-26.* Defendant Jamison therefore did not inquire as to how often she needed the diabetes medication because that is not something that officers usually ask. *Id. at 23-25, 27; Exhibit G, Pryor Dep. at 58:20-24.*

16.     Defendant Jamison never verbally told anybody about Molina's medical condition.

**Response:**     Plaintiffs admit.

17.     Defendant Pryor asked Molina if she was sick, injured or needed medical assistance before accepting her into lockup. Plaintiff Molina responded in the negative and stated that she just wanted to go to court.

**Response:**     Denied. Though Ms. Molina is not alive to rebut this statement directly, the document from this encounter (the Lockup Screening Record) indicates that Ms. Molina expressed a "serious medical [] need" that required medications. Ignoring that, the most that these citations support is that when Ms. Molina first entered the lockup area, at or about 4:25

5

a.m. on May 25, 2004, one day before she died, Defendant Pryor generally asked her if she needed medical attention and that Ms. Molina merely expressed her expectation that she did not want medical attention so that she could get to court and leave their custody.

18. While Defendant Pryor noticed that Molina walked slowly, Molina did not have labored breathing, and she breathed normally.

**Response:** Plaintiffs deny. The evidence supports that Ms. Molina had difficulty breathing after any limited movement from the time she was arrested through the time she died. *Exhibit A, Shannon Guzman affidavit.* Defendant Spencer also observed Ms. Molina during the evening of May 24, 2004 and noted that she had difficulty walking and that she "became winded by walking even a short distance within the apartment." *Exhibit 2 to Defendant's Rule 56.1 Statement.* Attorney Jerry Bischoff, a lawyer since 1986, observed Ms. Molina at approximately 4:00 p.m. on May 25, 2004; as he tried to interact with her, Attorney Bischoff observed that Ms. Molina appeared groggy and tired, was out of breath, breathing rapidly, and could not stand up without leaning on the table. *Exhibit B, Bischoff Dep. at 12-13, 15-16, 19, 37-39, 47, 51-52.* During the approximately 10 minute meeting, Ms. Molina never caught her breath. *Id. at 12-13, 16. See also id. at 38 ("She was having difficulty breathing.")* Her breathing was so bad she could barely talk (*Id. at 14, 16*) and the only thing that prevented Ms. Molina "from falling flat on her face" was the table in the interview room. *Id. at 46-47.*

19. Plaintiff Molina spoke normally to Defendant Pryor and did not exhibit slurred speech.

**Response:** Plaintiffs deny the conclusion that Molina spoke normally to Defendant Pryor. *See Plaintiffs' Response to Paragraph 18.* Furthermore, Attorney Bischoff observed Ms. Molina who was in such substantial distress that it was pointless to try to talk to her because she could not even answer audibly. *Exhibit B, Bischoff Dep. at 14, 16, 36-39.* For the most part, Ms. Molina was not even able to answer orally to all of his questions, but she gestured. *Id. at 14, 16.* From what Attorney Bischoff observed, the only thing that prevented Ms. Molina "from falling flat on her face" was the table in the interview room. *Exhibit B, Bischoff Dep. 46-47.*

20. Defendant Pryor repeatedly asked Molina if she was okay and if she needed assistance, including asking her if she needed assistance walking and if she wanted to go to the hospital. Each time Molina responded that she was fine, refused any medical assistance, and stated that she wanted to conclude the intake process so that she could go to court.

**Response:** Plaintiffs deny. When Attorney Bischoff observed that Ms. Molina was in obvious distress and demanded that she be taken to a hospital for medical attention, the Lockup keepers told him "they were working on it." *Exhibit B, Bischoff Dep. at 17, 30-31.* Moreover, the cited deposition testimony concerns only one initial conversation between Ms. Molina and Defendant Pryor when Ms. Molina was being processed. It mischaracterizes the testimony to refer to the questions and answers as repeated.

21. Defendant Pryor conveyed the following information about Molina's medical condition: (a) Defendant Pryor informed Defendants Ziemba and Becker that Molina would need a special needs car to transport her to court that day; and (b) Defendant Pryor informed Defendant DeFranco that someone would be bringing Molina Depends diapers and a walker later that day.

**Response:** Plaintiffs admits.

22. Plaintiff Molina did not appear to be intoxicated to Defendant Pryor.

**Response:** Plaintiffs admit that Ms. Molina was not intoxicated (due to drugs or alcohol) but deny that she did not have the appearance of someone in similar distress. Ms. Molina was groggy, out of breath, breathing rapidly, and could not stand up without leaning on things. *Exhibit B, Bischoff Dep. at 12-13, 15-16, 19, 37-39, 47, 51-52.* She could not even have a conversation because she could not speak. *Id. at 14, 16, 36-39.*

23. Defendants Yost and Gilchrist observed Molina breathing normally while she was in her cell.

**Response:** Plaintiffs deny. Ms. Molina had difficulty breathing after any limited movement on the night of her death from the time she was arrested through the time she died. *Exhibit A, Shannon Guzman affidavit.* Defendant Spencer also observed Ms. Molina during the evening of May 24, 2004 and noted that she had difficulty walking and that she "became winded by walking even a short distance within the apartment." *Exhibit 2 to Defendant's Rule 56.1*

*Statement.* Attorney Jerry Bischoff, a lawyer since 1986, observed Ms. Molina at approximately 4:00 p.m. on May 25, 2004; as he tried to interact with her, Attorney Bischoff observed that Ms. Molina appeared groggy and tired, was out of breath, breathing rapidly, and could not stand up without leaning on the table. *Exhibit B, Bischoff Dep. at 12-13, 15-16, 19, 37-39, 47, 51-52.* During the approximately 10 minute meeting, Ms. Molina never caught her breath. *Id. at 12-13, 16. See also id. at 38 ("She was having difficulty breathing.").* Her breathing was so bad she could barely talk (*Id. at 14, 16)* and the only thing that prevented Ms. Molina "from falling flat on her face" was the table in the interview room. *Id. at 46-47.*

24. Defendants Yost and Gilchrist observed Molina sleeping the entire time they were on duty, except when Molina woke up to visit her attorney, Jerry Bischoff ("Bischoff").

**Response:** Plaintiffs object to this statement based on foundation. Without waiving that objection, Plaintiffs state that Defendant Gilchrist's deposition does not support this statement. Plaintiffs admit that Defendant Yost's deposition testimony was that she only observed Ms. Molina sleeping in her cell.

25. Defendant Gilchrist never had any formal training regarding how to evaluate medical conditions that might require treatment.

**Response:** Plaintiffs admit.

26. Plaintiff Molina did not appear to be sick to Defendant Gilchrist, nor did Molina indicate that she was in any pain.

**Response:** Plaintiffs deny the conclusion that Molina did not appear to be sick to Defendant Gilchrist. Ms. Molina had difficulty breathing after any limited movement on the night of her death from the time she was arrested through the time she died. *Exhibit A, Shannon Guzman affidavit.* Defendant Spencer also observed Ms. Molina during the evening of May 24, 2004 and noted that she had difficulty walking and that she "became winded by walking even a short distance within the apartment." *Exhibit 2 to Defendant's Rule 56.1 Statement.* Attorney Jerry Bischoff, a lawyer since 1986, observed Ms. Molina at approximately 4:00 p.m. on May 25, 2004; as he tried to interact with her, Attorney Bischoff observed that Ms. Molina appeared

groggy and tired, was out of breath, breathing rapidly, and could not stand up without leaning on the table. *Exhibit B, Bischoff Dep. at 12-13, 15-16, 19, 37-39, 47, 51-52.* During the approximately 10 minute meeting, Ms. Molina never caught her breath. *Id. at 12-13, 16. See also id. at 38 ("She was having difficulty breathing ").* Her breathing was so bad she could barely talk (*Id. at 14, 16*) and the only thing that prevented Ms. Molina "from falling flat on her face" was the table in the interview room. *Id. at 46-47.*

Attorney Bischoff observed Ms. Molina, and concluded that she was "clearly sick" and needed to be taken to Cermak Hospital because she "clearly is not well." *Exhibit B, Bischoff Dep. at 17, 30-31.* Those observations were made in the presence of both Defendants Yost and Gilchrist. *Exhibit B, Bischoff Dep. at 17, Exhibit H, Yost Dep. at 39:1-3,7-17, 44:7-14, 51:21-52:4, Exhibit I, Gilchrist Dep. at 33:22-35:22, Exhibit C, Defendants' Answer to Plaintiff April Ortiz' First Set of Interrogatories, No. 7.*

27. Bischoff interviewed Molina on May 25, 2004 and determined that she could wait until after her bond hearing the following day to obtain medical attention. Molina agreed.

**Response:** Plaintiffs deny. The cited references do not support the conclusion identified in paragraph 27. Attorney Bischoff testified that it was his opinion that Ms. Molina needed immediate medical attention and he told that to the two lockup keepers who accompanied Ms. Molina. *Exhibit B, Bischoff Dep. at 17, 30-31.*

28. Defendant Torres was the acting Desk Sergeant on duty at the time that Bischoff visited Molina.

**Response:** Plaintiffs admit.

29. Bischoff never spoke with Defendant Torres regarding Molina's health. He only inquired where and when Molina's bond hearing would take place.

**Response:** Plaintiffs admit.

30. Molina's own attorney did not believe that she appeared to be under the influence of heroin hours before her death.

**Response**: Plaintiffs admit that she did not appear to be under the influence of heroin because she was not. What Attorney Bischoff described is consistent with someone lapsing into a fatal thyroid condition called myxedemia and a diabetic coma, both due to denial of Ms. Molina's medications. *Exhibit N, Adelman 1/8/08 Aff. at pp 3-4.* With respect to what Attorney Bischoff saw and believed, Ms. Molina was "clearly sick" and needed to be taken to Cermak Hospital because she "clearly is not well." *Exhibit B, Bischoff Dep. at 17, 30-31.* She was groggy and tired, was out of breath, breathing rapidly, and could not stand up without leaning on the table. *Id. at 12-13, 15-16, 19, 37-39, 47, 51-52.* Finally, Plaintiffs deny that Mr. Bischoff testified specifically or competently about whether or not Ms. Molina appearing to be under the influence of heroin.

31. Defendant Gomez never had any conversations with anybody regarding Molina's medical condition and had no knowledge of Molina's medical condition during the time Molina was in lock up.

**Response:** Plaintiffs deny. As a threshold matter, the citations do not provide a basis to claim that Defendant Gomez had not knowledge of Ms. Molina's medical condition. Further, the Screening Record put all Lockup keeper personnel on notice that Ms. Molina had a "serious medical [] need." *Exhibit R.* Moreover, as Defendant Gomez worked in the Lockup with Defendant Jamison during the evening/early morning hours on May 25-26, 2004, another detainee was brought into the lockup. *Exhibit F, Vaccarello Affidavit.* As she was being escorted into the lockup by Defendant Gomez, and also in the presence of Defendant Jamison, Ms. Molina asked or said something about her medications. *Exhibit F, Vaccarello Affidavit; Exhibit J, Gomez Dep. at 71:21-24.*

32. Defendant Gomez never spoke with Molina or heard her say anything to anybody regarding needing medical attention.

**Response:** Plaintiffs deny. See Response to Paragraph 31.

33. Each time Defendant Gomez observed Molina during her routine 15 minute checks, Molina was sleeping soundly and breathing normally.

**Response:**    Plaintiffs deny that Gomez conducted routine 15 minute checks; none of the required cell checks were performed on the night Ms. Molina died. *Exhibit F, Vaccarello Aff.* ¶¶ 5-6. Plaintiffs also deny that Ms. Molina was sleeping and breathing normally. Rather, Ms. Molina was awake for periods of time and spoke with Gomez and Jamison – at least one time, she also called to Jamison and Gomez for help, but they told her to "shut the fuck up." *Id.* ¶¶ 9-12.

34.    Defendant Gomez has not had any medical training.

**Response:**    Plaintiffs object based on foundation and because the citations do not support the broad statement. On that basis, Plaintiffs deny.

35.    When Defendant Jamison began her shift on the evening of May 25, 2004, she spoke with Defendant Yost who told her that Molina and the rest of the prisoners were fine.

**Response:**    Plaintiffs object to this based on foundation and hearsay. Without waiving those objections, Plaintiffs state that Ms. Molina was not fine, and that no Lockup keeper could have said so. *See Response to Paragraph 30.*

36.    Plaintiff Molina slept throughout Plaintiff Jamison's entire May 25-May 26, 2004 shift.

**Response:**    Plaintiffs deny. Ms. Molina was awake for periods of time and spoke with Gomez and Jamison — at least one time, she also called to Jamison and Gomez for help, but they told her to "shut the fuck up." *Exhibit F, Vaccarello Aff.* ¶¶ 9-12.

37.    Plaintiff Molina told Defendants Ziemba and Pryor that she did not want to go to the hospital. Molina was "adamant" in her representations to Defendant Ziemba that she did not wish to go to the hospital.

**Response:**    Plaintiffs denies. Ms. Molina never said she was "fine" during the intake process; to the contrary, document created by Jamison indicates Ms. Molina said she had a "serious medical [] need." *Exhibit R.* Moreover, at best, the evidence shows that Ms. Molina declined to go to the hospital during the intake process because she wished to quickly conclude the intake process quickly so that she could go to court and then home. *Exhibit G, Pryor Dep.,*

11

*17:12-16; 27:16-28:1; 35:21-36:11; 61:11-62:5.* There is no documentation of any refusal of medical care. *Exhibit P, Wallace Dep. at 33:14-21.*

38.     Defendant Ziemba did not observe Molina walking, so she had no awareness of any trouble in that regard.

**Response:**      Plaintiffs deny. Ziemba testified that she was present in the lockup when Ms. Molina was using the telephone and that while she was there, Ms. Molina went from the telephone to a cell. *Exhibit Q, Ziemba Dep. at 52:15-21.* It took Ms. Molina one to two minutes to walk 10 to 15 feet in Bischoff's presence. *Exhibit B, Bischoff Dep. at 10-11.* It took Ms. Molina approximately seven minutes to walk 25-30 feet in Pryor's presence, and she was out of breath after doing so. *Exhibit G, Pryor Dep. at 15:4-18, 16:19-17:11, 59:14-23.* At that time, Ziemba was told by Pryor that Ms. Molina had a thyroid condition. *Exhibit Q, Ziemba Dep. at 101:24-102:2, 104:12-105:7.*

39.     Defendant Ziemba did not observe Molina looking sick or unwell.

**Response:**      Plaintiffs deny. *See Response to Paragraph 38.* Furthermore, Ms. Molina had difficulty breathing after any limited movement on the night of her death from the time she was arrested through the time she died. *Exhibit A, Shannon Guzman affidavit.* Defendant Spencer also observed Ms. Molina during the evening of May 24, 2004 and noted that she had difficulty walking and that she "became winded by walking even a short distance within the apartment." *Exhibit 2 to Defendant's Rule 56.1 Statement.* Attorney Jerry Bischoff, a lawyer since 1986, observed Ms. Molina at approximately 4:00 p.m. on May 25, 2004; as he tried to interact with her, Attorney Bischoff observed that Ms. Molina appeared groggy and tired, was out of breath, breathing rapidly, and could not stand up without leaning on the table. *Exhibit B, Bischoff Dep. at 12-13, 15-16, 19, 37-39, 47, 51-52.* During the approximately 10 minute meeting, Ms. Molina never caught her breath. *Id. at 12-13, 16. See also id. at 38 ("She was having difficulty breathing.").* Her breathing was so bad she could barely talk (*Id. at 14, 16)* and the only thing that prevented Ms. Molina "from falling flat on her face" was the table in the

interview room. *Id. at 46-47.* Ms. Molina was "clearly sick" and needed to be taken to Cermak

Hospital because she "clearly is not well." *Id. at 17, 30-31.*

40.    Defendant Ziemba was not made aware by Molina or anyone else that Molina was diabetic, or that she needed medication or medical care. (Exhibit 22, Ziemba Dep., 102:23-103:19).

**Response:**    Plaintiffs deny. The Screening Record put all Lockup keeper personnel on

notice that Ms. Molina had a "serious medical [] need" and that she required medications for her

thyroid and diabetes. *Exhibit R.* Moreover, Ms. Molina was in objective distress. *See Plaintiffs'*

*Response to Paragraph 39.*

41.    Defendant Lemon never had any conversations with Molina, including any conversations about her health needs or medication.

**Response:**    Plaintiffs admit.

42.    Defendant Lemon did not have any conversations with anybody about Molina's medical condition during her shift.

**Response:**    Plaintiff objects and denies because the cited testimony does not support

the statement. Furthermore, the Screening Record put all Lockup keeper personnel on notice that

Ms. Molina had a "serious medical [] need" and that she required medications for her thyroid and

diabetes. *Exhibit R.* Moreover, Ms. Molina was in objective distress. *See Plaintiffs' Response*

*to Paragraph 39.*

43.    Defendant Lemon never observed Molina walking or talking.

**Response:**  Plaintiffs deny on the basis that the cited testimony does not support this

statement.

44.    Defendant Lemon did not notice any evidence that Molina was under the influence of alcohol or drugs on May 25, 2004 or otherwise needed medical attention.

**Response:**    Plaintiffs admit that Ms. Molina was not under the influence of drugs or

alcohol, but deny that she did not have the appearance of someone in similar distress. Ms.

Molina was groggy, out of breath, breathing rapidly, and could not stand up without leaning on

things. *Exhibit B, Bischoff Dep. at 12-13, 15-16, 19, 37-39, 47, 51-52.* She could not even have

a conversation because she could not speak. *Id. at 14, 16, 36-39.* Attorney Jerry Bischoff, a lawyer since 1986, observed Ms. Molina at approximately 4:00 p.m. on May 25, 2004; as he tried to interact with her, Attorney Bischoff observed that Ms. Molina appeared groggy and tired, was out of breath, breathing rapidly, and could not stand up without leaning on the table. *Exhibit B, Bischoff Dep. at 12-13, 15-16, 19, 37-39, 47, 51-52.* During the approximately 10 minute meeting, Ms. Molina never caught her breath. *Id. at 12-13, 16. See also id. at 38 ("She was having difficulty breathing.").* Her breathing was so bad she could barely talk (*Id. at 14, 16*) and the only thing that prevented Ms. Molina "from falling flat on her face" was the table in the interview room. *Id. at 46-47.* Ms. Molina was "clearly sick" and required hospitalization because she "clearly is not well." *Id. at 17, 30-31.*

45.     Plaintiff Molina appeared to be breathing normally when Defendant Lemon observed her in her cell.

**Response:**     Plaintiffs denies. Ms. Molina was having difficulty breathing. *Exhibit A, Shannon Guzman Affidavit; Exhibit 2 to Defendant's Rule 56.1 Statement; Exhibit B, Bischoff Dep. at 12-13, 15-16, 19, 37-39, 47, 51-52.* Ms. Molina's breathing was so bad she could barely talk (*Id. at 14, 16*) and the only thing that prevented Ms. Molina "from falling flat on her face" was the table in the interview room. *Id. at 46-47.*

46.     When Defendant Wallace signed off on Molina's arrest report, page two of the Arrest Report, which indicated her medical condition, had not yet been completed.

**Response:**     Plaintiffs admit.

47.     Prior to Molina's death, Defendant Wallace was never informed about Molina's medical condition or what medications, if any, she might need.

**Response:**     Plaintiffs admit.

48.     Defendant DeFranco never saw Molina during his shift.

**Response:**     Plaintiffs admit.

49.     Defendant Torres saw Molina one time briefly during his routine checks of the lockup. She was laying down and did not exhibit any signs of physical stress or pain.

14

**Response**: Plaintiffs admit that Defendant Torres testified that he saw Ms. Molina only one time in the lockup before she died. Plaintiffs deny the conclusion that she did not show any signs of physical stress or pain as it is not supported by the cited testimony. Moreover, Ms. Molina was in obvious distress. *See Plaintiffs' Response to Paragraph 44.* Defendant Torres (the Desk Sergeant on the shift before Holmes' shift) further admitted to Defendant Holmes that he was aware that Attorney Bischoff directed the officers to take May Molina to the hospital and the he therefore communicated with May Molina about her need for medical care. *Exhibit Y, Holmes Dep. at 17:13-18:9, 24:3-10.*

50.     Defendant Torres observed Molina breathing normally.

**Response**:     Plaintiffs object and deny this statement because the cited testimony does not support its conclusion. Plaintiffs also deny, because Ms. Molina was having difficulty breathing. *Exhibit A, Shannon Guzman Affidavit; Exhibit 2 to Defendant's Rule 56.1 Statement; Exhibit B, Bischoff Dep. at 12-13, 15-16, 19, 37-39, 47, 51-52.*

51.     Defendant Torres and Molina never spoke, and Defendant Torres never observed her speak with anybody.

**Response**:     Plaintiffs deny. Defendant Torres (the Desk Sergeant on the shift before Holmes' shift) admitted to Defendant Holmes that he was aware that Attorney Bischoff directed the officers to take May Molina to the hospital and the he therefore communicated with May Molina about her need for medical care. *Exhibit Y, Holmes Dep. at 17:13-18:9, 24:3-10.*

52.     Nobody who had any contact with Molina prior to Defendant Giorango informed him of anything regarding her situation. Defendant Giorango was not aware of any aspect of her medical condition.

**Response**:     Plaintiffs deny. The cited testimony supports that Defendant Giorango looked at page two of the arrest report, which is the Screening Record (Exhibit R) and which identifies that Ms. Molina had a serous medical condition and was taking medications for diabetes, a thyroid condition, and pain.

53.     Defendant Giorango saw Molina one time. She was sitting in her cell awake. They did not speak.

15

**Response:**     Plaintiffs admit.

54.     Everything appeared normal when Defendant Giorango checked on Molina.

**Response:**     Plaintiffs deny this statement because the conclusion stated in the statement is not supported by the cited testimony. Moreover, Ms. Molina was not "normal" in her cell; she was in obvious distress. *See Plaintiffs' Response to Paragraph 11.* Plaintiff further denies that any of the cell checks were performed. *Exhibit F, Vaccarello Aff. ¶¶ 5-6.*

55.     Defendant Becker never saw or spoke to Plaintiff Molina. He based his conclusions on information that he received from Defendant Ziemba.

**Response:**     Plaintiff objects to this statement based on foundation and vagueness. Without waiving those objections, Plaintiffs admit that Defendant Becker did not see or speak to Ms. Molina.

56.     The only information that Defendant Becker received regarding Molina's medical condition was that she had trouble walking and would need assistance going to court.

**Response:**     The Screening Record put all personnel on notice that Ms. Molina had a "serious medical [] need" and that she required medications for her thyroid and diabetes. *Exhibit R.* Moreover, Ms. Molina was in objective distress. *See Plaintiffs' Response to Paragraph 39.*

57.     Defendant Becker inquired of Defendants Ziemba and Lemon whether any arrestees needed to go to the hospital. Defendant Ziemba responded that Molina said she just needed a walker.

**Response:**     Plaintiffs deny on the grounds that the citations do not support this statement.

58.     During her shift, no civilians ever approached Defendant Holmes to give her any information about Molina.

**Response:**     Plaintiffs deny. The Screening Record put all personnel on notice that Ms. Molina had a "serious medical [] need" and that she required medications for her thyroid and diabetes. *Exhibit R.*

59.     Prior to Molina's death, Defendant Holmes was informed by the lockup keepers that Molina was sleeping. Defendant Holmes understood that to mean that Molina was okay.

**Response:**     Plaintiffs deny on the grounds that no cell checks were performed,

meaning no Lockup keeper would have been in a position to know that Ms. Molina was sleeping.

*Exhibit F, Vaccarello Aff.* ¶¶ *5-6.* Furthermore, Ms. Molina was not sleeping the entire time, she

was crying out for help, only to be told "shut the fuck up." *Exhibit F, Vaccarello Aff.* ¶¶ *7, 9.*

Finally, Holmes admits that she learned that during the afternoon before she started work,

Molina's lawyer requested medical attention for May Molina. *Exhibit Y, Holmes Dep. at*

*17:2-23, 31:1-22.*

60.     Defendant Holmes did not enter the lockup facility on the night that Molina died
        prior to her death.

**Response:**     Plaintiffs admit.

61.     Defendant Ramirez, a Desk Officer, received phone calls on May 25, 2004 from
        unidentified persons who stated that Molina needed medication. However,
        detainees who need medication must inform an officer. Detainees cannot receive
        medication based on representations from anonymous callers. It is not unusual to
        receive such calls and Chicago Police Department employees respond with a
        prepared answer.

**Response:**     Plaintiffs admit that Defendant Ramirez was advised that Ms. Molina

required medications. Plaintiffs further admit that Ramirez has accurately described the policies

and practices of the Chicago Police Department, which are to prevent the Lockup from receiving

medication. Plaintiff denies that the calls were "anonymous." *See Exhibit S, Affidavit of [April*

*Ortiz / Shannon Guzman]___ . ___ .*

62.     Defendant Ramirez informed a supervisor that she received the calls. However, it
        is outside of her job duties to personally follow up with the detainee.

**Response:**     Plaintiffs admit that Defendant Ramirez informed her supervisor about the

telephone calls that relayed the information that Ms. Molina needed medication. Plaintiffs object

to the remaining statement as an improper legal conclusion.

63.     Defendant Ramirez never personally saw Molina.

**Response:**     Plaintiffs admit.

64.     Defendant Nichols worked in the male lock up on May 25, 2004. He never went
        into the female lockup that night.

**Response:**     Plaintiffs admit.

65.     Defendant Nichols never discussed Molina with any detention aides in May 2004.

**Response:**     Plaintiffs admit.

66.     Defendant Connolly answered the phone call from Defendant Gomez stating that Molina was unresponsive This brief exchange was the only conversation that Connolly had about Molina that night.

**Response:**     Plaintiffs admit.

67.     Afterward Defendant Connolly remained at her desk and never went back to the lockup facility.

**Response:**     Plaintiffs admit.

68.     Defendant Connolly has never seen Molina. She had never heard of Molina prior to May 26, 2004.

**Response:**  Plaintiffs admit.

69.     Defendant Jamison first noticed that Molina was not responsive at approximately 2:45 a.m. when she found Molina lying in her cell with her eyes open. Defendant Jamison called out to her, then tried to rouse her by shaking her. When Defendant Jamison's efforts failed, she summoned Defendant Gomez and instructed her to call 9-1-1. Defendants Jamison and Gomez also called the front desk and the watch commander.

**Response:** Plaintiffs admit.

70.     When Defendant Jamison told Defendant Gomez that Molina was unresponsive, the two officers ran to their workstation and immediately informed the acting sergeant, Defendant Holmes, and the watch commander, Defendant Wallace, of the situation so they could call CFD.

**Response:**     Plaintiffs admit.

71.     On May 25, 2004 someone told Defendant Holmes that Gomez called to report that there was an unresponsive female in lockup. Holmes radioed for an ambulance as she rushed to the lockup.

**Response:**     Plaintiffs admit.

72.     After Defendant Wallace learned that Molina was unresponsive, he immediately went into lockup to check on her.

**Response:**     Plaintiffs admit.

73.     When Defendant Wallace entered Molina's cell, he quickly checked for a pulse and signs of breathing.

**Response:**    Plaintiffs admit.

74.    The only time Defendant Wallace came into contact with Molina was when he was summoned to the lockup in the early morning hours of May 26, 2004 because she was unresponsive. He never saw Molina alive.

**Response:**    Plaintiffs admit.

75.    Plaintiff Molina died in the early morning hours on May 26, 2004.

**Response:**  Plaintiffs admit.

76.    Dr. Choi determined that Molina died from opiate intoxication complicated by severe obesity and cirrhosis of the liver.

**Response:**    Plaintiffs admit that Dr. Choi so concluded, but deny that this conclusion is competent evidence for the truth of the matter asserted. At the time he determined the cause of death, Dr. Choi did not know what medications Ms. Molina was taking; did not ask what she was taking (for instance did not know if any of her pain medication was a narcotic); and did not know when Ms. Molina had last taken her medication. *Exhibit E, Choi Dep. at 71:6-11, 72:9-20, 73:16-74:4, 75:21-24, 85:9-24, 86:21-22, 87:6-22, 97:2-21.* Nor did Dr. Choi know the impact of Ms. Molina missing her medications. *Id. at 98:2-18.*

Dr. Choi admits that knowing all of the foregoing information has an impact on evaluating cause of death. *Exhibit E, Choi Dep. at 96:6-23, 97:2-21.*

Dr. Choi also did not consult any of Ms. Molina's medical records prior to determining his opinion about the cause of death *(Exhibit E. Choi Dep. at 86:23-87:2, 87:6-22),* even though he admits that such a history is needed to determine if a decedent died from natural causes. *Id. at 95:22-96:5.* Dr. Choi reached an opinion even though he did not know that Ms. Molina had been diagnosed with congestive heart failure, sleep apnea, asthma, or what type of diabetes she suffered. *Id. at 103:22-104:16, 202:4-23.* Dr. Choi concludes that part of the reason Ms. Molina died was her liver stopped functioning due to cirrhosis, (even though he saw none of the signs associated with death by that cause, *Exhibit E, Choi Dep. at 105:11-108:15),* heart problems due to her obesity (even though her cardiac condition was not identified, *Id. at 109:2-110:22)* and

19

opiate intoxication (even though the amount of morphine in her system was not high, rather on the low side of the intoxication range. *Id. at 130:11-22, 132:5-6, 136:18-23.*

Finally, Ms. Molina did not die of "opiate intoxication" as opined by Dr. Choi. *Exhibit N, Adelman 1/8/08 Aff. at pp 4-5.* Dr. Choi acknowledged that 72 ng/ml was not a high level of morphine in Ms. Molina's blood, and it is in fact in the therapeutic range, which is 65-80 ng/ml. *Id.* The toxic range, by contrast, is 200-5,000 ng/ml, and, according to the scientific literature, people who die from ruptured drug packets may have heroin and morphine levels greater than 100,000 ng/m. . .[and mean] fee morphine levels were 222 ng/ml. *Id.*

RESPECTFULLY SUBMITTED,

S/Mark Reyes

Attorneys for Plaintiff
Arthur Loevy
Mark Reyes
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
loevyreyes@aol.com

CERTIFICATE OF SERVICE

I, Mark Reyes, an attorney, certify that on February 11, 2008, I served this document by ECF electronic filing as to each party who is represented by counsel who uses electronic filing.

S/Mark Reyes
Attorneys for Plaintiff