IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| APRIL ORTIZ, on her own behalf and as administrator of the ESTATES OF MAY MOLINA and MICHAEL ORTIZ, and SHANNON GUZMAN, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHICAGO, et al. <br><br> Defendants. | 04 C 7423 <br><br> Judge Grady |

## PLAINTIFFS' LOCAL RULE 56.1(b)(3)(B) STATEMENT OF ADDITIONAL FACTS

Plaintiffs, by their attorneys, LOEVY & LOEVY, pursuant to Local Rule 56.1(b)(3)(B), and in opposition to Chicago's Motion for Summary Judgment, submit the following Statement of Additional Facts:

### Plaintiffs' Arrests

1. Plaintiff May Molina, along with her son Michael Ortiz, were arrested on May 24, 2004 in their respective apartments at 3526 North Halsted in Chicago, Illinois. *Exhibit 1 to Defendants' Rule 56.1 Statement.*

2. The police recovered a number of tinfoil packets from May Molina's house and charged her with possession of illegal drugs. *Exhibit 1 to Defendants' Rule 56.1 Statement,* ¶6. Substances were recovered from Ortiz' apartment as well, but when tested by the Illinois State Police Forensic Crime Laboratory, the results were that the substances from Ortiz' apartment were not illegal drugs, much less heroin. *Exhibit 1 to Def. Rule 56.1 Statement,* ¶12.

3. After her arrest, Defendant Spencer informed Ms. Molina that she was not permitted to bring her medications with her to the police station. *Exhibit T, Defendants Resp. to Plaintiffs' First Set of Requests to Admit,* ¶ 6, *Exhibit L, Spencer Aff.* ¶ 6. Ms. Molina could not live without her medications, which she took regularly at the prescribed doses and times; Ms.

Molina knew that denial of access to her medications was life-threatening, and she took them with her when she left her home. Ms. Molina never would have permitted herself to be separated from her medications voluntarily for any period of time longer than a few hours. *Exhibit S, April Ortiz Aff.*, ¶¶ 3-8; *Exhibit A, Shannon Guzman Aff.* ¶¶8-14.

### The Lockup

4. Ms. Molina was taken to the 23rd District station of the Chicago Police Department before she was transported to the women's lockup at the Chicago Police Department's 19th District station, located at Belmont and Western (the "Lockup"). *Exhibit 1 to Defendants' Rule 56.1 Statement.* She arrived at the Lockup on May 25, 2004 at 4:25 a.m. *Exhibit D, Jamison Dep. at 15.6-24.*

### Defendants' Actual Notice of Ms. Molina's Medical Needs

5. Ms. Molina had difficulty walking and she "became winded by walking even a short distance within the apartment." *Exhibit 2 to Defendant's Rule 56.1 Statement.*

6. When Ms. Molina first arrived at the Lockup at or about 4:25 a.m. on May 25, 2004, she was interviewed by Defendant Jamison, who interviewed her and created the Lockup Keeper's Arrestee Questionnaire, also referred to as the Screening Record For Arrestee to be Held in Lockup (hereafer, "Screening Record"). *Exhibit R.* At that time, Jamison noted on the written Lockup Screening Record that Ms. Molina did not appear to be under the influence of drugs, nor was she showing any sign of withdrawal. *Exhibit R.*

7. When asked if she had any "serious medical [] problems," Ms. Molina answered "yes" -- an answer that was recorded by Defendant Jamison on the Lockup Screening Record. *Exhibit R; Exhibit D, Jamison Dep. at 30:3-13; Exhibit G, Pryor Dep. at 26:4-27:12.*

8. The Screening Record requires further explanation where the intake person checks "yes" for people with "serious medical [] problems." *Exhibit R.* Jamison duly noted that Ms. Molina was taking medicine for diabetes, as well as "thyroid meds" and pain medication for her legs. *Exhibit D, Jamison Dep. at 21:4-22:14-23:8, 36:1-13; Exhibit G, Pryor Dep. at 26-27.*

2

### The Chicago Police Department Policies And
### Practices For Documenting Medical Needs

9. There is no Chicago Police Department policy to require a Lockup officer taking control of a detainee to ask about the need, type, or frequency of medication that an incoming detainee is taking. *Exhibit D, Jamison Dep. at 24:8-18, 25:20-24, 27:18-21, 28:2-29:8.* Nor has the Chicago Police Department trained its officers to ask about the name or type of medication or the frequency that the medication needs to be taken by a person who enters its custody is taking. *Exhibit D, Jamison Dep. at 25:7-12, 25:20-26:5.*

10. Accordingly, although Ms. Molina told Defendant Jamison that she took her diabetes medication for her "serious medical [] need," Jamison gathered no further information, such as the type or frequency of the medication, or when she last took it. *Exhibit D, Jamison Dep. at 30:16-31:10; Exhibit G, Pryor Dep. at 26:4-27:12, 60:12-18.* Defendant Jamison also did not inquire as to how often she needed the diabetes medication because that is not something that officers usually ask. *Exhibit D, Jamison Dep. at 23:20-24:7, 25:13-19, 27:10-17; Exhibit G, Pryor Dep. at 58:20-24.*

11. After Defendant Jamison created the Screening Record confirming that May Molina had a "serious medical [] condition" and that she needed medications for her diabetes, thyroid, and pain, Jamison then took that information to the front desk, where it is kept at the front desk, accessible to all front desk personnel. *Exhibit D, Jamison Dep. at 38:8-39:2, 9-19, 51:8-12; Exhibit G, Pryor Dep. at 47:9-13; Exhibit H, Yost Dep. at 19:8-15, 20:5-13; Exhibit J, Gomez Dep. at 32:16-20, 43:4-13; Exhibit O, Lemon-Redmon Dep. at 54:11-55:11; Exhibit P, Wallace Dep. at 35:19-36:1, 42:4-8.*

12. The medical information in the Screening Record was not kept in the Lockup. *Exhibit H, Yost Dep. at 19:8-15, 20:5-21:12; Exhibit J, Gomez Dep. at 42:5-24; Exhibit T, Def. Resp. to Plaintiffs' First Set of Requests to Admit, ¶¶ 14-16.* Instead Pryor told Defendants Becker and Ziemba (who were working the next shift) about May Molina's medical condition in that she had trouble walking on her own. *Exhibit G, Pryor Dep. at 49:2-50:17.*

3

### Ms. Molina's Deterioration

13. Sometime around 5:30 a.m., Defendant Ziemba was present in the Lockup at the end of Jamison and Pryor's shift and the beginning of her own on May 26, 2004; at this time Ms. Molina was finishing her telephone call and walking back to her cell. *Exhibit Q, Ziemba Dep. at 52:15-21.* At that time, Defendant Pryor observed that Ms. Molina was walking very slowly, taking approximately seven minutes to walk 25-30 feet and that she was out of breath after doing so. *Exhibit G, Pryor Dep. at 15:4-18, 16:19-17:11, 59:14-23.* At that time, Ziemba was told by Pryor that Ms. Molina had a thyroid condition. *Exhibit Q, Ziemba Dep. at 101:24-102:2, 104:12-105:7.*

### Attorney Bischoff's Request To Provide Ms. Molina With Medical Assistance

14. Attorney Jerry Bischoff, a lawyer since 1986, observed Ms. Molina at approximately 4:00 p.m. on May 25, 2004. *Exhibit B, Bischoff Dep. at 4, 8-9; Exhibit H, Yost Dep. at 39:7-17.* Defendants Yost and Gilchrist escorted Ms. Molina to see Bischoff. *Exhibit H, Yost Dep. at 39:1-3, 7-17, 44:7-14, 51:21-52:4; Exhibit I, Gilchrist Dep. at 33:22-35:22; Exhibit C, Defendants' Answer to Plaintiff April Ortiz' First Set of Interrogatories, No. 7.*

15. Yost observed that it took Molina one to two minutes to walk a few feet. *Exhibit H, Yost Dep. at 46:16-22.* Similarly, Bischoff observed that it took Ms. Molina one to two minutes to walk 10 to 15 feet. *Exhibit B, Bischoff Dep. at 10-11.* According to Defendant Yost, Ms. Molina held onto the wall and counter while taking a few minutes to walk from her cell to the meeting with Bischoff. *Exhibit H, Yost Dep. at 48:5-14, 49:5-21.*

16. As he tried to interact with her, Attorney Bischoff observed that Ms. Molina appeared groggy and tired, was out of breath, breathing rapidly, and could not stand up without leaning on the table. *Exhibit B, Bischoff Dep. at 12-13, 15-16, 19, 37-39, 47, 51-52.* During the approximately 10 minute meeting, Ms. Molina never caught her breath; she was breathing in a way he had never seen her before in the past. *Id. at 12-13, 16. See also id. at 38* ("She was having difficulty breathing.").

4

17. After seeing Ms. Molina's distress, Attorney Bischoff concluded it was pointless to try to talk to her about her case and became concerned about her health. *Exhibit B, Bischoff Dep. at 14, 36-39.* For the most part, Ms. Molina was not even able to answer orally to all of his questions, but she gestured. *Id. at 14, 16.*

18. From what Attorney Bischoff observed, the only thing that prevented Ms. Molina "from falling flat on her face" was the table in the interview room. *Exhibit B, Bischoff Dep. 46-47.* Had that table not been there, she would have fallen flat on her face. *Id.*

19. Mr. Bischoff asked Ms. Molina if she was a diabetic, to which she responded yes. *Exhibit B, Bischoff Dep. at 14.* Mr. Bischoff asked Ms. Molina how she took her medication and Ms. Molina gestured that she did so orally. *Id. at 14, 36-37.* Attorney Bischoff then asked if the police were letting her take her medication, to which Ms. Molina indicated with her head that they were not. *Id. at 14, 36-37.*

20. Once he realized Ms. Molina could not communicate, Attorney Bischoff terminated the meeting, concluding that she belonged in a hospital. *Exhibit B, Bischoff Dep. at 16.*

21. Attorney Bischoff proceed to inform two female officers (now known to be GIlchrest and Yost) that she was "clearly sick" and to take her to Cermak Hospital because she "clearly is not well." *Exhibit B, Bischoff Dep. at 17, 30-31.* In response to that request, one of the Lockup keepers said they were working on it. *Id.*

22. But, as a matter of practice, Chicago Police Department personnel will never consider a request for hospitalization from people other than detainees. *Exhibit K, Ramirez Dep. at 11:6-13:6, 15:15-16:11, 17:8-19.*

### Ms. Molina's Family's Attempts
### To Provide Ms. Molina Her Medicine

23. During the evening of May 25, 2004, Defendant Ramirez was working at the front desk at the 19th District. She received five to ten telephone calls from multiple callers who advised her that Ms. Molina had medical needs and needed to take medication. *Exhibit K, Ramirez Dep. at 11:6-17:19.*

5

24. In response, Defendant Ramirez told her supervisor, but did not take any other action to ensure that Ms. Molina received medical care because it was not her job to do so. *Exhibit K, Ramirez Dep. at 11:6-17:19.*

25. The evening of May 24, 2004 (or the very early hours of May 25, 2004), Ms. Molina's daughter brought Ms. Molina's diabetes, thyroid and blood pressure medication to the 23rd District Chicago Police station so that her mother could take them. Ms. Molina's daughter was told by a male supervisor that the police were not allowed to give her the medications but the Belmont and Western officers would send her to the hospital for her medications. *Exhibit S, April Ortiz Aff.,* ¶ 9.

26. Chicago Police Department lockup personnel are never allowed to provide medications to detainees in the lockup of the Chicago Police Department; instead all medications must be dispensed at a hospital. *Exhibit D, Jamison Dep. at 32:19-33:1, 116:11-14; Exhibit G, Pryor Dep. at 62:12-23); Exhibit H, Yost Dep. at 25:20-27:20, 32:14-24; Exhibit J, 32:21-33:17, 34:5-18; Exhibit O, Lemon-Redmon Dep. at 58:12-59:6; Exhibit P, Wallace Dep. at 14:15-23, 47:11-13.* A supervisor is further required to approve any transportation of an arrestee to the hospital for the provision of medical care. *Exhibit P, Wallace Dep. at 11:22-12:17, Exhibit, Becker Dep. at 40:1-8.*

27. In Attorney Bischoff's experience over more than a decade, "I can't get medication to people who in lockup. It's just their policy. They will not give it. . . And I don't understand the policy for the life of me. If you're not going to give someone who requires daily medication their medication, then send them to the hospital where they can get it. It baffles me. You just asked me a question I actually have, you know, strong opinions on. I don't understand that policy. It defies logic." *Exhibit B, Bischoff Dep. 41-42.*

### Ms. Molina's Pleas For Help

28. Another detainee (Jasmine Vaccarello) arrived in the Lockup around 11:00 p.m. on May 25. *Exhibit F, Vaccarello Aff.* ¶¶ *3-4.* While she was being processed, Vaccarello heard Ms. Molina yelling to get the Lockup keepers attention. *Id.* ¶ *4.* Though they were in ear-

6

shot (because they were with Vaccarello, who could hear Ms. Molina's calls) the Lockup keepers ignored her. *Id.* ¶ 4.

29. As Vaccarello was being led to her cell in the Lockup, she heard Ms. Molina ask the Lockup keeper about a telephone call and her medications. *Exhibit F, Vaccarello Aff.* ¶ 8. The Lockup keeper's response was that Ms. Molina was only entitled one phone call. *Id.; Exhibit J, Gomez Dep.* at 71:21-24.

30. While Vaccarello was in her cell, she heard Ms. Molina call out "guard," but no one responded. *Exhibit F, Vaccarello Aff.* ¶ 9. On at least two occasions, Vaccarello herself called out for the guards to help. *Exhibit F, Vaccarello Aff.* ¶¶ 7, 9. In response, the Lockup keepers stated words to the effect of: "Shut the Fuck up." *Id.* Vaccarello could hear the Lockup keepers talking and laughing. *Id.*

31. Thereafter, Vaccarello heard Ms. Molina making loud snoring noises. *Exhibit F, Vaccarello Aff.* ¶ 10. That snoring then turned shallow and softer, then Vaccarello could no longer hear Ms. Molina at all. *Id.*

32. When Ms. Molina stopped making any snoring noises altogether, Vaccarello called out loudly two or three times "Ma'am, are you ok," or words to that effect. *Exhibit F, Vaccarello Aff.* ¶ 12.

33. At that point, Vaccarello again tried to summon the guard. *Exhibit F, Vaccarello Aff.* ¶ 11. The Lockup keepers ignored Vaccarello's pleas for help, and she could hear them talking and laughing. *Id.*

34. All of the aforementioned communications to the Lockup keepers could be heard where the Lockup keepers were stationed because the door is kept open and voices can be heard through the door. *Exhibit D, Jamison Dep.* at 45:18-22, *Exhibit J, Gomez Dep.* at 72:21-73:4; *Exhibit F, Vaccarello Aff.*

### Nonexistent "Cell Checks"

35. None of the required "15-minute cell checks" occurred in the Women's Lockup prior to Ms. Molina's death. *Exhibit F, Vaccarello Aff.* ¶¶ 5-6. The only time

Vaccarello saw any Lockup keepers in the Lockup was when they brought in another detainee, and after Ms. Molina died. *Id.*

36. Defendants Jamison and Gomez were both Lockup keepers working in the women's Lockup at Belmont and Western from May 25, 2004 at 9:30 a.m. to May 26, 2004 at 5:30 a.m., *i.e.*, during the same early morning hours that Ms. Molina died. *Exhibit D, Jamison Dep. at 47:16-24, 56:8-11, Exhibit J, Gomez Dep. at 11:7-10, 19:23-20:5.*

### Ms. Molina's Death

37. Defendant Jamison noted the time as 2:45 a.m. on May 26, 2004 when she first saw that Ms. Molina was dead. *Exhibit D, Jamison Dep. at 90:5-91:18.*

38. It was unusual that Ms. Molina was still in the lockup during the early morning of May 26, 2004 because felony cases usually went to court the day following an arrest. *Exhibit D, Jamison Dep. at 58:16-22.*

### Cause of Death: Dr. Choi

39. The Cook County Medical Examiner who conducted the autopsy was Dr. Eupil Choi. At the time he determined the cause of death, Dr. Choi did not know what medications Ms. Molina was taking; did not ask what she was taking (for instance did not know if any of her pain medication was a narcotic); and did not know when Ms. Molina had last taken her medication. *Exhibit E, Choi Dep. at 71:6-11, 72:9-20, 73:16-74:4, 75:21-24, 85:9-24, 86:21-22, 87:6-22, 97:2-21.* Nor did Dr. Choi know the impact of Ms. Molina missing her medications. *Id. at 98:2-18.*

40. Dr. Choi admits that knowing all of the foregoing information has an impact on evaluating cause of death. *Exhibit E, Choi Dep. at 96:6-23, 97:2-21.*

41. Dr. Choi also did not consult any medical records prior to reaching his opinion about the cause of death *(Exhibit E. Choi Dep. at 86:23-87:2, 87:6-22)*, even though such a history is needed to determine if a decedent died from natural causes. *Id. at 95:22-96:5.* Dr. Choi did not know that Ms. Molina had been diagnosed with congestive heart failure, sleep apnea, asthma, or what type of diabetes she suffered. *Id. at 103:22-104:16, 202:4-23.*

42. Dr. Choi concludes that part of the reason Ms. Molina died was her liver stopped functioning due to cirrhosis, (even though he saw none of the signs associated with death by that cause, *Exhibit E, Choi Dep. at 105:11-108:15*), heart problems due to her obesity (even though her cardiac condition was not identified, *Id. at 109:2-110:22*) and opiate intoxication (even though the amount of morphine in her system was not high, rather on the low side of the intoxication range). *Id. at 130:11-22, 132:5-6, 136:18-23*.

43. Ms. Molina did not die of "opiate intoxication" as opined by Dr. Choi. *Exhibit N, Adelman 1/8/08 Aff. at pp. 4-5*. Dr. Choi acknowledged that 72 ng/ml was not a high level of morphine in Ms. Molina's blood, and it is in fact in the therapeutic range, which is 65-80 ng/ml. *Id.* The toxic range, by contrast, is 200-5,000 ng/ml, and, according to the scientific literature, people who die from ruptured drug packets may have heroin and morphine levels greater than 100,000 ng/m...[and mean] fee morphine levels were 222 ng/ml. *Id.*

### Placement of the Foil Packets

44. Dr. Choi found a foil packet lodged in Ms. Molina's throat, which likely would have caused a gag reflex. *Exhibit E, Choi Dep. at 156:17-157:5, 161:3-162:2*. However, nobody, including Defendant Jamison, heard Ms. Molina gagging or choking before she died. *Exhibit D, Jamison Dep. at 45:24-46:3; Exhibit H, Yost Dep. at 64:14-19; Exhibit J, Gomez Dep. at 73:16-18*.

45. Per procedures, all arrestees are searched upon entry to Lockup in order to make sure that no arrestee has weapons, drugs or other contraband. *Exhibit D, Jamison Dep. at 10:12-13:5; Exhibit H, Yost Dep. at 13:20-14:3; Exhibit J, Gomez Dep. at 45:16-46:15; Exhibit I, Gilchrist Dep. at 7:16-8:9*. Ms. Molina was searched thoroughly when she entered the women's Lockup; no contraband was found. *Exhibit G, Pryor Dep. 18:22-23:7*.

9

### Cause of Death
### Deprivation Of Necessary Medications

46. Dr. Howard Adelman determined that Ms. Molina's death was caused the deprivation of her medications:

   a. Ms. Molina had serious physical problems that required her to take medications on a regular basis. Specifically, she had type 2 diabetes Mellitus which required medication and monitoring to ensure that her blood sugar was in check, otherwise she risked slipping into either a hyperglycemic or hypoglycemic state, either of which was life-threatening and could lead to a fatal coma. *Exhibit N, Adelman 1/8/08 Aff. at p.1.* Ms. Molina also suffered from a life-threatening hypertensive condition that required medication and monitoring. *Id. at p.1.*

   b. To treat the foregoing life-threatening conditions, Ms. Molina was taking the following medications:

   Diabetes drugs called Glipizide (10 mg tabs) and Metformin (1000 mg), which helped prevent the hyperglycemic or hypoglycemic state described above. *Id. at pp.1-2.*

   Furosemide (80 mg) a diuretic used to treat hypertension and excessive fluid build up and swelling (edema) caused by cirrhosis or heart failure, among other things. The drug depletes potassium, which can be fatal, and thus requires careful medical supervision. *Id. at p.2.*

   Potassium Chloride (20 mEq.), to counteract the effects of the Furosemide. *Id. at p.2.*

   Albuterol Inhaler, which was critical to treat Ms. Molina's asthma and apnea. *Id. at p.2.*

   Enalapril tabs (5 mg), another drug to treat hypertension and heart failure. *Id. at p.3*

   c. The Lockup screener wrote down that Ms. Molina was also taking thyroid medications. *Exhibit R; Exhibit D, Jamison Dep. at 22:17-23:8; Exhibit G, Pryor Dep. at 26:4-27:12.* The pictures and recorded body proportions from Ms. Molina's autopsy are also typical of a fatal thyroid condition called myxedemia. *Exhibit N, Adelman 1/8/08 Aff. at p.4.* Thyroid medications typically replace a vital hormone (thyroxine), without which Ms. Molina could well have slipped into a comatose state brought about by lack of thyroid function. *Id.* May Molina's thyroid had been removed. *Exhibit E, Choi Dep. at 167:9-19.*

      d.      Ms. Molina's medical condition and the "powerful drugs" she was taking required constant physician monitoring and supervision. *Id. at pp. 3-4.* To a high degree of medical certainty, the deprivation of these powerful and vital medications ultimately led to her death. *Id.*

### Effect of Failure To Provide Medical Attention

47.    Assuming that the cause of Ms. Molina's death was an opiate intoxication, to a reasonable degree of medical certainty, had she received timely medical treatment, she would have likely lived. *Exhibit M, Dr. Carter Affidavit and Report.*

      a.      In a medical setting, the foil packets would have appeared with auscultation and on the chest x-ray, and even if they did not, given Ms. Molina's symptoms, the potential for narcotic ingestion is high on the differential list of problems that trained medical professionals would have considered under these circumstances. <u>Id.</u>

      b.      Even assuming that Ms. Molina could not speak or did not claim to have ingested drugs, worsening respiratory effort would have provided the opportunity for early intervention with narcotic antgonistic drugs, such as Narcan. Narcan is routinely administered in medical settings to reverse the effects of narcotics on the central nervous system during advanced life saving codes and resuscitation efforts. <u>Id.</u>; <u>see also</u> *Exhibit N, Adelman 1/8/08 Aff. at pp. 5.*

48.    Assuming that the cause of Ms. Molina's death was a diabetic coma, had she received proper treatment, she would have likely lived had she been brought to the hospital even as late as the time her lawyer (Bischoff) visited her. *Exhibit N, Dr. Adelman Affidavit and Report, at p. 4.* Treatment of her condition in the form of monitoring her blood sugar and titrating her oral antidiabetic and other medications likely would have prevented her fatal coma. *Id.*

11

RESPECTFULLY SUBMITTED,

S/Mark Reyes

Attorneys for Plaintiff
Arthur Loevy
Mark Reyes
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
loevyreyes@aol.com

CERTIFICATE OF SERVICE

I, Mark Reyes, an attorney, certify that on February 11, 2008, I served this document by ECF electronic filing as to each party who is represented by counsel who uses electronic filing.

S/Mark Reyes
Attorneys for Plaintiff