**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| APRIL ORTIZ, on her own behalf and as Administrator for the ESTATE OF MAY MOLINA and MICHAEL ORTIZ, Deceased, and SHANNON GUZMAN, )<br><br>        Plaintiffs, )<br><br>        v. )<br><br>CITY OF CHICAGO, CHICAGO POLICE OFFICERS AVIS JAMISON, MARTHA GOMEZ, J. NELSON, M. RAMIREZ, DEBRA HOLMES, C. CONNOLLY, NICK SPENCER, DIANE YOST, BEVERLY GILCHRIST, RICHARD HALJEAN, THOMAS GAYNOR, R. BAEZA, NARI ISAKSON, G. ESPINOSA, STEPHEN NASSER, JOSE M. DEJESUS, FABIAN SALDANA, ROBERT STATSCH, NICK SPENCER, CATHERINE ZIEMBA, JOSE TORRES, GIORANGO, ARTHURINIE PRYOR, PATRICK McKENNA, THOMAS BECKER, WILLIAM WALLACE, VINCENT DEFRANCO, and AS-YET UNKNOWN CHICAGO POLICE OFFICERS, and DETENTION AIDES E. NICHOLS and TAMARA LEMON-REDMOND.<br><br>        Defendants. | No. 04 C 7423 |

**MEMORANDUM OPINION**

The court has under the advisement the motion of the defendants for summary judgment as to the counts of the pending complaint that seek recovery for the pain and suffering and death of the decedent May Molina. The briefing on the motion was completed at a time when the Fourth Amended Complaint was pending,

and the defendants' motion is directed to counts of that complaint. The parties differed as to whether Count I of that complaint, a civil rights action brought pursuant to 42 U.S.C. § 1983, pleaded a claim based on "objectively unreasonable" conduct or was, instead, a claim alleging only "deliberate indifference."  On May 7, 2008, pursuant to leave of court, the plaintiffs filed a Fifth Amended Complaint.  Count I alleges "objectively unreasonable" conduct, and Count II alleges that the defendants were deliberately indifferent.  The filing of the Fifth Amended Complaint moots some of the arguments in the parties' briefs, but the essence of the dispute – whether there is a genuine issue of fact under either the objectively unreasonable or deliberately indifferent standard, remains.  We will discuss the merits of the defendants' motion and then, at the conclusion of this opinion, apply our ruling to each of the counts of the Fifth Amended Complaint that involve the decedent May Molina.

A brief summary of the facts will facilitate the discussion. On the evening of May 24, 2004, various Chicago police officers of the 23rd District conducted a search of the premises at 3526 N. Halsted Street, occupied by May Molina and members of her family. In the apartment occupied by Ms. Molina, the police found a number of separate tin foil packages containing heroin.  She was placed under arrest in the early morning hours of May 25 and taken to the 23rd District headquarters at Halsted and Addison Streets.  That

facility has no female lockup, so after a short time Ms. Molina was taken to the 19th District station located at Belmont and Western Avenues.  She arrived there at 4:25 a.m. on May 25, 2004.

Ms. Molina was overweight and spent most of her time in a wheelchair.  When she walked, she used a walker.  At the time of her arrest, Ms. Molina informed the 23rd District officers that she took medications for diabetes and a thyroid condition.  She asked whether she could take her medications with her and was told that prisoners were not allowed to bring medications into the lockup. (This was a Chicago Police Department policy based on safety considerations.)  While Ms. Molina was still at the 23rd District, her daughter, April Ortiz, took Molina's medications for diabetes, thyroid and pain to the station and asked that they be given to Molina.  The Desk Sergeant told her that the medications could not be accepted.

At the 19th District, the defendant Avis Jamison, a lockup keeper, questioned Ms. Molina and filled out a "Receiving Screening Record for Arrestee to Be Held in Lockup." (Pls.' Resp., Ex. R.) One of the questions on the form was "Are you presently taking any medication?"  The "yes" box is checked, and the word "dibetes" [sic] is written in the space after the question asking "For what?".  The question "Do you have any serious medical or mental problems?  (If yes, specify problem under Remarks)" is answered "yes," and the question "Are you receiving any treatment?" (If yes,

specify under Remarks) is answered "yes."  In the "Remarks"
section, Officer Jamison wrote, "Taking pain medication for swollen
legs and diabetes (pills), thyroid meds."

During the evening of May 25, the defendant Maja Ramirez was
answering the telephone at the 19th District.  She received five to
ten telephone calls, apparently from friends and family members of
Ms. Molina, stating that Ms. Molina needed to take medications.

Ms. Molina did not take any medication while she was in police
custody from May 25 to May 26, 2004.  She died in the early morning
hours of May 26, 2004 at the 19th District lockup.

The post-mortem examination of May Molina showed that there
were three tin foil packets in her stomach.  There was also a tin
foil packet in her duodenum.

The foregoing facts are undisputed.  The parties disagree as
to whether there is a genuine dispute as to other facts, and that
is what the motion for summary judgment is about.  Each of the
counts involved in the defendants' motion for summary judgment is
based on the theory that the defendants' conduct in denying May
Molina her necessary medications was a cause of her death and pain
and suffering prior to her death.

## **What Law Applies**

Under the Eighth Amendment "deliberate indifference" standard,
liability attaches only if the defendants' conduct is "intentional
or criminally reckless."  <u>Chapman v. Keltner</u>, 241 F.3d 842, 845 (7th

Cir. 2001). Applying this test to the facts as they see them, the defendants argue that the proof is insufficient as a matter of law to show a violation of this standard.

While arguing that the defendants' conduct did amount to deliberate indifference to May Molina's medical needs, the plaintiffs also rely on the Fourth Amendment "objectively unreasonable" standard applicable to pretrial detainees, citing Lopez v. City of Chicago, 464 F.3d 711, 718 (7th Cir. 2006). (Pls.' Resp. at 11.)

Which test to apply is, of course, a matter of substance, because deliberate indifference "requires a culpable state of mind such as ignoring a known risk of harm; 'it is more than negligence and approaches intentional wrongdoing,'" whereas the Fourth Amendment standard "requires only proof that the defendants' conduct was objectively unreasonable under the circumstances." Lopez, 464 F.3d at 718 (citations omitted). Our Court of Appeals has suggested "four factors that are relevant for ascertaining whether a defendant's conduct was objectively unreasonable." Williams v. Rodriquez, 509 F.3d 392, 403 (7th Cir. 2007). The four factors were gleaned by the Court from its earlier opinion in Sides v. City of Champaign, 496 F.3d 820 (7th Cir. 2007). The Williams Court described the first factor as follows:

> The first is that the officer be given notice of the
> arrestee's medical need, whether by word as occurred in

Sides, or through observation of the arrestee's physical symptoms.

The second and third factors were described as follows:

> Second, the court in Sides considered that The seriousness of the medical need .... The severity of the medical condition under this standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendment. Instead, the Fourth Amendment's reasonable analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor – the scope of the requested treatment.

The Court gave the following explanation of the fourth factor:

> Finally, police interests also factor into the reasonableness determination. This factor is wide-ranging in scope and can include administrative, penological, or investigatory concerns.

509 F.3d at 403.

To sum up the four suggested factors, then, we look at whether the officer had notice of the arrestee's medical need, how serious the need appeared to the officer, the difficulty of providing the treatment requested, and any "police interests" that might inhibit affording that treatment.

In this case, the third and fourth Williams-Sides factors are not a significant part of the analysis. Plaintiffs complain that May Molina was not taken to Cermak Hospital, where she could have been diagnosed and supplied with the necessary medication. There is no indication in the evidence that taking Ms. Molina to Cermak Hospital would have been in any way burdensome or that it would have compromised any police concerns. As far as the four-part

inquiry is concerned, we will confine ourselves to the question of whether the defendants were (1) on notice that Ms. Molina had a medical need (2) that required immediate medication or hospitalization.[1]

## Liability of the Various Defendants
## Under an Objectively Unreasonable Standard[2]

We agree with the defendants that it is necessary to distinguish between the 23rd District defendants and the 19th District defendants, and we will discuss them separately.

### The 23rd District Defendants

There is no evidence that any of the 23rd District officers was put on notice that May Molina was suffering from a serious medical condition that required immediate hospitalization (medication) in order to avoid serious complications. There is no doubt that Ms. Molina gave the appearance of being disabled. She was extremely obese and spent most of her time in a wheelchair. She was approximately five feet, five inches in height and weighed approximately 326 pounds. (Defs.' Rule 56.1 Statement of

---

[1] The plaintiffs do not argue that the Police Department policy against permitting arrestees to bring in their own medications is objectively unreasonable. What they argue is that it was objectively unreasonable not to transport Ms. Molina to a hospital where the necessary medications could have been provided. (Pls.' Resp. at 18.)
Because medication would have required hospitalization, we will use the terms "medication" and "hospitalization" interchangeably in this opinion.

[2] Because the objectively unreasonable standard is easier for the plaintiffs to satisfy, our discussion will be directed to that standard. If plaintiffs do not satisfy the objectively unreasonable standard, it follows that they cannot meet the more demanding Eighth Amendment deliberate indifference standard.

Undisputed Facts ¶ 9.) One of the arresting officers, Nick Spencer, noticed that Ms. Molina became winded by walking even a short distance within the apartment,[3] which he attributed to her weight and to the fact that she was out of shape. (Defs.' Rule 56.1 Statement of Undisputed Facts, Ex. 2, Decl. Of Nick Spencer ¶ 8.) Aside from this, she showed no apparent signs of physical distress and made no requests for medical attention. (Defs.' Rule 56.1 Statement of Undisputed Facts, Ex. 1, Aff. Of Nick Spencer, ¶ 14.) Officer Spencer informed Ms. Molina that she could not take her medications with her to the station. She informed him that she had taken the medication shortly before the police arrived and did not need to take them with her. (Spencer Decl. ¶ 6.)

None of the other 23rd District defendants had closer contact with Ms. Molina than Officer Spencer did, and there is no evidence that any of them was on notice that she had a serious medical need that required uninterrupted medication.

Therefore, the court will enter summary judgment in favor of the 23rd District defendants on the counts of the Fifth Amended Complaint seeking recovery for the injuries and death of May Molina. These defendants are Thomas Gaynor, Raul Baeza, Jr., Nari Isakson, Gilberto Espinosa, Stephen Nasser, Jose M. DeJesus, Robert Stasch, Richard Haljean, Fabian A. Saldana, and Nick Spencer.

---

[3] This same observation was made by plaintiffs' witness Shannon Guzman, a friend of Ms. Molina's who was present in the apartment at the time of the arrest. (Pls.' Resp. Ex. A, Aff. of Shannon Guzman, ¶¶'s 5, 6.)

These defendants are also charged with intentional infliction of emotional distress, and because there is no evidence that would support liability of any of these defendants on that theory, summary judgment will also be entered in their favor on that charge.

## The 19th District Defendants

The remaining defendants are police officers and civilian employees at the 19th District station.  Some of them had no more connection with May Molina than the least involved of the 23rd District defendants.  Others had actual contact with Molina, and the question is whether that contact could reasonably be found to have put them on notice that she needed immediate mediation or hospitalization for a serious medical condition.

The defendant Avis Jamison recorded the intake information from Ms. Molina at the 19th District lockup and noted that she was taking medications for diabetes, a thyroid condition, and pain from swollen legs.  There is nothing about these responses that indicate a critical need for immediate medication.  Plaintiffs emphasize that Ms. Molina answered "yes" to the question as to whether she had any "serious medical or mental problems," and argue that this should have put Jamison, and anyone else who had access to the intake record, on notice that Ms. Molina was in need of immediate medical attention for one or more of the conditions listed, i.e., diabetes, thyroid and swollen legs.  The evidence does not support

that conclusion. Many people are walking around with diabetes, thyroid conditions and swollen legs, with no immediate need to see a doctor or go to a hospital. The same can be said of the many people with chronic heart conditions, rheumatoid arthritis, cancer and a litany of other chronic medical conditions that are undoubtedly "serious." There is no indication in the evidence that Ms. Molina advised Ms. Jamison of any immediate need for medication, medical attention, or hospitalization. In short, the fact that the word "serious" appears on the printed form does not of itself provide notice of any immediate need for medical attention.

After the intake interview, Ms. Molina was placed in a lockup cell. The next significant contact was a visit from her attorney, Jerry Bischoff. He arrived at the lockup at around 4:00 p.m. on May 25. Ms. Molina was brought by the lockup keepers from her cell to meet with Mr. Bischoff in an interview room. She was walking with a walker. (Pls.' Resp., Ex. B, Dep. of Jerry D. Bischoff at 8-10.) It took Ms. Molina one to two minutes to walk ten to fifteen feet with the walker. (Id. at 10-11.) Mr. Bischoff had seen Ms. Molina on many previous occasions and had never seen her out of her wheelchair. (Id. at 12.) She looked very disheveled and was a little groggy. She appeared to be out of breath and was having trouble speaking. She was heavyset and was not able to fit into the chair in the interview room. (Id. at 11-12.) She was

standing there, leaning on the table.  Mr. Bischoff thought to himself that she needed to be in a wheelchair.  (Id. at 13.)

Mr. Bischoff decided to end the interview and told Ms. Molina that he would see her the following morning in court.  He intended to ask the judge to see to it that she got to a hospital in the morning because that is where he thought she belonged.  (Id. at 15.)  His belief was based on the fact that "she appeared to be having a little difficulty breathing."  Her overall body language was of a person who wasn't feeling well.  She wasn't always able to respond to him.  (Id. at 16.)

The same two female lockup keepers who brought Ms. Molina to the interview, defendants Diane Yost and Beverly Gilchrist, returned when the interview was over.  Mr. Bischoff told the lockup keepers that he thought they should get Ms. Molina to Cermak Hospital.  He told them that she was clearly sick.  One of the officers responded, "we are working on it, counsel."  (Id. at 17.)

Mr. Bischoff's testimony surely alerted lockup keepers Yost and Gilchrist that he thought Ms. Molina was sick and needed to go to a hospital.  It is also a fair inference that Yost and Gilchrist observed Molina's difficulty in walking and breathing.  Their failure to take issue with Bischoff's statement that Molina needed to go to a hospital, especially when they indicated they were "working on it," would be some evidence that they recognized the

need for hospitalization.  It is clear that neither of the lockup keepers took any action thereafter that might have resulted in moving Molina to a hospital.

It is unclear whether Ms. Molina's problems observed by Mr. Bischoff – problems in walking, standing, breathing and talking – were symptomatic of diabetes or a thyroid condition.  They seem more related to the difficulties the 23rd District officers and Shannon Guzman observed when Ms. Molina was under arrest at her apartment.  The evidence indicates that both at the apartment and at the lockup she should have been in a wheelchair.  In the interview room, she not only lacked the wheelchair, she lacked the walker and had to lean against the table in order to stand. Shortness of breath is consistent with her unaccustomed exertions in walking from her cell to the interview room.  In these circumstances, it is doubtful that the opinion of attorney Bischoff that Ms. Molina needed to go to a hospital would necessarily impress Yost and Gilchrist as a sound of alarm.  Simply returning to her cell and sitting down for awhile might have appeared to a reasonable person as likely to provide the necessary relief.

The defendant Maja Ramirez received five to ten telephone calls from friends of Ms. Molina during the evening of May 25, stating that Ms. Molina needed to take medications.  Ms. Ramirez took no action.  There is no evidence that she was told by any of the callers how critical the need for the medications was or what

could be the result if Ms. Molina did not take them. Nor is there any evidence that Ms. Ramirez asked any of the callers these questions. Ms. Ramirez had no reason to believe Ms. Molina would be deprived of any medication on a long-term basis, since she was due in court the following morning. Nothing in the evidence indicates that Ms. Ramirez had any authority to do anything about medications.

Another witness for plaintiffs is Jasmine Vaccarello, an arrestee who arrived at the lockup at about 11:00 p.m. on May 25. At that time she heard May Molina yelling for the lockup keepers (Yost and Gilchrist), who ignored her. On at least two occasions, Vaccarello "called to the lockup keepers to come help me," and the lockup keepers responded with words to the effect of "shut the f___ up." (Pls.' Resp., Ex. F, Aff. of Jasmine Vaccarello, ¶ 7.) Vaccarello heard May Molina ask the lockup keepers about a telephone, her walker, and something about medications. One of the lockup keepers responded that she was only allowed one phone call.

Vaccarello states that she heard Molina call out "guard," and no one responded. The witness herself then called "guard," and one of the lockup keepers yelled "shut the f_____ up." (Id. ¶ 8.) Vaccarello was able to hear the lockup keepers talking and laughing. After that, she heard Molina snoring loudly, and the snoring eventually turned shallow and softer. Then she could no longer hear the snoring. (Id. ¶ 9.) After Molina stopped snoring,

Vaccarello again tried to call the guards to come, but they did not respond. She could hear them talking and laughing. She states that the lockup keepers did not check the lockup every fifteen minutes as they claim, but instead only twice. (Id. ¶¶ 5-6.)

We think the testimony of Mr. Bischoff and Ms. Vaccarello is sufficient to raise a genuine issue of fact as to whether lockup keepers Yost and Gilchrist were put on notice that May Molina had some kind of serious medical condition that, more likely than not, required medical attention before court the following morning. A jury could find that, in failing to take any steps to secure medical attention for Molina, the conduct of these defendants was objectively unreasonable. The physical symptoms they observed may have been nothing more than the results of Ms. Molina's trying to get around without a wheelchair. But the urgency of Ms. Molina's cries for help, reinforced by the calls from Ms. Vaccarello, could be found to constitute notice that the situation had worsened after Ms. Molina returned to her cell and was no longer experiencing the stress of standing or walking. What Ms. Molina's condition was, of course, was unknown to Yost and Gilchrist, but in a sense that is the very point. They did not know, and arguably took an unreasonable risk in failing to call for competent medical help.[4]

---

[4] Yost and Gilchrist deny the material testimony of Bischoff and Vaccarello, and defendants point out that Vaccarello made several statements that are allegedly inconsistent. But our function at this point is not to decide questions of credibility. We reject defendants' argument that Vaccarello's testimony should be disregarded.

On May 12, 2008, the plaintiffs filed a motion to supplement their summary judgment response with an affidavit of Diane Rice, who states that she was in the 19th District lockup as an arrestee on "March 25, 2004" at approximately 7:30 a.m. when she heard a woman (whose description meets that of May Molina) "yelling for a wheelchair." The witness heard female voices yell back that she could not have a wheelchair. The witness did not hear the woman request medication, but she did hear her yell out that she needed to see a doctor. The witness heard a female voice respond, "M'am [sic] we asked you when you came in if you needed a doctor and you said 'no'." (Pls.' Mot. to Supplement Resp., Ex. A, at 2-3.) Given the history of this case, we assume that the defendants would object to the filing of this affidavit at this late date, but we will allow the motion and consider the affidavit as evidence against the lockup keepers Yost and Gilchrist. We will assume that Ms. Rice is mistaken about the date and that she was in the lockup on May 24, 2004. The effect of Ms. Rice's affidavit is to buttress the conclusion we have already reached that a genuine issue of fact exists as to whether Yost and Gilchrist acted unreasonably.

We would deny the defendants' motion for summary judgment as to the defendants Yost and Gilchrist if the only questions were whether those two defendants were guilty of objectively unreasonable conduct as to the federal claim or reckless conduct as to the state law claims. However, there is the additional question

of whether the evidence shows that the conduct of these defendants was a proximate cause of May Molina's death.  We will address that question in the next section of this opinion.

We will grant the defendant Maja Ramirez's motion for summary judgment.  She was not given enough information in the telephone messages to put her on notice that May Molina's health would be in serious jeopardy if she were not given immediate access to her medication.  Furthermore, nothing in the evidence suggests that, had Ms. Ramirez conveyed the telephone messages to someone in authority at the lockup, the medications would have been provided.

There is no evidence that any other 19th District defendant was put on notice of May Molina's need for immediate medication or medical attention.  There is no need to extend this opinion by describing the circumstances of each of these defendants and explaining why the evidence fails to show any of them had "notice of the arrestee's medical need, whether by word as occurred in Sides, or through observation of the arrestee's physical symptoms."  See Williams, 509 F.3d at 403.  Summary judgment will be entered against the plaintiffs and in favor of the defendants Avis Jamison, Martha Gomez, Maja Ramirez, Elpercy Nichols, Tamara Lemon-Redmond, Arthurinie Pryor, Joseph Giorango, Jose Torres, Debra Holmes, Carol Connolly, Catherine Ziemba, Thomas Becker, William Wallace and Vincent DeFranco on the counts that seek recovery for the injury and death of May Molina.

### The Question of Proximate Cause

In order to recover on any of their claims regarding May Molina, the plaintiffs must show that the conduct of Yost or Gilchrist was a proximate cause of the injury or death. To avoid summary judgment, the plaintiffs must show that <u>admissible</u> <u>evidence</u> raises a genuine issue concerning proximate cause.

We turn, then, to the question of whether the admissible evidence does create a genuine issue as to whether, had Yost or Gilchrist done what they should have done in light of what they observed about May Molina, and seen to it that she was taken to a hospital where she could have been diagnosed and treated, she would not have died or have experienced pain and suffering prior to her death. For purposes of this discussion we will assume that had Yost and Gilchrist sounded the alarm at the point where they should have known hospitalization was necessary, Ms. Molina would have been taken promptly to Cermak Hospital.

We begin with the proposition that this is a matter of expert medical testimony. At an earlier stage of this proceeding we excluded the testimony of plaintiffs' medical expert, Dr. Howard C. Adelman, concerning the cause of death because we found it to be unreliable and therefore inadmissible under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). <u>Ortiz v. City of Chicago</u>, No. 04 C 7423, 2007 WL 2903177 (N.D. Ill. Oct. 2, 2007).

Dr. Adelman has submitted an additional affidavit,[5] which plaintiffs see as curing the Daubert problems we discussed in the opinion of October 2, 2007.

In that opinion, we held that Dr. Adelman's testimony that May Molina died of a diabetic coma was "almost pure speculation and ignores all of the relatively hard evidence that points to a contrary conclusion." Id. at *3. We will examine his new affidavit, dated January 2, 2008, to see whether it raises a genuine issue as to proximate cause.

In order to know whether deprivation of a medication was a cause of suffering or death, it would obviously be necessary to know the answers to several questions: What was the medication and what was the prescribed dosage? What dosage was the patient taking, and what was the therapeutic effect of that amount? What was the duration of the therapeutic effect? What would be the result of the patient's not taking the medication for a period of approximately 24 hours?[6]

Dr. Adelman begins his January 2, 2008 affidavit with the statement that "I have reviewed the list of medications that were prescribed for May Molina Ortiz. Ms. Ortiz had serious physical problems that required her to take these medications on a regular

---

[5] Plfs.' Resp., Ex. N.

[6] The arrest was in the early morning hours of May 25, and the death occurred in the early morning hours of May 26.

basis." He states that she was obese and had an arthritic condition that drastically affected her mobility. She had Type 2 diabetes and "required medication and monitoring to be sure her blood sugar was kept in check." Dr. Adelman goes on in the second paragraph of the affidavit to state that Ms. Molina had high blood pressure, a life-threatening condition.

The source of this information is not disclosed. There is no indication that Dr. Adelman ever consulted with Ms. Molina's treating physician or that he ever examined any medical records of any kind.

Dr. Adelman goes on to say that Ms. Molina's "medications included the following prescriptions" and lists seven different drugs that are used for the treatment of Type 2 diabetes, high blood pressure, asthma and pain. There is no information as to the prescribed dosages for Ms. Molina. For instance, the first medication listed is Glipizide 10 Mg Tabs. Dr. Adelman describes this as "an oral drug that is used for treating patients with Type 2 diabetes." But we do not know from Dr. Adelman's affidavit how often Ms. Molina took these tablets or what the effect on her blood sugar was if she failed to take the prescribed dosage. The same kind of information is missing in his discussion of each of the other six drugs.

The "discussions and conclusions" section of Dr. Adelman's affidavit is a series of hypotheses as to what _could_ have occurred,

assuming that the amount of medication Ms. Molina did not take during the period in question was critical. For instance, he states that "[d]iabetics who are deprived of their medication to control their blood glucose can spiral out of control into a metabolic acidosis, in which the blood can become too acidic due to the accumulation of metabolic byproducts and can result in coma." (Pls.' Resp., Ex. N, at 4.) Granted, there are patients whose blood sugar levels do "spiral out of control" if they are deprived of their medication, but Dr. Adelman offers no evidence that this happened in the case of Ms. Molina. He has no idea whether the dosage Ms. Molina would have taken during the 24-hour period in question was necessary to prevent a coma from occurring during that period.

Although thyroid medication is not included in Dr. Adelman's "list," he mentions in the fifth paragraph of the "discussion" section that "[h]er daughter reported that Mrs. Molina was also taking thyroid medications." He states that such medications typically replace thyroxine, a vital hormone. "Deprived of this vital mediation [sic], Mrs. Molina could well have slipped into a fatal myxedema coma, a comatose state brought about by lack of thyroid function." (Id. at 5.) Again, Dr. Adelman has no information as to what Ms. Molina's thyroid condition was, what the medication was, how much medication she took and how soon

complications would develop <u>for</u> <u>her</u> in the event she failed to take the medication.

At the conclusion of this discussion, Dr. Adelman concludes that "It is, therefore my opinion, to a reasonable degree of medical probability, that Ms. Molina, deprived of her diabetic and thyroid medications fell into a comatose state, most likely a diabetic or myxedematous coma and died." He further concludes that had Ms. Molina been brought to a hospital "even as late as when her lawyer visited with her, the outcome would, to a high degree of medical probability [have] been much different. In the first place, treatment of her diabetes in the form of monitoring her blood sugar and titrating her oral antidiabetic and other medications would probably have prevented her fatal coma." (<u>Id.</u>)

All of these statements are made without Dr. Adelman knowing anything about what Ms. Molina's medical conditions actually were, what treatment she had been under, the dosages of her medications, the effect of those particular dosages on any conditions she had, and how long she could go without those medications before serious complications were likely to occur. And there is no attempt to address the contrary evidence we referred to in our opinion of October 2, 2007.

Most of the relevant information could have been provided by Ms. Molina's treating physician, if in fact she was seeing a

physician.  If there has been any discovery taken of a treating physician, it has not been brought to our attention.

The opinion expressed by Dr. Adelman in his affidavit of January 2, 2008 is no more admissible than his earlier opinion that we held to be inadmissible.  Repeating a quotation we included in that opinion,

> A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997).  The data are almost non-existent.  The opinion proffered is almost entirely speculative.  Plaintiffs have failed to raise a genuine issue as to whether the conduct of the defendants Yost and Gilchrist, or any of the other defendants for that matter, was a proximate cause of May Molina's death or of any pain and suffering she experienced prior to her death.[7]  Summary judgment will therefore be entered in favor of all individual defendants and against the plaintiffs on Counts I, II, VII and VIII of the Fifth Amended Complaint and in favor of the defendant City of Chicago and against the plaintiffs on the respondeat superior claim in Count XIV.

---

[7] Plaintiffs argue that the opinion of Dr. Choi, defendants' medical expert, that May Molina died of opiate intoxication is not supported by the evidence.  We have no occasion to decide whether that is true or not.  Assuming it is true, that would not relieve the plaintiffs of their burden to produce admissible evidence of the cause of death.

DATE:        May 13, 2008


ENTER:

John F. Grady, United States District Judge