IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| APRIL ORTIZ, on her own behalf and as administrator of the ESTATES OF MAY MOLINA and MICHAEL ORTIZ, and SHANNON GUZMAN, | ) ) ) ) ) | 04 C 7423 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Grady |
| CITY OF CHICAGO, THOMAS GAYNOR, RAUL BAEZA, JR., NARI ISAKSON, GILBERTO ESPINOSA, STEPHEN NASSER, JOSE M. DEJESUS, ROBERT STASCH, RICHARD HALJEAN, FABIAN A. SALDANA, NICK SPENCER, AVIS JAMISON, MARTHA GOMEZ, MAJA RAMIREZ, ELPECRY NICHOLS, TAMARA LEMON-REDMOND, DEBRA HOLMES, CAROL CONNOLLY, DIANE YOST, BEVERLY GILCHRIST, CATHERINE ZIEMBA, JOSE TORRES, JOSEPH GIORANGO, ARTHURINE PRYOR, PATRICK McKENNA, THOMAS BECKER, WILLIAM WALLACE, and VINCENT DEFRANCO | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | Jury Trial Demanded |

**PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS'
SUMMARY JUDGMENT MOTIONS (DCKT. NOS. 313 AND 316)**

Plaintiffs, April Ortiz and Shannon Guzman, by and through their attorneys, LOEVY &

LOEVY, under Fed. R. Civ. P. 56 and Local Rule 56(b)(3)(C), respectfully submit the following

combined response to Defendants' Motions for Summary Judgment concerning the improper

searches, arrests, and detentions of Shannon Guzman, May Molina and Michael Ortiz. The

Motions should be denied in their entirety for the following reasons:

## I.  INTRODUCTION

This case is about a destroyed family.  On May 24, 2004, Defendant police officers from the Chicago Police Department stormed into the separate apartments of Michael Ortiz and May Molina.  What followed was an injustice that ended in the deaths of April Ortiz' mother (May Molina), and, eventually, of her brother (Michael Ortiz).

May Molina never left the custody of the Chicago Police, dying 30 hours after the raid, alone in a cell controlled by the Chicago Police Department.  Her son, Michael Ortiz, though an innocent man, was arrested and held in custody for three weeks, until Defendants finally told someone that they never had a reason to arrest Ortiz in the first place.  Although he was released, he never recovered emotionally from the loss of his mother, the circumstances of her death, or his helplessness as she was buried while he sat in jail.

Plaintiffs have unearthed evidence that Defendants were intent on finding a basis to raid Plaintiffs' houses after their own failed week long investigation of the house revealed no evidence of illegal activity.  Contrary to Defendants' story that the raid was done after a good-hearted heroin-addict informant reported that he bought drugs at Plaintiffs' apartments, there is enough evidence in this record that Defendants either made up the fact of an informant or fed information to a heroin addict to act as an informant in order to justify search warrants.  Even if there was an informant, by asserting a privilege to prevent Plaintiffs' discovery relating to the informant, Defendants have forfeited the ability to rely on anything from that informant to support their positions.

In seeking summary judgment, Defendants rely on their own version of the facts, ignore the factual disputes, and ask for all inference in their favor.  Because the standard for summary judgment demands the opposite, summary judgment is not available to Defendants.

## II.  STATEMENT OF FACTS

**A.**     **Defendants Story: The Purported "John Doe" Informant**

Despite substantial evidence (including their own admissions through  affidavits) that there was an unsuccessful ongoing police surveillance of 3526 N. Halsted before May 24, 2004, Defendant Spencer and Haljean claim that they only happened to learn of alleged illegal activity there on May 24, 2004 from an alleged "John Doe" informant whose identity Defendants refuse to disclose in this case.  Pl. Facts at ¶ 11.

Haljean says that the purported informant telephoned him on his personal cell phone on May 24, 2004, while Haljean was at home, to tell him that there were narcotic sales going on at 3526 N. Halsted.  *Id.* at ¶ 12.   According to Haljean, the alleged informant said that he bought two tins of heroin from May Molina and then went outside and into the next apartment and bought one tin from "gordo," though the alleged informant did not say why he would make two separate transactions at one address, and Haljean says he did not question why.  *Id.* at ¶ 12.  Nor did Spencer or Haljean investigate who "gordo" referred to.  Id. at ¶ 15.

Spencer and Haljean describe the purported informant only as a disheveled white male, and they refuse to state his even his age.  *Id.* at ¶ 13.  According to Spencer and Haljean, they met "John Doe" at a gas station across the street from the police station where the three greeted each other by name.  *Id.* at ¶¶ 13, 14.

The alleged "John Doe" did not look like he was "majorly under the influence of drugs at that point" (Spencer and Haljean admit they had both seen the informant high on illegal drugs an unknown amount of times because he is a known narcotics user).  *Id.* at ¶ 14.  If he exists, "John Doe" had no job (outside of illegal activities), no permanent residence, and a long criminal record, including a record of being incarcerated.  *Id.* at ¶ 18.

Haljean and Spencer claim that "John Doe" gave them the names of May Molina and "gordo" as two people he bought drugs from during the early morning hours of May 24, 2004. *Id.* at ¶ 15. But the police documented no evidence that Ortiz was "gordo," nor is there any evidence suggesting that Ortiz ever went by such a nickname. The raid resulted in heroin being recovered from the first floor, but none from the second. *Id.* ¶¶ 58, 72.

Spencer and Haljean claim that after purportedly receiving the tip, they, along with the alleged informant, went across the street from 3526 N. Halsted to look at the house from a restaurant for 20-30 minutes from 2:30 to 3:00 p.m. *Id.* at ¶ 16. Spencer and Haljean claim that during that time, they saw two white males go to each door of 3526 N. Halsted, Chicago, Illinois, though neither Spencer or Haljean documented these observations. *Id.* at ¶ 16. Spencer and Haljean claim that the informant never gave them a reason why he would report his drug purchases, except that he wanted to "help[] out in the community. *Id.* at ¶ 17. To this day, the identity of the alleged "John Doe" is known only to Spencer and Haljean. *Id.* at ¶ 18.

In addition to the sketchy information about "John Doe," Spencer and Haljean admit that he had never before led them to any known convictions and they could not recall him ever even providing information leading to issuance of a search warrant. *Id.* at ¶ 18. Spencer and Haljean do not remember using him again as an informant after the raid on 3526 N. Halsted on May 24, 2004. *Id.* at ¶ 18. The only measure of the purported informant's reliability was the subjective memory of Spence and Haljean – they did not report anything about him to their superior officer, they asked no other officer if the informant was reliable, and they documented nothing about him. *Id.* at ¶ 20.

Defendants' story does not have to be believed by a jury.

**B.      Chicago Police Unsuccessfully Investigated 3526 N. Halsted Before the Raid**

4

Contrary to Spencer and Haljean's story, the record contains much evidence that Defendants were unsuccessfully targeting Molina before the raid and her arrest on May 24, 2004. Pl. Facts at ¶ 36. One week before the raid, Defendants Isakson and DeJesus arrested a woman named Lorrie Ortner, who purportedly told Isakson and DeJesus that heroin was being sold from Molina's first floor apartment at 3526 N. Halsted, Chicago, IL (according to Isakson, Ortner used the exact address, though DeJesus gave conflicting testimony about that issue, first saying she did not, then saying she did). *Id.* at ¶ 7. Neither documented that report.

Around the time of Ortner's arrest, plain clothes Chicago Police officers arrested Alex Rodriguez (at his job at a college – not at his home at 3526 N. Halsted) and tried to get him to say that May Molina was selling drugs from 3526 N. Halsted and that there was a gun at that address – Rodriguez denied both. *Id.* at ¶ 9.

During the week after Ortner and Rodriguez were arrested until the May 24, 2004 raid, Spencer and Haljean conducted a "narcotics surveillance of 3526 N. Halsted Street." *Id.* at ¶ 10. There is no report that either Spencer and Haljean ever saw any illegal activity during that week of surveillance. Although their surveillance never revealed any illegal conduct, Haljean and Spencer told Lieutenant Stasch the day before the raid that they believed there was drug trafficking at 3526 N. Halsted. *Id.* at ¶ 10. The day after reporting that hunch to their lieutenant, according to Spencer and Haljean, the good-hearted informant allegedly spontaneously came to them to report not one, but two purchases of heroin from 3526 N. Halsted.

## C. Spencer and Haljean Draft Factually Untrue Complaints for Search Warrants

Spencer and Haljean drafted complaints for search warrants to search the first and second floor apartments at 3526 N. Halsted. *Id.* at ¶ 21. In the complaints, they identified the residents of 3526 N. Halsted as May Molina, age 55, and "Gordo," which means fat in Spanish. *Id.* at ¶

5

22.  Michael Ortiz' nickname was "Spanky" and he was not called "gordo."  *Id.* at ¶ 22.  Nor was there anyone who went by "gordo" in the 2nd floor apartment.  *Id.* at ¶ 22.

In the complaints for search warrants, Haljean falsely represented that he was a member of the 23rd District tactical team as a basis for obtaining the warrant, claiming that his position as a tactical officer led him to numerous drug arrests.  *Id.* at ¶ 23.  In fact, Haljean had never been a tactical team officer.  *Id.* at ¶ 23.  He further referred to the four alleged people he saw going to the house as "numerous foot traffic."  *Id.* at ¶ 24.

After drafting the complaints, Spencer and Haljean contacted the Cook County State's Attorney's office for approval.  *Id.* at ¶ 25.  According to the Assistant State's Attorney who approved Spencer and Haljean's complaints, he relies on the honesty of the officer submitting the complaints, and he did not investigate the accuracy of the information in the complaints.  *Id.* at ¶¶ 26, 28.  An officer misstating his assignment in a search warrant complaint is a credibility issue that would cause the prosecutor to disapprove a search warrant because he would not approve any complaint for search warrant if it contained a deliberate falsehood.  *Id.* at ¶ 26.

**D.**    **Spencer and Haljean's Claim That Judge Berry Let them Bring the Drug-Addict "John Doe" Into the Judge's House is Refuted By the Judge.**

After getting approval for the search warrant from the State's Attorney's office, Spencer and Haljean contacted a police officer friend from the west side of Chicago and solicited the name of  Judge Berry to take the warrant to on the far south side.  *Id.* at ¶ 29.  Spencer and Haljean claim that they and "John Doe" went directly to Judge Berry's house and Judge Berry said, "Well, come in," so all three of them went into Judge Berry's house for 5 to 15 minutes.  *Id.* at ¶ 30.  Spencer and Haljean say that Judge Berry asked Haljean and the informant if everything in the complaints for search warrants was true.  *Id.* at ¶ 31.  Haljean claims that they went to the

judge's home and not a courtroom so that nobody would see them with the informant. *Id.* at ¶ 32.

Contrary to Spencer and Haljean's story, Judge Berry testified that he does not recall ever allowing a police informant into his house because of concerns about his and his family's safety. *Id.* at ¶ 34. Judge Berry did sign the search warrants at 8:35 and 8:40 p.m. on May 24, 2004, and he would have done that only after asking the officer questions. *Id.* at ¶ 35. Judge Berry testified that a lot of times for John Doe search warrants, the John Doe would not even come before him. *Id.* at ¶ 35. After coming back from Judge Berry's house, Spencer says he dropped the informant off in plain view in a parking lot across from the police station. *Id.* at ¶ 33.

### E. Two Apartments, Six Bedrooms and Eight Tenants at 3526 N. Halsted

On May 24, 2004, Shannon Guzman, Michael Ortiz, Juan Robles, Alex Rodriguez, and Karen Moy all lived on the 2nd floor of 3526 N. Halsted, Chicago, Illinois. *Id.* at ¶ 3. The 2nd floor apartment had three bedrooms – Rodriguez' bedroom was the bedroom in the front of the house (overlooking Halsted) across from the living room, Ortiz' and Guzman's bedroom was in the middle of the apartment, across from the bathroom, and Robles' and Moy's bedroom was in the back of the apartment, across from the kitchen. *Id.* at ¶ 4.

There were also three bedrooms in the first floor apartment. *Id.* at ¶ 6. May Molina lived in the first floor apartment at 3526 N. Halsted, Chicago, Illinois with a woman named Geri and a man named Victor Ocasio. *Id.* at ¶ 6.

At the time of the raid, Guzman, Molina, and Geri were in the 1st floor apartment, and Robles, Ortiz, and a small boy named Ezekial were in the 2nd floor apartment. *Id.* at ¶¶ 37, 52. Searching the first floor apartment were Defendants Nasser, Haljean, Spencer, Statsch, Cortes, Saldana (for two or three minutes), Gaynor, and Shields. *Id.* at ¶ 36. Searching the second floor

7

apartment were Defendants Baeza, Gaynor, Isakson, DeJesus, Espinosa, Stasch, Stasch, Haljean, and Spencer.  *Id.* at ¶ 36.

## F.     The Raid Starts

To start the 2nd floor raid, the police simply crashed through the door of the apartment, breaking the door frame, which almost fell on the boy.  *Id.* at ¶ 37.  Defendants, in plain-clothes and uniforms, poured into the apartment threatening to shoot Ortiz' dog (even though the dog was not threatening).  *Id.* at ¶ 37.  The officers immediately handcuffed Robles and Ortiz behind their backs and Defendant DeJesus ordered them to lie on the floor.  *Id.* at ¶ 38.

At the time of the raid, both Robles and Ortiz looked similar and were similar weight ("very large") and height (around 6'0").  *Id.* at ¶ 38.  While the police were handcuffing him on the floor, Michael Ortiz asked, "What's going on?"  *Id.* at ¶ 38.  Despite the invasion of their apartment, neither Ortiz or Robles caused any trouble during the search.  *Id.* at ¶ 38.

## G.     Robles and Ortiz Questioned About Ortner

While other officers searched the house, Defendant Isakson asked Robles if he knew a woman named Lorrie Ortner.  *Id.* at ¶ 39.   Isakson explained that she had Ortner in custody and wanted information about her contacts with Molina.  *Id.* at ¶ 39.

## H.     Defendants Learn That Ortiz is Not Gordo

During the raid, Defendant Espinosa did a name search for both Robles and Ortiz to check their criminal background.  *Id.* at ¶ 39.  Defendants also asked Ortiz if he went by the nickname "gordo," and Ortiz said that he did not.  *Id.* at ¶ 40.

## I.     Isakson Searches Rodriguez' Bedroom and Finds Innocuous Items That Form the Basis of Ortiz' Arrest

Defendant Isakson and/or her partner, Defendant DeJesus, went to Alex Rodriguez'

bedroom in the front part of the 2nd floor apartment and found "something," while another officer claimed to have found "something" in another part of the same apartment. *Id.* at ¶¶ 44. Shortly thereafter, DeJesus came to Robles and Ortiz with a plastic bag with brown putty (described by Isakson as "tar-like") and told Robles and Ortiz, "we got you." *Id.* at ¶ 45. At the time of the raid, Rodriguez worked at a local school doing building maintenance, and he kept putty and small bottles of building supplies in the house that looked like what Defendants said were drugs. *Id.* at ¶ 45.

The supervising sergeant saw DeJesus and Isakson go into the front (Rodriguez') bedroom to search while Baeza searched Ortiz' and Guzman's middle bedroom. *Id.* at ¶ 46. Isakson also told Saldana that the items she found came out of the front (Rodriguez') bedroom. *Id.* at ¶ 46. DeJesus too agrees with Saldana that Isakson went into the front bedroom (Rodriguez' bedroom facing Halsted) to search and that she removed the non-drugs from that bedroom. *Id.* at ¶ 47.

Robles also heard two male officers claim to have found something in the middle bedroom. *Id.* at ¶ 48. Michael Ortiz saw what they found and told the officers that what they found was just something to make candles. *Id.* at ¶ 48. In fact, the found jar was for candle making, and it was in the common area of the apartment, just outside of the middle bedroom. *Id.* at ¶ 48.

## J. Isakson Now Claims That She Searched Ortiz' Bedroom

Contrary to the witnesses who saw Isakson actually search the front bedroom (Rodriguez'), in the course of this lawsuit (after Ortiz' bedroom has been identified) Isakson claims that she searched the Ortiz-Guzman (middle) bedroom alone for 30 minutes. *Id.* at ¶ 41. Isakson says that when she entered the bedroom, she saw piles of personal property and clothes

9

in the room, though Guzman swears that her room was neat and orderly before the raid. *Id.* at ¶ 41.

Isakson claims in this case that all three items of alleged "contraband" taken from Ortiz' apartment (and one envelope with his name on it) was found by her in his middle bedroom. *Id.* at ¶ 42. Isakson said that she found a black tar-like substance that she says she thought was black tar heroin, even though black tar heroin is rarely found and cannot be identified without testing. *Id.* at ¶ 43. She says that she found white crystals in a jar with a cap that she says looked like crystal meth to her – really the candle making jar outside of the bedroom – though she did not open it. *Id.* at ¶ 43. Isakson also says that she found a medicine bottle with a plastic bag in it with a white "chunky" substance that she says she thought looked like cocain or heroin (Spencer says it looked like crack), though she never took the lid off the bottle and it would be unusual for the drug to be packaged that way. *Id.* at ¶ 43. She says she then gave each item to Spencer. *Id.* at ¶ 43.

**K.    The Items From the Second Floor Were Not Contraband**

There is no dispute that there were no illegal substances recovered from the second floor apartment during the raid. *Id.* at ¶ 73. There is also no dispute that Defendants did not inspect or test the items recovered to make sure that they were not innocuous household items.

Isakson admits she did not open either the jar or prescription bottle to observe the look and smell of the items she recovered. *Id.* at ¶ 43. She also admitted that black tar heroin is rare. *Id.* at ¶ 43. There is no evidence that any of the items were illegal in any way, and  after the recovered substances came back negative for illegal drugs, Ortiz was never charged with any crime relating to them. For instance, the brown putty found in Rodriguez' bedroom was not a substance that would be used to mix with illegal drugs. *Id.* at ¶ 49. Instead, the putty and white

"chunky" substance was construction material kept by Rodriguez in his room. *Id.* at ¶ 45. Similarly, the crystals were candle making materials. *Id.* at ¶ 48.

The police did not test any of the items recovered because the City of Chicago does not have a policy to allow for any type of field testing. *Id.* at ¶ 50. Instead, more than a week later, the Illinois State Police tested the items recovered from Ortiz' and Molina's apartments. *Id.* at ¶ 50.

Based only on a hunch that the items taken from Michael Ortiz' apartment were illegal drugs, Defendants arrested him at 10:07 p.m. on May 24, 2004. *Id.* at ¶ 61. Defendants did not arrest Juan Robles, though he lived in the apartment too and had as much of a tie to Rodriguez' bedroom as Ortiz. *Id.* at ¶ 61.

## L. Defendants Let Michael Ortiz Sit in Jail for Two Weeks After Learning That He Was Innocent

On May 24, 2004, Spencer signed felony complaints against Ortiz based on the three untested items removed from his house. *Id.* at ¶ 72. All of the items removed from Michael Ortiz' apartment were tested by the Illinois State Police and found not to be illegal drugs. *Id.* at ¶ 73. Spencer and Haljean were the officers responsible for finding out the results of the drug testing. *Id.* at ¶ 74. On or about June 3, 2004, the two received a letter from the Illinois State Police crime lab (addressed only to Spencer) advising them that Michael Ortiz was innocent of the drug possession charges against him. *Id.* at ¶ 74.

Even though Spencer and Haljean did not know if anyone else besides them was notified about the test that proved that Ortiz did not possess illegal drugs (*Id.* at ¶ 75), they did nothing with the letter advising them that Ortiz was innocent of the charges against him. *Id.* at ¶ 76. Instead, even though Ortiz was stuck in jail, they acted in accordance with Chicago Police

11

Department policy and training and waited for the next court hearing two weeks later, on June 16, 2004, to reveal Ortiz' innocence. Pl. Facts at ¶ 76, Def. Facts at ¶ 64. Once the State's Attorney found out about the test results, the prosecution was, of course, dismissed. Def. Facts at ¶ 64.

It is consistent with the policies of the Chicago Police Department for an officer to take no action to drop charges or release from custody an arrestee who was arrested for illegal drugs even after the officer is notified that the suspect illegal drugs are not in fact illegal drugs. Pl. Facts at ¶ 76.

## M.    Police Steal Shannon Guzman and May Molina's Property

On May 24, 2004, about 45 minutes to an hour before the raid, Shannon Guzman sat watching television with May Molina in Molina's first floor apartment. *Id.* at ¶ 51. At the time of the raid, Guzman, who was a taxi driver, had her purse with her with more than $300 in it. *Id.* at ¶ 51.

During the course of the raid, a male officer asked Guzman for her identification, and she told the officer that it was in her purse in Molina's room. *Id.* at ¶ 53. The officer retrieved the purse, went through it to find Guzman's state identification or drivers license, and then took the purse to the back of the apartment, telling Guzman she could leave. *Id.* at ¶ 53. Guzman went to look for her purse so she could leave, but the officer who had her purse threatened to arrest her if she did not leave, so Guzman was forced to leave without it. *Id.* at ¶ 54.

After the police left, Guzman returned to the first floor apartment and found her purse, which no longer had the money in it. *Id.* at ¶ 55. In addition to the money in her purse, Guzman had $2,000 (for rent and security deposit for a new apartment) in two lockboxes in Molina's bedroom. *Id.* at ¶ 56. Guzman had asked Molina to keep the $2,000 about five days before the

12

raid and had last seen the money and some of her jewelry in the lockbox the day before the raid. *Id.* at ¶ 56. After the raid, the opened lockboxes were there, but the money and jewelry were gone. *Id.* at ¶ 56. Defendants admit that the money and jewelry were not inventoried by the police. *Id.* at ¶ 57.

Also missing from Molina's apartment after the raid were documents related to her civil rights activities. *Id.* at ¶ 59. In fact, April Ortiz, May Molina's daughter, saw police carry out bags of property, including various documents. *Id.* at ¶ 59.

## N.     May Molina Arrested

During the search of the 1st floor apartment, a police officer claimed to have found illegal drugs in a leather jacket from either the kitchen or May Molina's bedroom. *Id.* at ¶ 58. The leather jacket was not May Molina's nor could it have fit her. *Id.* at ¶ 58.

At 10:07 p.m. on May 24, 2004, Defendants arrested May Molina. *Id.* at ¶ 60. Defendants did not arrest Shannon Guzman and Geri from Molina's apartment. *Id.* at ¶ 60.

## O.     Molina is Kept in Chicago Police Custody for 29 Hours

May Molina was kept in Chicago Police custody from 10:07 on May 24, 2004 until she died alone in her cell at 3:13 a.m. on May 26, 2004. Pl. Facts at ¶ 60; Def. Facts at ¶ 58. Defendants admit that May Molina was not taken for her *Gerstein* hearing (to determine probable cause) on May 25, 2004 (like Michael Ortiz), claiming that lapse was because her fingerprints were not "reviewed downtown" to allow them to get her arrest record in time for the hearing. Pl. Facts at ¶ 63. But Defendants had May Molina's criminal history record before the raid on the house at 3526 N. Halsted on May 24, 2004. *Id.* at ¶ 62.

At 4:36 a.m. on May 25, 2004, May Molina's preliminary booking information and fingerprints were inputted at Belmont and Western. *Id.* at ¶ 64. At 5:14 a.m., the fingerprints

were "accepted" (meaning received) by Sharon Pryor, who works on fingerprints for the Chicago Police Department. *Id.* at ¶ 65. It took the fingerprint technician only two minutes to confirm that the prints were May Molina's, and her identity was confirmed at 7:01 a.m. through the LEADS database. *Id.* at ¶ 66.

From 7:01 a.m. to 11:16 a.m., May Molina's information was sent to the "Instant Update Unit," which was responsible for updating her rap sheet from an old typewritten form into a computer database and checking to see if she had any outstanding warrants. *Id.* at ¶ 67.

At 11:17 a.m., the Instant Update Unit finished its work, so there was no more fingerprint processing to be done. *Id.* at ¶ 68. Molina's arrest processing information and rap sheet were then faxed at 12:12 p.m. from the fingerprint section to the lockup where Molina was being held. *Id.* at ¶ 68.

By 12:12 p.m. on May 25, 2004, May Molina was completely processed, and there was no reason why she could not be sent to court by the lockup keepers anytime thereafter. *Id.* at ¶ 69. In fact, there was a 1:00 p.m. court call available to take May Molina on May 25, 2004, and there was no reason why she could not have been taken there. *Id.* at ¶ 69.

Molina could have been sent to bond court as long as her prints cleared a half-hour to an hour before bond court started, for instance if her prints cleared at 8:30 a.m. to 9:00 a.m., she could have been taken to bond court at 9:30 a.m. *Id.* at ¶ 70.

Defendant Ziemba and Lemon-Redmond were working in the 19th District lockup from 5:30 a.m. to 1:30 p.m. on May 25, 2004. *Id.* at ¶ 71.

### III. ARGUMENT

When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted); *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("summary judgment cannot be used to resolve swearing contests between litigants.").  Of course, summary judgment may only be granted when the evidence submitted, viewed in the light most favorable to the non-movant, shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Because this case presents pronounced genuine issues of material fact as to whether Defendants: (1) illegally searched Plaintiffs' homes (thereby trespassing); (2) falsely arrested Plaintiffs ; (3) unlawfully extended the detentions of both Molina and Ortiz; (4) stole property that did belong to them; and (5) maliciously prosecuted and caused emotional harm to May Molina and Michael Ortiz, summary judgment is not a proper avenue for resolving this case.

## A.       The Searches of the Apartments at 3526 N. Halsted  Were Illegal.

A jury could reasonably find that Defendants Spencer and Haljean violated Plaintiffs Molina, Ortiz and Guzman's right to be secure in their homes because Defendants did not have probable cause to seek warrants of their apartments.  The issue of whether probable cause exists is generally an issue for a jury to decide if the evidence is disputed.  *Washington v. Haupert*, 481 F.3d 543, 551 (7th Cir. 2007).[1]

The fourth amendment to the United States Constitution requires that a warrant be supported by probable cause.  Whether probable cause supports the issuance of a warrant "require[s] the judgment of a magistrate on the probable-cause issue and the issuance of a warrant."  *Chambers v. Maroney*, 399 U.S. 42, 51 (1970).  "Sufficient information must be

---

[1]  The case cited by Defendants at p. 18 (Dckt. 314) to the contrary, *Jones v. Watson*, 106 F.3d 774, 778 (7th Cir. 1997), does not relate to the issue of summary judgment of a probable cause determination.  Instead, it recites a string citation about qualified immunity issues.

presented to the magistrate to allow that official to determine probable cause; his action cannot

be a mere ratification of the bare conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 239

(1983) ("[o]nly in exigent circumstances will the judgment of the police as to probable cause

serve as a sufficient authorization for a search"). Because a magistrate relies on police officers

for information related to the important issue of establishing probable cause sufficient to

authoirze invasion a person's home, officers have a duty to reveal "serious doubts" about an

informant's testimony. *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir.2001).

It goes without saying that Defendants further were not allowed to make material false

statements to obtain a warrant. *Franks v. Delaware*, 38 U.S. 154 (1978).[2] The same rule applies

to omissions kept from the issuer of a warrant. *Id*.

### 1. Defendants may not rely on any information from the purported "John Doe" informant as evidence to justify the search warrants.

Now that the Court has decided that Plaintiffs cannot obtain any discovery regarding

"John Doe," the law requires evidentiary consequences to Defendants, who asked the Court to

bar Plaintiffs' inquiries based on the informant's privilege. Defendants did not have to assert this

privilege – they elected to do so. Having made that election, Defendants cannot have it both

ways. Privileges – whether they be Fifth Amendment, attorney-client, or any other privilege –

cannot be used simultaneously as both a shield and a sword. Thus, when a party asserts a

privilege to preclude its opponent from obtaining information in discovery, it relinquishes the

ability to use that information in its favor at trial. *Manning v. Buchan*, 357 F. Supp. 2d 1036,

1048-1049 (N.D. Ill. 2004) ("Having succeeded in sustaining the [informer's] privilege and in

---

[2] Defendants are incorrect that state law governs the constitutionality of the warrants at issue here. The cases they cite, *U.S. v. Barrett*, 496 F.3d 1079, 1090 (10th Cir. 2007) and *People v. Gorosteata*, 374 Ill.App.3d 203, 208 (1st Dist. 2007), are both criminal cases analyzing state law claims and neither case has any bearing on the analysis of a case under 42 U.S.C. § 1983.

stymieing [the plaintiff's] ability to challenge their reliance on the informants' information, defendants have relinquished the right to use that information for their own benefit at trial."); *citing*, *United States v. Workman*, 138 F.3d 1261, 1264 (8th Cir.1998) (same regarding attorney-client privilege); *Harris v. City of Chicago*, 266 F.3d 750, 754 (7th Cir.2001) (same for Fifth Amendment privilege); *Santelli v. Electro-Motive*, 188 F.R.D. 306, 308 (N.D.Ill.1999) (same for psychotherapist-patient privilege). The rationale is that it is unfair to let a party make selective use of information helpful to him while blocking inquiry into other aspects of the information that might be unhelpful. *See, e.g.*, *Workman*, 138 F.3d at 1263.

In *Manning*, like here, the defendants resisted discovery into the identity of the informant who supposedly gave them information suggesting that Mr. Manning was a suspect in multiple murders. *Manning*, 357 F. Supp. 2d at 1046-1047. Judge Kennelly concluded that once the defense prevented the other side from investigating whether the informant really said what the defendants claimed, the defense could not expect to rely on the purported information at trial. *Id*. at 1048-1049. The court in Manning relied on *Jones v. United States*, 9 F. Supp. 2d 1119, 1139 (D.Neb.1998). Jones involved a claim for wrongful disclosure of tax information by an IRS agent to a confidential informant. The court sustained the defendant's assertion of the informer's privilege, and as in this case, "at the government's insistence . . . prohibited the plaintiffs from discovering the identify of the informant." *Id*. For this reason, the court precluded the defendant from arguing that the plaintiff had failed to prove who had received the disclosure, stating that the defendant could not use the privilege as both a shield and a sword. *Id*.

Judge Kennelly's conclusion is dead on:

> A trial in which the defendants were permitted to declare before the jury that unnamed sources had [given them information] would be an adversary proceeding in name only. It would be grossly unfair to require [the plaintiff] to

> abide the defendants' use of the informants' claims without any ability to reply
> effectively. ****
>
> The [defendants] resisted discovery of the basic information that [the
> plaintiff] needed to attempt to refute the contention that the confidential
> informants' information contributed to their decision to place an informant with
> [the plaintiff] in the Cook County Jail [among other things]. Defendants seem to
> think that having succeeded in sustaining the privilege, they now have free rein to
> use the unnamed informants' information for whatever purpose they believe is
> appropriate. The defendants, who cite no authority for this proposition, have it
> backwards.

*Manning*, 357 F.Supp.2d at 1049-1050. In short, because Defendants chose to assert a privilege

and Plaintiffs could not conduct discovery, Defendants must be stuck with the consequences.

That means Defendants should be barred from relying on what the witness purportedly said or

did.

By the same logic, Defendants should not be able to rely on what a judge determined

based on the testimony over which Defendants asserted the privilege. If Defendants want to be

able to rely on the judge's decision to grant the search warrants, they must participate in

discovery about what led the witness to say what he said to the judge. *Brokaw v. Mercer County*,

235 F.3d 1000, 1016-1017 (7th Cir. 2004) (defendants "cannot escape the consequences of their

(alleged) actions based on the unwitting decision of the various judges involved"); *Haywood v.*

*City of Chicago*, 378 F.3d 714 (7th Cir. 2004) (police could be liable for forged affidavit

submitted at *Gerstein* hearing where it caused magistrate to find probable cause).

Absent the shielded informer's evidence, Defendants have no basis to even ask this Court

for summary judgment regarding the legality of the searches. Even with it, they still would not

be entitled to summary judgment.

**2. A jury could reasonably conclude that Spencer and Haljean are lying about the "John Doe" informant.**

Taken in the light most favorable to Plaintiffs, the evidence in the record provides ample

support for a jury to conclude that Spencer and Haljean's reliance on an informant is a made up fact used to obtain a warrant for the two residences at 3526 N. Halsted. A jury could reasonably conclude that instead, what really happened is that Defendants learned some information about possible drug sales from Molina's house at 3526 N. Halsted and watched the apartment building for a week, but when they did not see anything incriminating, they invented an informant – or fed information to a heroin addict to act as an informant – as an excuse to say they had fresh evidence.

> **a.** **The warrant was really based on an unsuccessful undercover police surveillance**.

Plaintiffs have evidence that Defendants had been watching Molina's house for at least a week trying to dig up information about drug dealing and gun running there. Isakson and Dejesus admit that they arrested a woman named Lorrie Ortner – based on the tip of another "confidential informant"– who allegedly told them that drugs were being sold at Molina's apartment at 3526 N. Halsted. Pl. Facts at ¶ 7. DeJesus and Ortner claim that they never told anyone about that until this lawsuit – not even telling their fellow officers the night of the raid at the same address. Pl. Facts at ¶ 8. According to Isakson and DeJesus, they just ignored Ortner's tip. *Id*. A reasonable jury would likely not believe that – instead a jury could reasonably conclude that if a police officer receives a report of heroin dealing, he would investigate and address the allegation.

Not coincidentally, around that same time, Chicago police officers also arrested Alex Rodriguez where he worked, based on an outstanding warrant. Pl. Facts at ¶ 9. The police who arrested him made it clear to him that they knew that he lived at 3526 N. Halsted, and they drove him by the apartment building. *Id*. The arrest was obviously predicated on something more than

just an outstanding warrant because officers drove him by 3526 N. Halsted and kept asking him if there were drugs and guns at the building. *Id*. Rodriguez denied both even though he was promised help if he said yes. *Id*.

That Ortner and Rodriguez' arrests establish an ongoing investigation of 3526 N. Halsted is corroborated by Defendants Spencer and Haljean, each of whom admit that they were conducting a "narcotics surveillance of 3526 N. Halsted Street" the week leading up to the raid. Pl. Facts at ¶ 10. Defendants Spencer and Haljean did not tell the judge who issued the warrant about the fruitless investigation though. Def. Ex. 3, 4. Instead, all Spencer and Haljean included in their complaint for search warrant was the allegation of the alleged confidential informant. Pl. Facts at ¶ 11.

There is little doubt that if Spencer and Haljean's "narcotics surveillance" had netted any shred of evidence to support a raid of the house, they would have documented that fact and included it in their complaints for search warrants. A jury could reasonably conclude that the absence of such information is because the week long "narcotics surveillance" netted no information that drug sales were indeed taking place. That omission is of great significance, given that it was important evidence rebutting the presence of probable cause, thus it should have been presented to the judge deciding on probable cause.

In fact, what the evidence strongly suggest is that, stymied by the negative results from their "narcotics surveillance," Spencer and Haljean made up the existence of an informant – or fed information to a drug addict to act as an informant – as their sole basis to obtain a warrant. That explanation makes a lot more sense than Defendants' story, and a jury could reasonably conclude that there is no way that their story about the informant who telephoned Haljean on his personal phone to inform on Molina out of the kindness of his heart makes any sense. Pl. Facts

at ¶¶ 12, 17.  That story further makes no sense when one remembers that the drug addict

informant was proposing to get rid of two purported heroin suppliers for no reason other than his

civic duty (or so Defendants say).  Finally, the story is rebutted by Judge Berry, who contradicted

Defendants claim that the informant appeared before him in his house.  Pl. Facts at ¶ 34.  There is

enough evidence in this record, considered in a light most favorable to Plaintiffs, for a reasonable

jury to conclude that Defendants' story about the informant is simply not believable.

### b.    Defendants lied in their complaints for search warrants.

One lie that Defendants cannot escape is that Haljean lied on the face of the search

warrant complaint that he was a tactical officer.  Pl. Facts at ¶ 23, Def. Ex. 3, 4.  On the face of

the complaints, Haljean lied to bolster his credentials in order to get the search warrants – "[i]n

this capacity as a Tactical Officer, your affiant has made numerous arrests of individuals for

delivery and/or possession of a controlled substance." *Id*.  On its face, a jury could conclude that

this statement was a material fact in the determination of probable cause because it underscores

why this officer should be believed in the complaint.  Plaintiffs have even further evidence to

present to a jury.  The Assistant State's Attorney who approved the complaints for search

warrants testified that if had known of the lie that Haljean was a tactical officer, it would be a

credibility issue that would have caused him to disapprove of the complaint.  Pl. Facts at ¶ 26.

A similar lie – or at minimum an exaggeration – is that Haljean stated in his complaints

for search warrant that he personally observed "numerous foot traffic" at 3526 N. Halsted on

May 25, 2004.  Pl. Facts at ¶ 24, Def. Exh. 3, 4.  Haljean admitted that "numerous foot traffic"

consisted only of four people coming to the three apartment building. *Id*.  A jury could conclude

that this lie (or blatant exaggeration) was a material misstatement in the complaint alleging

probable cause for the warrants.

c. **The evidence supports that no informant met with the judge who signed the warrant.**

Even though they were assigned to a north side district and the warrant related to a north side residence, Spencer and Haljean drove to the far south side to meet with the judge who approved the warrant. Pl. Facts at ¶ 29. They drove all that way after consulting with a police officer friend about who to take the warrant to. Pl. Facts at ¶ 29. They claim that they could not take the informant to a courthouse because someone might see them with the informant (Pl. Facts at ¶ 32), but that doesn't explain why they did not take him to a courthouse far away from the neighborhood since they were already driving to the far south side.

Contrary to Spencer and Haljean's testimony that the judge welcomed them and the drug addict informant into his home (Pl. Facts at ¶ 30), Judge Berry testified that he does not recall ever allowing an informant into his house because of obvious concerns about his and his family's safety. Pl. Facts at ¶ 34. A jury could reasonably conclude that Defendants Spencer and Haljean are flat out lying when they say that they took an informant into the home of a presiding judge, and that they did so because there was no informant. Instead, a jury could further find that Judge Berry simply took Spencer and Haljean on their word that an informant existed, but that reliance was misplaced.

Fundamentally, Spencer and Haljean were required to tell Judge Berry the truth about their unsuccessful "narcotics surveillance" and that there was no informant. Either of those omissions are enough for a reasonable jury to conclude there was a lack of probable cause to search Ortiz and Guzman's apartment. The lack of probable cause is further corroborated by the other evidence in the record.

d. **The evidence in the record supports that Spencer and Haljean did not tell the truth to obtain the warrants.**

22

The record further contains other evidence that a jury could draw upon to decide that the existence of a confidential informant was simply made up – or that Spencer and Haljean fed incriminating information to someone claiming to be an informant – after the failure of the week-long "narcotics surveillance" and/or that Spencer and Haljean were withholding material information from Judge Berry.

Spencer and Haljean claim that they have no documents related to the informant. A jury could reasonably find that claim to be unbelievable and evidence that there is no informant or that information was fed to someone to act as an informant.

A reasonably jury could conclude that the story of the purported informant, on its face, makes no sense. According to Spencer and Haljean, the informant had gone to Molina's house and bought two foil wrapped tins of heroin and then went to Ortiz' house and bought one of the same – why wouldn't he have just bought three from Molina, before informing on her out of the kindness of his heart. The answer cannot be that (as Spencer claimed late in this litigation) that Molina had run out and Ortiz had some – the raid netted dozens of heroin packets from Molina's first floor apartment and absolutely zero from Ortiz'. Also, it is incredible to believe that Molina and Ortiz –mother and son – had set up competing heroin dealerships in the same apartment building, especially since there was no heroin found in the upstairs apartment or drug dealing material found anywhere in the building. According to the police report, paraphernalia associated with drug dealing was not found in either apartment – there were no scales, pagers, packaging materials, large sums of money, or guns. Def. Exh. 23, 24.

The evidence further establishes prosecutor and judge shopping. A jury could conclude that Defendants were seeking out a judge more likely to issue a search warrant based on the sole representations of the police officers. In other words, the judge did not commit misconduct, but

23

he was more receptive to taking police officers at their word when those officers were seeking a warrant. Judge Berry testified that he often did approve a "John Doe" warrant without requiring the informant to appear before him. Pl. Facts at ¶ 35.

Similarly, a jury could reasonably conclude from Defendants' method that they were looking for a prosecutor who would be willing to approve a warrant for Ortiz and Guzman's apartment despite the incredible nature of a second drug buy from the purported informant. The Assistant State's Attorney approved one complaint for search warrant at 7:35 p.m. on May 24, 2004. *Id*. at ¶ 27. Only after he approved the first Complaint for search warrant, at 7:47 p.m., did Defendants fax the second one for the 2nd floor apartment. *Id*. There is no reason why Defendants could not have gone to a courthouse for the search warrant and no reason why they could not have faxed the search warrants together. A reasonable jury could conclude that Defendants were gaming the system to increase the odds of getting a warrant based on questionable evidence.

Later events also can be considered by a reasonable jury to conclude that Defendants' lies and omissions were intentional. Although the relevant inquiry is what Defendants knew at the time, later facts establish that Defendants are being dishonest about what they say happened.

For instance, Defendants all claim that Michael Ortiz was called "gordo," but nobody who knew Ortiz ever heard him referred to as "gordo," which means "fat" in Spanish. Pl. Facts at ¶ 23. Ortiz' did have a nickname – Spanky. *Id*. Hence, when Defendants want to claim credibility because the "informant" referred to a "gordo" in the second floor apartment it actually cuts against them.

More importantly, Defendants say that the "informant" related that he bought a foil packet of heroin, but at the raid – done just hours after the purported informant's report – there

24

were no such foil packets (or any illegal drugs whatsoever) in Ortiz' apartment. Hence, that fact

undercuts Defendants' credibility on the existence of an informant and a reasonable jury could

consider that to conclude that Defendants were lying all along about the informant.

### 3. Even if the John Doe story is believable, Spencer and Haljean did not tell Judge Berry about other relevant facts that refute probable cause.

Even if a jury believed in the existence of a confidential informant, it could reasonably

conclude that Spencer and Haljean withheld other material facts from the judge that would have

factored into his decision on probable cause.

As noted above, Spencer and Haljean also failed to tell the judge in the complaint that

they had conducted a week long "narcotics surveillance" at the address and that the surveillance

netted no evidence of drug dealing. A jury could reasonably conclude that if they had learned

such evidence from the surveillance, they would have shared that with the judge.

Although Defendants want to say that the alleged informant came to Haljean out of the

kindness of his heart, that story is so incredible that a reasonable jury could disbelieve it. Instead,

if it concludes that a confidential informant exits, it could reasonably conclude that the informant

was offered some sort of consideration (*i.e.*, an agreement not to arrest, money, more drugs,

leniency). The failure of Defendants Spencer and Haljean to tell the judge about any deals made

with the informant is material evidence that the judge would have needed to decide about the

existence of probable cause.

Haljean described the "informant" as not "majorly under the influence of drugs" when he

made his report to him and Spencer. Pl. Facts at ¶ 14. That evidence was not relayed to Judge

Berry to consider in making his decision on probable cause.

Neither did Spencer or Haljean do a criminal record check on the informant before

seeking the warrant. Pl. Facts at ¶ 19. Nor did they tell Judge Berry that the alleged informant had never led them to any convictions or other search warrants before, that he had no job, no permanent residence, and a long criminal record. Pl. Facts at ¶ 18. A reasonable jury could find that these were all material facts affecting probable cause that were withheld from the judge by Defendants.

Finally, Defendants failed to advise the judge that the evidence of narcotics trafficking on the second floor consisted of two people going to the outside door that actually led to the second and third floors.

The bottom line is that whether Defendants presented proper evidence to Judge Berry to establish probable cause to search the Ortiz and Guzman residence is a question of fact that needs to be decided by the jury. Plaintiffs have identified sufficient evidence to find that Defendants violated Plaintiffs' fourth amendment rights based on the evidence they both told and withheld from Judge Berry.

**4. "John Doe" was not a reliable basis to obtain a warrant.**

According to Defendants Spencer and Haljean, "John Doe" was a drug addict with a long criminal past. Even though Spencer and Haljean claimed to have used "Doe" as an informant, they did not know if any of his tips ever led to convictions. Furthermore, Spencer and Haljean acknowledge that "Doe" had ingested heroin that very day. Nor had Spencer and Haljean ever used "Doe" to obtain a search warrant before May 24, 2004. Based on the above facts, "John Doe" was not a reliable informant for purposes of obtaining a warrant without any corroborating facts. Pl. Facts at ¶ 78.

**B. There was no Probable Cause to Arrest Michael Ortiz.**

Everyone agrees that Michael Ortiz was arrested even though there were no illegal items

26

found in his apartment. The evidence establishes that Defendants Spencer, Haljean, and Isakson ignored the evidence that Michael Ortiz was completely innocent when they arrested him.

To prevail on their false arrest claims, Plaintiffs must establish that Defendants arrested him without probable cause to believe both that a crime had been committed and that either Ortiz or Molina is the one who committed it. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013 (7th Cir. 2006). Probable cause exists only if at the moment of arrest, the facts known to the officers would warrant a prudent man in believing that the suspect had committed a crime. *Maryland v. Pringle*, 540 U.S. 366, 124 S. Ct. 795, 799 (2003); *Beck, 379 U.S. at 91; Sornberger*, 434 F.3d at 1013 (citations omitted). Probable cause requires more than a mere suspicion that someone has committed a crime. *Bostic v. City of Chicago*, 981 F.2d 965, 968 (7th Cir.1992). In a damages suit such as this one, the existence of probable cause is typically within the province of the jury. *Chelios v. Heavener,* 520 F.3d 678, 686 (7th Cir. 2008); *Washington v. Haupert*, 481 F.3d 543, 551 (7th Cir. 2007); *Sornberger v. City of Knoxville*, 434 F.3d at 1013-1014 ("The question of probable cause is typically 'a proper issue for a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'").

As noted above, the officers were well aware that there was no probable cause to believe that Michael Ortiz had committed any crimes even before the unlawful raid on his house. During that raid, Defendants found nothing illegal in Michael Ortiz' house and had no reason to arrest him.

As a threshold matter, there was never a basis to identify Michael Ortiz as "gordo" as Defendants would like to do for this case. Pl. Facts at ¶¶ 22, 40. To reinforce that Ortiz is not "gordo," police never found heroin – let alone foil packets of heroin – in Ortiz' house despite

Defendants' claim they were told that "gordo" sold him tinfoil packets of heroin that very day. Hence, Defendants cannot bootstrap their probable cause argument to any identification of Ortiz as being a drug dealer.

Moreover, there is a dispute of fact about where the items that were the basis for Ortiz' arrest were found. Defendants claim that they arrested Ortiz because the "contraband" found in the apartment were found in his room. But that is highly disputed and cannot be the source of summary judgment for Defendants.

Although Defendants claim that all of the "contraband" found in the apartment was found in Ortiz' bedroom, eyewitnesses dispute that. Juan Robles, who lived in the apartment, testified that Defendant DeJesus removed the brown construction putty from Rodriguez' bedroom. Pl. Facts at ¶ 45. Consistent with Robles, Defendant Isakson at the time of the raid told Defendant Saldana (who saw Isakson searching the front bedroom) that all of the "contraband" items were found in the front (Rodriguez') bedroom. Pl. Facts at ¶ 46. DeJesus confirms that the items came from Rodriguez' bedroom (facing Halsted). Pl. Facts at ¶ 47. As far as the candle-making jar, Plaintiffs have evidence that it was kept in the common area, not in Ortiz' bedroom. Pl. Facts at ¶ 48. In short, a jury could reasonably conclude that Defendants had no basis to ever believe that Ortiz possessed anything illegal in his apartment.

Even if any of the three recovered items were found in Ortiz' bedroom, Defendants had nothing more than a suspicion that any of the items were illegal substances. Remember, they were looking for foil packets of heroin – nothing they recovered resembled that. Instead, they recovered construction putty, a small medicine bottle with other construction material in it, and a candle-making jar. Pl. Facts at ¶¶ 45, 48. A jury could conclude that there was never a basis to arrest Ortiz based on Defendants' hunches that the household items in the Ortiz and Guzman

residence were "contraband."

Instead of going with mere hunches, Defendants were obligated to field test the unknown items, or delay charging Ortiz until they could do a test. Pl. Facts at ¶ 79. Recall again that none of the items matched what "John Doe" said he obtained from "gordo." Given the lack of any corroboration that the items were likely to be illegal drugs, Defendants were obligated under nationally accepted police standards to hold off charging Ortiz until they actually had real evidence. *Id*.

Defendants point to their own self-serving bald testimony that the items looked like illegal drugs. A reasonable jury could reject those claims – especially since there are any number of regular household objects in anyone's house that a police officer could say looks like illegal drugs. Similarly, there is nothing in the record to suggest that any of the items taken from Ortiz' apartment are "mixing agents" for illegal drugs, as Defendants suggest. The fact is that people keep legal white powder, crystals, and putty in their house and police are not allowed to arrest people based on their guess or hunch that such items are illegal. The assertion to the contrary rests on the bald claims of Defendants, which a reasonable jury could reject. That is ever more true when the jury considers that Defendants did not even open the items to inspect them to see if they felt or smelled like drugs.

## C. All officers who knowingly went along with the arrest of Michael Ortiz are liable.

Defendants Spencer and Haljean were the arresting officers and are culpable for the false arrest, but the other officers who conspired with them are also liable for the false arrest. *See Jones v. City of Chicago*, 856 F.2d 985, 992-993 (7th Cir. 1988). To be liable as a conspirator, "one must be a voluntary participant in a common venture, though one need not have agreed on the details of the conspiratorial scheme . . .; it is enough that one understand the general

objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do one's part to further them." *Id.* Courts frequently recognize the reality that a conspiracy, by definition, occurs behind closed doors, outside the presence of the object of the conspiracy. *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) (a conspiratorial "meeting of minds . . . may need to be inferred even after an opportunity for discovery, for conspirators rarely sign contracts"). Thus, circumstantial evidence is sufficient to survive a motion for summary judgment. *See Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984) ("Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire" and thus "circumstantial evidence may provide adequate proof of conspiracy"). *See also, Cameo Convalescent Center, Inc. v. Senn*, 738 F.2d 836, 840-41 (7th Cir. 1983) ("existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide.").

Here, there is enough circumstantial evidence for a jury to conclude that Defendant Isakson was part of the conspiracy to arrest Michael Ortiz without probable cause. The evidence, taken in the light most favorable to Plaintiffs, establishes that the "contraband" was found outside of Ortiz' bedroom, but that Isakson made up evidence that she found the items in Ortiz' bedroom. Similarly, both Isakson and DeJesus are implicated because both admit that they obtained the Lorrie Ortner evidence, and a reasonable jury could conclude that they were then part of the scheme to make up evidence about a "John Doe" and/or arrest Ortiz on simply a hunch that he had something to do with Ortner. A jury could further reasonably conclude that Isakson and DeJesus participated or led Spencer and Haljean to conduct the "narcotics surveillance" that obviously netted no evidence of wrongdoing by Ortiz.

**D.     Defendants Spencer and Haljean are guilty of false imprisonment by letting Michael**

**Ortiz sit in jail even after learning that he was innocent.**

Spencer and Haljean learned that Ortiz was innocent, but sat on that evidence for almost two weeks. They want to claim that it was not their obligation to tell anyone of Ortiz' innocence, but that is simply not the case. *Jones v. City of Chicago*, 856 F.2d 985, 988, 993 (7th Cir. 1988). In a case with quite similar allegations, the court denounced "a frightening abuse of power by members of the Chicago police force," when police officers "deep-sixed" exculpatory evidence that would have exonerated a young man who was in jail awaiting trial. As was the case here, the officers "had a hunch he was guilty and were not going to let a mere absence of evidence stand in their way." *Id*. at 993. The court found that if prosecutors had known of the exculpatory evidence, they would almost certainly have dropped the charges. *Id*. The court affirmed the jury's judgment in favor of the plaintiff for damages on his claims including false imprisonment, intentional infliction of emotional distress, and malicious prosecution, as well as conspiracy to commit these wrongs.

The *Jones* court was dismissive of the officers' effort to pass the buck and avoid liability, explaining, "[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial – none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision." *Id*. (citations omitted). Thus, officers who withhold information from prosecutors that would have caused the state to drop its criminal charges against the defendant can be liable for both Fourth Amendment violations and violations of due process. *Id.*, 856 F.3d at 994. The court concluded that, regardless of how the violation is categorized, officers are liable for a defendant's continued confinement, when they hold exonerating evidence that could have caused the state to drop its charges:

It is true that at some point after a person is arrested, the question whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause (and after conviction to the Eighth Amendment's cruel and unusual punishments clause, but that is not relevant here) . . . . But the causal inquiry is unchanged. If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded.

*Id.*

Thus, here, a reasonable jury could find in favor of Plaintiffs' because Ortiz suffered extended pre-trial detainment as a direct result of Defendant Sperncer and Haljean's failure to inform the prosecutors of exculpatory evidence. By not letting prosecutors know that the items taken from Ortiz' apartment were not illegal, Spencer and Haljean caused Ortiz to sit in jail for two additional weeks. Had they turned over that information, then the prosecutor could have moved for the release that much earlier. Without that information, however, there was no way for the prosecutor to do so.

A similar result was reached in *Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992), where, in denying summary judgment, the court found that a fact-finder could reasonably conclude that the defendant police officer "deliberately looked the other way in the face of exonerative evidence indicating that he had arrested the wrong man." The court held, "Lt. McCoy's deliberate failure to disclose this undeniably credible and patently exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability under § 1983." *Id. See also Olson v. Tyler*, 771 F.2d 277, 282 (7th Cir. 1985) ("Where the judicial finding of probable cause is based solely on information the officer knew to be false or would have known was false had he not recklessly disregarded the truth, not only does the arrest violate the fourth amendment, but the officer will not be entitled to good faith immunity.").

Here, there is no dispute that Defendants Spencer and Haljean learned from the June 3, 2004 letter sent to Spencer that Michael Ortiz was not guilty of possessing illegal drugs – the crime they had arrested him for on May 24, 2004.  Spencer admits he did not know if anyone else was notified about Mr. Ortiz' innocence.  Rather than immediately go to the prosecutor to advise that Mr. Ortiz was innocent of those charges, they sat on the evidence and let him sit in until June 16, 2004.  In short, Spencer and Haljean let Ortiz sit in jail for almost two weeks, all the time knowing that Ortiz was innocent of the charges they made against him.

It is no excuse to guess that the prosecutor might have charged Ortiz with another crime (he didn't).  Under *Jones*, the duty is on these officers to alert the prosecutor of this evidence of innocence and let the prosecutor take whatever actions she deems proper.  To sit by silently as an innocent man loses two weeks of his liberty is unconscionable.  *Jones*, 856 F.3d at 994.

**E.      Defendants Ziemba and Lemon Redmond Unreasonably Detained May Molina from Going to a *Gerstein* Hearing.**

Separate from the requirement for probable cause, a warrantless detention must be reasonable in length.  Here, Defendants delayed May Molina from attending the first available *Gerstein* hearing while they were updating her arrest record for their own clerical purposes.  That delay is a separate Fourth Amendment violation for which Plaintiff is entitled to damages.  *See Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006) ("[A]  prompt judicial determination of probable cause following a warrantless arrest is a core Fourth Amendment requirement").

 In *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) , the United States Supreme Court explained the basis for the right to a prompt judicial probable cause determination following a warrantless arrest:

> Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships.  Even pretrial release may be accompanied by

burdensome conditions that effect a significant restraint of liberty. When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty. Accordingly, we hold that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." Id. (citations omitted).

In *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991), the Supreme Court established a presumptive limit of 48 hours from arrest to the probable cause hearing. The Court was careful to note, however, that delays of less than 48 hours "may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. " *Id*.

Here, May Molina was kept in police custody for 30 hours without a *Gerstein* hearing until she died alone in her cell.  There was no reason why she could not have been taken before a judge the day after her arrest, however.  May Molina's booking information was completed at 4:36 a.m. on May 25, 2004.  Pl. Facts at ¶ 64.  At 5:14 a.m., those prints were electronically received for processing by the fingerprint analysts.  Pl. Facts at ¶ 65.  It took only two minutes to confirm that the fingerprints belonged to May Molina and her identify was confirmed at 7:01 a.m. through the police database.  Pl. Facts at ¶ 66.  At that time, there was no reason why Molina could not have been taken for *Gerstein* hearing.

Consistent with their practices, instead of informing the lockup keepers that the analysis was done, the clerks kept her paperwork an extra four plus hours to update her rap sheet from a typewritten form into a computer database, basically to update the police record keeping of Molina.  Pl. Facts at ¶ 67.   After that four hours, Molina's new computer generated rap sheet was faxed to the lockup at 12:12 p.m.  Pl. Facts at ¶ 68.  Even with this delay, Defendants Ziemba and Lemon-Redmond could have taken May Molina to a judge that afternoon for her *Gerstein*

hearing.  Pl. Facts at ¶¶ 69-71.

The Chicago Police Department did not need to keep May Molina locked up while they updated her rap sheet.  They could have done those updates at any time, and a jury certainly could find that to delay an arrestee's right to a *Gerstein* hearing for that clerical task is unreasonable.

Defendants claim that there was an issue about May Molina's fingerprints being processed.  Even if that were true, there was still no reason to delay her *Gerstein* hearing.  As noted above, Molina's fingerprints were fully processed at 7:01 a.m., sufficient notice to get her to a court well before a 9:30 a.m. court call.  Pl. Facts at ¶ 70.  Regardless, the police had May Molina's criminal history, which a jury could reasonably conclude included all outstanding warrants, before she was even arrested.  Pl. Facts at ¶ 62.  Thus, they did not have to wait for her criminal history – the whole reason why fingerprints are processed.  Pl. Facts at ¶ 63.  Defendants have never identified what information they needed after her fingerprints were fully processed at 7:01 a.m.[3], and, taken in the light most favorable to Plaintiffs, a jury could reasonably conclude that the evidence establishes that May Molina was unreasonably delayed from being taken to her *Gerstein* hearing.

## F.    The Record Does Not Support Qualified Immunity

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court set out a two-part test

---

[3]  Plaintiffs move to reconsider the Court's prior summary judgment ruling in favor of Defendants and against Plaintiffs relating to May Molina's death in custody.  It was objectively unreasonable for Defendants not to take Molina to bond court on May 25, 2004 after they learned of her serious medical need.  Based on discovery made available only after the Court's summary judgment ruling, there was no reason why May Molina could not have been taken for her *Gerstein* hearing during the morning or early afternoon of May 25, 2004.  A reasonable jury could certainly find that to not take her during those times, knowing of May Molina's serious medical need, was objectively unreasonable.

for qualified immunity. First, a court must decide whether the facts, when viewed in the light most favorable to the plaintiff, indicate that the actor's conduct violated the plaintiff's constitutional right. 533 U.S. at 201. Second, if the answer to the first question is "yes," then the court must determine whether the constitutional right violated was "clearly established" at the time of the alleged violation. *Id*. *See also Purtell v. Mason*, 527 F.3d. 615, 621 (7th Cir. 2008). The state actor is only entitled to qualified immunity if the court finds that a right was not violated or the right was not clearly established. *Id*. Here, as stated above, Defendants violated Plaintiffs' rights and those rights were clearly established at the time of the violation.

The clearly established constitutional rights at issue here are the rights: (1) to be secure from unreasonable searches based on incomplete or misrepresented evidence to a magistrate asked to issue a search warrant. *Franks v. Delaware*, 38 U.S. 154 (1978); *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir.2001); (2) to be free from arrest without probable cause (*see Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006)); (3) to be free from unreasonable delay in a Gerstein hearing, *See County of Riverside v. McLaughlin*, 500 U.S. 44 (1991); and (4) to have evidence of one's innocence tendered to a prosecutor so that charges can be dismissed. *Jones v. City of Chicago*, 856 F.2d 985, 988, 993 (7th Cir. 1988).

All of those rights were clearly established at the time of events in this case. The law is also well established that a police officer seeking a search warrant must fully inform the magistrate of the facts needed to establish probable cause, including informing the magistrate of all facts that detract from probable cause. *Illinois v. Gates*, 462 U.S. 213, 239 (1983); *Franks v. Delaware*, 38 U.S. 154 (1978); *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir.2001). The Seventh Circuit has held that the right to be from unreasonable arrest has been established since

36

*Beck. Sornberger v. City of Knoxville*, 434 F.3d at 1013 ("The constitutional right to be free from arrest without probable cause indisputably was established at the time [plaintiffs] were arrested."), *citing Beck v. Ohio*, 379 U.S. 89, 91 (1964). As far back as *Olson v. Tyler*, 771 F.2d 277, 282 (7th Cir. 1985), the Seventh Circuit concluded that an officer is not entitled to immunity when he knows and disregards that probable cause to detain an arrestee is based on false information. Similarly, it was established long before 2004 that police officers can be liable under Section 1983 if they unreasonably delay a probable cause hearing. *See County of Riverside v. McLaughlin*, 500 U.S. 44 (1991); *Willis v. City of Chicago*, 999 F.2d 284 (7th Cir. 1993).

**G.      There is Sufficient Evidence to Take Plaintiffs' State Law Claims to a Jury**

> **1.      A jury could reasonably find that Defendants Baeza, Gaynor, Isakson, DeJesus, Espinosa, Stasch, Stasch, Haljean, and Spencer trespassed at Ortiz and Guzman's apartment.**

As identified above, a reasonable jury could find that all Defendants who entered into Ortiz and Guzman's apartment had no lawful basis to be there. Such a finding would subject each Defendant to liability for trespass. A trespass is an invasion in the exclusive possession and physical condition of land. *Lyons v. State Farm Fire and Cas. Co.*, 349 Ill.App.3d 404, 411 (5th Dist. 2004). There is no dispute that Defendants invaded Ortiz' and Guzman's exclusive possession of their home by physically entering their property. Defendants crashed open the door and ransacked the apartment. If a jury concludes that Defendants had no lawful basis to have entered into the apartment, it could also reasonably conclude that a trespass was committed.

> **2.      A jury could reasonably find that Defendants Nasser, Haljean, Spencer, Statsch, Cortes, Saldana, Gaynor, and/or Shields committed conversion by taking Guzman's personal property from Molina's apartment.**

Each of the above identified Defendants admit to being in Molina's apartment, where Shannon Guzman's personal property was stolen during the raid. Pl. Facts at ¶ 36. To prove

conversion, Guzman must establish that: (1) she has a right to the property; (2) she has an absolute and unconditional right to the immediate possession of the property; (3) she made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Loman v. Freeman*, 229 Ill.2d 104, 127, 890 N.E.2d 446 (2008); *quoting Cirrincione v. Johnson*, 184 Ill.2d 109, 114, 234 Ill.Dec. 455, 703 N.E.2d 67 (1998).

Guzman can establish each of those elements. Defendants admit that nobody inventoried Guzman's property after the raid. Def. Mot. (Dckt. 314) at 22. That is exactly the problem – a police officer would not report his own theft in a police report.

Guzman testified that she saw her property – money and jewelry – in Molina's room the day before the raid and had money in her purse when the police entered Molina's apartment. She saw officers in Molina's room and an officer holding her purse. In fact, she asked for the return of her purse, but instead of returning it the officer threatened to arrest her. The night of the raid, Guzman returned to Molina's apartment, but her money and jewelry were gone. Because Defendants had exclusive possession of the apartment when the property was there and it was missing after they left, a reasonable jury could conclude that one or more Defendants took Guzman's valuables. Defendants have never articulated a lawful basis for keeping her property (instead just disputing the fact that they took it) and have never agreed to return the property to Guzman, despite Guzman's demand in this suit for the return of the property.

Guzman's conversion claim is the epitome of a material dispute of fact. The issue ultimately boils down to Guzman's testimony that Defendants took it, and Defendants' claim that

they did no such thing.[4]

**3.      A jury could reasonably find Defendants Spencer and Haljean liable for false imprisonment**.

To establish a claim of false imprisonment, Plaintiffs must show that Ortiz was restrained by Defendant and that they restrained him without probable cause.  *Boyd v. City of Chicago*, 378 Ill.App.3d 57, 70 (1st Dist. 2007).  Thus, the analysis for this claim tracks the false arrest analysis above.  Plaintiffs have enough evidence to take to a jury to prove that Defendants had no reason to believe that Ortiz had committed a crime.  They found no suspected  "contraband" in his bedroom.  Even if the items were found in his bedroom, there was no basis outside of a simple hunch to believe that the household items were illegal substances.

Even after Defendants Spencer and Haljean were told that their hunches were wrong and that the items taken from Ortiz' apartment were not illegal – proving the lack of probable cause to keep him detained – they stood silently by while Ortiz lost two weeks of his life sitting at Cook County Jail.  There is more than enough evidence for a jury to reasonably find for Plaintiffs on Ortiz' false imprisonment claim.

**4.      A jury could reasonably find Defendants Spencer,  Haljean, Isakson, and DeJesus liable for the malicious prosecution of Ortiz**.

A jury could further reasonably find that the above Defendants maliciously prosecuted Ortiz. In order to establish malicious prosecution,  Plaintiffs must establish: (1) the

---

[4]  If the Court finds that Guzman has failed to meet any of the elements to prove conversion, then Guzman asserts a due process claim based on Defendants depriving her of property without due process of law.  Ordinarily, such a claim might be barred by the availability of a tort action. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable post deprivation remedy."); *Manos v. Caira*, 162 F.Supp.2d 979, 991 (N.D.Ill. 2001).  But if that remedy is not available to Guzman, then her due process rights were violated.

commencement or continuation of judicial proceedings; (2) the termination of the prosecution in favor of the accused in a manner indicative of innocence; (3) the absence of any probable cause for the proceedings; (4) the presence of malice; and (5) resulting injury. *Reynolds v. Menard, Inc.*, 365 Ill. App. 3d. 812, 818-819 (1st Dist. 2006). For each element, there is more than sufficient evidence for Plaintiffs to prevail.

Ortiz was prosecuted in Cook County Circuit Court – based on complaints signed by Spencer and Haljean – and the prosecution was dismissed after it became clear that Ortiz did nothing wrong. As stated above, Defendants never had probable cause to initiate the prosecution, especially after learning that the items taken from Ortiz' apartment were not illegal drugs. Moreover, a reasonable jury could conclude that Defendants were looking to arrest Ortiz on the flimsiest of evidence based on their spending a whole week conducting a "narcotics surveillance" – their surveillance was not going to end in anything but an arrest regardless of the lack of evidence That is sufficient evidence of malice for a reasonable jury to find for Plaintiffs. Even without that evidence, malice may be inferred by the lack of probable cause absent other credible evidence that refutes the inference. *Salmen v. Kamberos*, 206 Ill.App.3d 686 (1st Dist. 1990). Finally, Ortiz spent more than twenty days in Cook County Jail based on the prosecution – sufficient evidence of damages.

**5. A reasonable jury could find that Defendants Spencer and Haljean are liable for intentional infliction of emotional distress**

There is more than enough evidence for a jury to reasonably conclude that Defendants are liable to Plaintiffs for intentional infliction of emotion distress caused to Michael Ortiz. In order to prove this claim, Plaintiffs must establish: (1) extreme and outrageous conduct; (2) intent to inflict severe emotional distress or knowledge that there was a high probability that her conduct

40

would do so; and (3) severe emotional distress suffered by Plaintiff. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 268-269 (2003). There is more than enough evidence of each element here.

A reasonable jury could conclude that arresting Ortiz without probable cause and knowingly letting him sit in jail, even after the pretext for that arrest was proven to be just that, was extreme and outrageous. A jury could further find that Spencer and Haljean must have known that letting an innocent person sit in jail would cause severe emotional distress. Finally, there is sufficient evidence to take to a jury that being deprived of his liberty caused Ortiz severe emotional distress – especially because he was innocent and it was at the same time that his mother died and his family was grieving. Pl. Facts at ¶ 77.

### 6. Illinois Civil Rights Act

Plaintiffs' agree with Defendants that the Illinois Civil Rights Act allows for Plaintiffs to assert the same kind of claims against Defendants under the Illinois Constitution that Plaintiffs assert under the United States Constitution under 42 U.S.C. § 1983. (Def. Mot. Dckt. 314 at 21). Plaintiffs restate this section to make clear that they are entitled to recover attorneys' fees and costs based on successfully proving those state law claims.

### 7. The City of Chicago is obligated to indemnify its employees

Defendants conclude that they did nothing wrong so that the City of Chicago does not have to indemnify them. That analysis puts the cart before the horse. An employer is liable for the tort of an employee, "for those torts that are committed within the scope of employment." *Bagent v. Blessing Care Corp.*, 224 Ill.2d 154, 163, 308 Ill.Dec. 782, 862 N.E.2d 985, 991 (2007). Courts in Illinois generally wait until after liability is established in the first place to determine if the conduct being compensated arose from the scope of employment. *Czapski v. Maher*, 385 Ill. App. 3d 861, 866-867, 896 N.E.2d 394 (1st Dist. 2008) ("Whether the insurer has

a duty to indemnify the insured for a particular liability is only ripe for consideration in a declaratory judgment action, if the insured has already incurred liability in the underlying claim against it.").  For an employee's misconduct to be considered within the scope of employment, the acts must be: (1) the kind that the employee is empowered to perform; (2) substantially within the authorized time and space limits; and (3) actuated, at least in part, by a purpose to serve the employer.  *Allianz Ins. Co. v. Guidant Corp.*, 355 Ill.App.3d 721, 731, 839 N.E.2d 113 (2nd Dist. 2005); *Lyons v. State Farm Fire and Cas. Co.*, 349 Ill. App. 3d 404, 415, 811 N.E.2d 718, 728 (5th Dist. 2004).   A determination of those factors has to be decided by the jury.

### 8.    Defendants are not shielded by state law immunity

Defendants are not entitled to summary judgment on their claim of immunity under the tort immunity act.  Each of Defendants' actions described above that constitutes a state law violation was undertaken under the rules and regulations of the Chicago Police Department so that the employees were not executing discretionary policy decisions under 745 ILCS 10/2-201.  *See Hayes v. City of Des Plaines*, 182 F.R.D. 546, 551-552 (N.D.Ill. 1998).  In short, Defendants' misconduct was not done in the act of "determining policy" as required.  745 ILCS 10/2-201.

Nor are Defendants' shielded by immunity under 745 ILCS 10/2-202 at this stage.  Defendants concede that immunity under this section does not apply to willful and wanton conduct.  Def. Mot. Dckt. 314 at 23.  Whether a police officer engaged in willful and wanton conduct necessary to prevent application of immunity is normally a question of fact to be decided by the jury. *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008).  A willful and wanton act includes an act that is done recklessly.  *Id*.  A jury could reasonably conclude that Defendants' misconduct above amounts to reckless behavior.

Similarly, Defendants are not immune for instituting the prosecution of Ortiz maliciously

42

and without probable cause. 745 ILCS 10/2-208. The issue of whether the arresting officers here had probable cause to arrest and detain Ortiz are fact questions precluding summary judgment. *Kumar v. Chicago Housing Authority*, 862 F.Supp. 213 (N.D. Ill.1994). As articulated above, a jury could find that Defendants instituted the proceedings against Ortiz without probable cause and that their actions were malicious.

Finally, Defendants are liable to Plaintiffs for punitive damages. A police officer is not considered a "public official." *Currie v. Lao*, 148 Ill.2d 151, 166 (1992) ("The doctrine of public official's immunity rests on the principle that a public decision maker should be shielded from personal liability where he makes a judgment based on his perception of the public needs."). Therefore, a police officer would not be excused from punitive damages as a "public official" under 745 ILCS 10/2-102. Defendants rely on one federal case, that interprets the state law definition of "public official." The Illinois Supreme Court analysis above, however, is the more accurate basis to decide the issue of whether Defendants are excused from punitive damages as "public officials" under 745 ILCS 10/2-102. They are not. Hence, as articulated fully above, a jury could reasonably conclude that Defendants acted willfully and wantonly so that they are liable for punitive damages.

## Conclusion

A reasonable jury could conclude that various Defendants lacked probable cause to search Michael Ortiz' apartment and/or to arrest and detain him. A reasonable jury could also conclude that it was unreasonable to hold May Molina for more than 29 hours after her arrest. Finally, a reasonable jury could find that the Defendants who had exclusive control of Guzman's property stole the property since it was missing after their control. Accordingly, Plaintiffs ask the Court to deny Defendants' motion for summary judgment for the following counts and Defendants:

Counts III and X (false arrest/unlawful detention and false imprisonment as to Michael Ortiz) against Defendants Spencer, Haljean, Isakson, and DeJesus;

Count III (unlawful detention as to May Molina) against Defendants Ziemba and Lemon-Redmond;

Count VI (unreasonable search and seizure as to May Molina, Michael Ortiz, and Shannon Guzman) against Defendants Spencer, Haljean, Isakson, and DeJesus;

Count VIII (intentional infliction of emotional distress as to Michael Ortiz) against Defendants Spencer, Haljean, Isakson, and DeJesus;

Count IX (Illinois Civil Rights Act) for all remaining claims;

Count XI (malicious prosecution) against Defendants Spencer and Haljean;

Count XII (trespass of Michael Ortiz and Shannon Guzman's apartment) against Defendants Baeza, Gaynor, Isakson, DeJesus, Espinosa, Stasch, Stasch, Haljean, and Spencer; and

Count XIII (conversion of Shannon Guzman's property) against Defendants Nasser, Haljean, Spencer, Statsch, Cortes, Saldana, Gaynor, and/or Shields.

RESPECTFULLY SUBMITTED,

S/Mark Reyes

Attorneys for Plaintiff
Arthur Loevy
Mark Reyes
LOEVY & LOEVY
312 North May Street
Suite 100
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
loevyreyes@aol.com

44

CERTIFICATE OF SERVICE

I, Mark Reyes, an attorney, certify that on April 24, 2009, I served this document by ECF electronic filing as to each party who is represented by counsel who uses electronic filing.

S/Mark Reyes
Attorneys for Plaintiff