**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| APRIL ORTIZ, as Administrator | ) | |
| for the ESTATES OF MAY MOLINA | ) | |
| and MICHAEL ORTIZ, Deceased, | ) | |
| and SHANNON GUZMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 04 C 7423 |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Before the court are the individual defendants' motions for summary judgment.  For the reasons explained below, the motions are granted.

**BACKGROUND**

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 against the City of Chicago and a number of Chicago police officers.  Plaintiff April Ortiz is the administrator of the estates of Michael Ortiz, her deceased brother, and May Molina, her deceased mother.  Plaintiffs' pleadings describe plaintiff Shannon Guzman variously as having been Michael Ortiz's domestic partner, common-law wife, and fiancée.

The action arises out of a May 24, 2004 search by various Chicago police officers of the premises at 3526 North Halsted

Street in Chicago, where Molina, Guzman, and Michael Ortiz ("Ortiz") lived; the ensuing arrests of Molina and Ortiz for possession of a controlled substance; Molina's death in police custody on May 26, 2004; and Ortiz's three-week detention until a *nolle prosequi* of the charges against him was entered.[1]

Plaintiffs' claims have been significantly pared down in the years since this case was filed. In May 2008, we entered summary judgment in favor of all defendants and against plaintiffs on the counts of the complaint that sought recovery for the pain and suffering and death of Molina. Defendants then filed motions for summary judgment on the remaining claims. During the briefing of those motions, plaintiffs filed motions pursuant to Federal Rule of Civil Procedure 56(f) requesting discovery of the identity of and information relating to the confidential informant ("John Doe") who supplied information to defendant officers that the officers then used to obtain warrants to search Molina's and Ortiz's apartments. We granted the motion to an extent in that we provided that the court would conduct an *in camera* review of documents relating to John Doe as well as an examination of John Doe to confirm that he exists and that he provided the information to the officers and appeared with those officers before a judge in relation to the search warrants. Although we found that the evidence cited by

_____

[1] Ortiz's death is not a subject of this lawsuit; he died some time after the action was filed.

plaintiffs was insufficient to authorize us to conduct a Franks[2] hearing to consider the veracity of Officer Richard Haljean's allegations in the search warrant affidavits, we held that some additional scrutiny of John Doe was warranted by way of the *in camera* examinations under an analysis similar to that in Roviaro v. United States, 353 U.S. 53 (1957).[3]

On January 7, 2009, the court interviewed John Doe under oath. Then we determined that we would like to ask additional questions, so on February 27, 2009, we conducted a follow-up examination. On March 25, 2009, we held a status hearing regarding the interviews. We informed the parties that we were satisfied that John Doe had indeed furnished the information to the officers that is set forth in Haljean's affidavits and that John Doe had appeared before Judge John Martin Berry with Officers Haljean and Nick Spencer in relation to the warrants. We ruled that the informer's privilege prevailed over plaintiffs' interest in further investigation of John Doe, and we denied plaintiff's motion to compel additional discovery relating to Doe.

Summary judgment briefing resumed. Various ancillary motions were filed that prolonged the briefing. Moreover, plaintiffs informed the court that they would not contest the entry of summary

---

[2] Franks v. Delaware, 438 U.S. 154 (1978).

[3] In Roviaro, the Supreme Court held that disclosure of a confidential informant's identity and/or the contents of his communication is required under certain circumstances.

judgment against them on certain claims, so on July 16, 2009, we ordered plaintiffs to identify those claims in writing. After plaintiffs filed a proper notice (their initial filing was not in a helpful format), we entered an order granting summary judgment in favor of several defendants on several claims. Because the order greatly reduced the scope of defendants' summary judgment motions, we asked for an additional surreply from plaintiffs, and the motions were finally fully briefed in November 2009.

Six individual defendants remain in the case: Haljean, Spencer, Nari Isakson, Jose DeJesus, Tamara Lemon-Redmond, and Catherine Ziemba. The remaining claims of the current complaint (the Fifth Amended Complaint) are as follows: (1) Count III (Ortiz's § 1983 claims against Haljean, Spencer, Isakson, and DeJesus for false arrest and against Haljean and Spencer for unlawful detention and Molina's § 1983 claim against Lemon-Redmond and Ziemba for the unlawful delay of a probable-cause hearing); (2) Count VI (Ortiz and Molina's § 1983 claims against Haljean and Spencer for unreasonable search and seizure); (3) Count X (Ortiz's state-law claim against Haljean and Spencer for false imprisonment); (4) Count XI (Ortiz's state-law claim against Haljean, Spencer, Isakson and DeJesus for malicious prosecution); (5) Count XII (Ortiz's state-law claim against Haljean, Spencer, Isakson and DeJesus for trespass); and (6) Count XIII (Guzman's state-law claim against Haljean and Spencer for conversion).

## DISCUSSION

### A.    Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party.  See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999).  "Summary judgment should be denied if the dispute is 'genuine':  'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).  Once the moving party has supported its motion for summary judgment, the "opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in [Rule 56]--set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

**B.    Relevant Facts**

The following facts are taken from the parties' Local Rule 56.1 Statements of Facts.  These are the basic facts; additional facts are set forth in our discussion of the remaining claims. Although the majority of the facts are not in dispute, the parties' views of the facts and the inferences that can be drawn from them are divergent.

On the night of May 24, 2004, defendants Haljean, Spencer, Isakson, DeJesus, and other Chicago police officers conducted simultaneous searches of two apartments located at 3526 North Halsted.  Molina, along with others, lived in Apartment #1, which was on the first floor.  Ortiz and Guzman, along with their roommates Juan Robles, Karen Moy, and Alejandro Rodriguez, lived in Apartment #2, which was on the second floor.  The searches were conducted pursuant to two search warrants that had been signed by a judge earlier that night.  The complaint seeking a search warrant for Apartment #1 states:

> **P.O. Richard Haljean, # 9860 Chicago Police Department, 023RD District, and John Doe, Complainants now appear before the undersigned judge of the Circuit Court of Cook County and requests [sic] the issuance of a search warrant to search:**

> May Molina F/WH/55YOA 5"08 250 lbs

> **and the premises:**

> 3526 N. Halsted Ave., #1, Chicago, Cook County, IL.

> **and seize the following instruments, articles and things:**

Heroin, to wit a controlled substance and any documents showing residency, any paraphernalia used in the weighing, cutting or mixing of illegal drugs. Any money and records detailing illegal drug transactions,

**which have been used in the commission of, or which constitute evidence of the offense of:**

720 ILCS 570/402

**Complainant says that he has probable cause to believe, based upon the following facts, that the above listed things to be seized are now located upon the person and premises set forth above:**

I, P.O. Richard Haljean, #9860, am a police officer employed by the City of Chicago for the past 13 years, and currently assigned to the 023rd District tactical team. In this capacity as a Tactical Officer, your affiant has made numerous arrests of individuals for delivery and/or possession of a controlled substance. Your affiant and a citizen of Chicago who I will refer to as John Doe in this affidavit state the following: John Doe stated that in the past 60 days he has purchased various quantities of "Heroin", from May Molina at 3526 N. Halsted Ave. #1. John Doe related that he purchased five blows of "Heroin", this past week. The last date that he purchased "Heroin" was 24 May 2004 where he went to 3526 N. Halsted Ave., #1, and was allowed into the premises by May Molina, who then asked him what he needed. John Doe then tendered 20.00USC to May Molina, at which time May Molina went into her bedroom and returned moments later bearing a plastic bag with numerous tinfoil packets which contained a white powder substance suspect heroin. She reached into the bag and then tendered two tinfoil packets containing a white powder substance suspect heroin to John Doe. May Molina then advised John Doe to "come back anytime".

John Doe then took the tinfoil packets containing the white powder substance and left the location. John Doe then ingested the "Heroin", that he bought from May Molina, and received the same euphoric high which he has received numerous times after ingesting "Heroin".

I, P.O. Richard Haljean went to the location of 3526 N. Halsted Ave., #1 along with the John Doe who verified

that the location was in fact the exact place that he
went to and bought "Heroin" from May Molina. P.O.
Richard Haljean observed numerous foot traffic to 3526 N.
Halsted Ave., #1 which appeared to be narcotics related.

Based on the aforementioned facts, your affiant believes
that there is sufficient information for the issuance of
a search warrant for May Molina and #1, located at 3526
N. Halsted Ave., Chicago, Cook County, Il.

(Defs.' J.A. of Exs., Ex. 3.)

The complaint seeking a search warrant for Apartment #2

states:

**P.O. Richard Haljean, # 9860 Chicago Police Department,
023RD District, and John Doe, Complainants now appear
before the undersigned judge of the Circuit Court of Cook
County and requests [sic] the issuance of a search
warrant to search:**

"Gordo" M/WH/37YOA 5"11 300 lbs

**and the premises:**

3526 N. Halsted Ave., #2, Chicago, Cook County, IL.

**and seize the following instruments, articles and things:**

Heroin, to wit a controlled substance and any documents
showing residency, any paraphernalia used in the
weighing, cutting or mixing of illegal drugs. Any money
and records detailing illegal drug transactions,

**which have been used in the commission of, or which
constitute evidence of the offense of:**

720 ILCS 570/402

**Complainant says that he has probable cause to believe,
based upon the following facts, that the above listed
things to be seized are now located upon the person and
premises set forth above:**

I, P.O. Richard Haljean, #9860, am a police officer
employed by the City of Chicago for the past 13 years,

and currently assigned to the 023rd District tactical
team.   In this capacity as a Tactical Officer, your
affiant has made numerous arrests of individuals for
delivery and/or possession of a controlled substance.
Your affiant and a citizen of Chicago who I will refer to
as John Doe in this affidavit state the following: John
Doe stated that in the past 30 days he has purchased
various quantities of "Heroin", from "Gordo" at 3526 N.
Halsted Ave. #2.   John Doe related that he purchased two
blows of "Heroin", this past week.   The last date that he
purchased "Heroin" was 24 May 2004 where he went to 3526
N. Halsted Ave., #2, and was allowed into the premises by
"Gordo", who then asked him what he needed.   John Doe
then tendered 10.00USC to "Gordo", at which time "Gordo"
went into the kitchen and returned moments later bearing
a plastic bag with numerous tinfoil packets which
contained a white powder substance suspect heroin.   He
reached into the bag and then tendered one tinfoil packet
containing a white powder substance suspect heroin to
John Doe.   "Gordo" then advised John Doe to "come back
anytime".

John Doe then took the tinfoil packet containing the
white powder substance and left the location.   John Doe
then ingested the "Heroin", that he bought from "Gordo",
and received the same euphoric high which he has received
numerous times after ingesting "Heroin".

I, P.O. Richard Haljean went to the location of 3526 N.
Halsted Ave., #2 along with the John Doe who verified
that the location was in fact the exact place that he
went to and bought "Heroin" from "Gordo".

Based on the aforementioned facts, your affiant believes
that there is sufficient information for the issuance of
a search warrant for "Gordo" and #2, located at 3526 N.
Halsted Ave., Chicago, Cook County, Il.

(Defs.' J.A. of Exs., Ex. 4.)

Haljean and Spencer testified at deposition that after meeting

with John Doe on the afternoon of May 24, 2004, getting the

information described in the warrants and watching the apartments

at 3526 North Halsted from a restaurant across the street for about

a half-hour and observing foot traffic, Haljean prepared and signed the Complaints for Search Warrant and the search warrants. Haljean obtained approval from a superior and from a state's attorney. Then Haljean and Spencer, along with John Doe, drove to the home of Judge John Martin Berry of the Circuit Court of Cook County. Judge Berry, who allowed officers to come to his house to seek approval of search warrants, reviewed the Complaints, swore in Haljean and John Doe, and asked them to attest to the content of the Complaints. After they did so, Judge Berry signed the warrants around 8:40 p.m.

The searches of Apartments #1 and #2 at 3526 North Halsted took place around 10:00 p.m. that night. Haljean and Spencer, along with other officers, searched Apartment #1. At that time, Molina and Guzman were in Apartment #1.[4] During the search, Haljean found eighty tinfoil packets containing a white powdery substance, which he suspected to be heroin, in a purse. Also found in the purse was an Illinois Department of Public Aid mailing addressed to Molina at the North Halsted address.[5] Haljean and

---

[4] Plaintiffs assert that one of Molina's roommates, "Geri," also was home in Apartment #1 at the time of the search, but defendants dispute this fact. Nonetheless, the dispute is immaterial to the instant motions. Moreover, plaintiffs do not introduce any relevant evidence relating to "Geri."

[5] Plaintiffs dispute these facts, citing Guzman's testimony that an officer at the scene claimed to have found drugs in Apartment #1 in a leather jacket and that the jacket was not Molina's and could not have fit her. However, Molina does not assert a claim for false arrest. The post-mortem examination of Molina showed that there were three tinfoil packets in her stomach and one tinfoil packet in her duodenum. Defendants' medical expert opined that Molina died of opiate intoxication; plaintiffs argued that this opinion was not supported by the evidence but failed to produce admissible evidence of Molina's

Spencer arrested Molina for possession of a controlled substance.

At the same time Apartment #1 was being searched, Officers Isakson and DeJesus, in addition to other officers, searched Apartment #2. Ortiz and one of his roommates, Robles, along with an eight- or nine-year old boy they were babysitting, were home. Ortiz and Robles were handcuffed during the search.

Isakson testified at deposition that she searched a bedroom that she believed at the time to be that of "Gordo." She later came to understand that "Gordo" was Ortiz. She did not recall whether the bedroom that she searched was in the front, middle, or back of the apartment. While Isakson was in the bedroom for approximately thirty minutes, she found three items that she suspected to be illegal drugs. The first was a small plastic bag containing a dark brown substance that she suspected was "black tar" heroin. The second was a white crystalline substance in a small clear vial that she suspected was crystal methamphetamine. The third was an unlabeled prescription bottle, inside of which was a plastic bag containing a white chunky substance that she suspected was heroin. (Pls.' Ex. H, Dep. of Nari Isakson, at 86-87.) In the drawer where she found the first item, Isakson also found a Department of Public Aid mailing addressed to Ortiz at the North Halsted address. She turned the items over to Spencer, and

---

cause of death.  See Ortiz v. City of Chicago, No. 04 C 7423, 2008 WL 4681156 (N.D. Ill. May 13, 2008).

Spencer and Haljean arrested Ortiz for possession of controlled substances.

After Molina and Ortiz were arrested, Haljean and Spencer returned to the 23rd District police station to process the arrests and the evidence that had been seized. Haljean and Spencer completed a vice case report, an arrest report, and two inventory reports for each arrestee.

The 23rd District did not have a lockup for female arrestees, so Haljean and Spencer arranged for Molina to be transported to the 19th District lockup. She arrived at the 19th District lock-up around 4:25 a.m. on May 25, 2004. The details regarding the processing of her arrest are set forth in our discussion below. At 3:13 a.m. on May 26, 2004, Molina died in the lockup awaiting a bond court hearing.

Ortiz was held at the 23rd District lockup. His fingerprints and identity were verified, and a check on outstanding warrants was completed by 5:54 a.m. on May 25, 2004. He attended bond court later that day for a <u>Gerstein</u> hearing.[6] Cook County Circuit Court Judge Matthew E. Coghlan found probable cause to detain Ortiz, set bond at $125,000.00, and continued the case until June 16, 2004.

---

[6]  "<u>Gerstein v. Pugh</u> held that 'the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention,' 420 U.S. 103, 126, 95 S. Ct. 854, 869, 43 L. Ed. 2d 54 (1975), and probable cause hearings that take place after arrests made without warrants commonly are referred to as <u>Gerstein</u> hearings." <u>Garcia v. City of Chicago</u>, 24 F.3d 966, 968 n.2 (7th Cir. 1994).

Ortiz was unable to post bond, so he was transferred to the Cook County Jail to await his next court date.

The substances that Haljean and Spencer seized from the apartments were sent to the Illinois State Police Forensic Science Center, also known as the crime lab, for analysis. At some time in early June,[7] Spencer and Haljean received a letter from a forensic scientist at the crime lab that was addressed to Spencer and dated June 2, 2004. The letter advised that the three items seized from Ortiz's apartment tested negative for the presence of any controlled substance. Neither Spencer nor Haljean notified the State's Attorney's Office (the "SAO") or anyone else about the letter. Spencer testified that he was unaware of any department policy or practice requiring officers to notify the SAO of crime lab results other than a policy or practice that officers would bring a copy of lab results to a defendant's next court date. (Pls.' Ex. M, Dep. of Nick Patrick Spencer, at 153.) He also stated that he did not know whether the SAO received a copy of the results pertaining to Ortiz. (Id. at 152.) Haljean testified, "We get the notification, and then we wait for a court date to come and to get notified for a court date, and then we go to court on it." (Pls.' Ex. BB, Dep. of Richard Haljean, at 139.) Haljean also

---

[7] When he was asked about the specific date on which he received the letter, Spencer testified that he believed he received the letter within a week or a week and a half from the date of the letter. (Pls.' Ex. M, Dep. of Nick Patrick Spencer, at 136.) Haljean was not asked exactly when he received the letter, and he simply stated that he received it "at some point in time." (Pls.' Ex. BB, Dep. of Richard Haljean, at 155.)

stated that he understood that generally, the SAO received a copy of lab results as well, but did not know in this particular instance whether the SAO had received a copy of the results pertaining to Ortiz at the same time Haljean and Spencer had received their letter. (Id. at 139-140; Defs.' App. of Exs. to Reply, Ex. 58, at 199.)

Ortiz appeared at his court hearing on June 16, 2004. The SAO moved to *nolle prosequi*[8] the charges against Ortiz, and the case was terminated.

## C.   Ortiz and Molina's Claims for Unreasonable Search and Seizure and Trespass

Ortiz and Molina's illegal search claim against Haljean and Spencer depends on whether the officers had probable cause to support a search of the apartments. "Probable cause exists when the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that evidence of a crime will be found." Suarez v. Town of Ogden Dunes, 581 F.3d 591, 595 (7th Cir. 2009) (ellipsis and internal quotation marks omitted). "In making probable-cause determinations, law enforcement agents are entitled to draw reasonable inferences from the facts before them, based on their training and experience." Id. at 595-96. "Probable

---

[8]/   "The formal explanation for this action, 'nolle prosequi,' is the bringing of a motion before a judge on the part of a prosecutor to 'voluntarily withdraw . . . all proceedings on a criminal charge.'" Anderer v. Jones, 385 F.3d 1043, 1061 n.8 (7th Cir. 2004) (brackets omitted) (citing Black's Law Dictionary).

cause is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed." Id. at 596.

Defendants assert that they are entitled to summary judgment on plaintiffs' claim for unlawful search and seizure because Judge Berry determined that there was probable cause to search the apartments and signed search warrants for both apartments. Plaintiffs contend that we should deny summary judgment on this claim for two reasons. The first is that because defendants have invoked the informant's privilege regarding John Doe, they "may not rely on any information" from John Doe "as evidence to justify the search warrants." (Pls.' Combined Resp. at 16.) This argument misses the mark because defendants are not relying on the information provided by John Doe as a defense to the illegal search claim; they are relying on the mere existence of the warrants. In a similar vein, plaintiffs contend that "[d]efendants should not be able to rely on what a judge determined based on the testimony over which Defendants asserted the privilege." (Id. at 18.) But the authorities plaintiffs cite fail to support this proposition; they do not even involve the informer's privilege.

The second reason we should deny summary judgment on the illegal search claims, plaintiffs maintain, is that a jury could reasonably conclude that Spencer and Haljean are lying about John Doe and that the officers either invented the informant or "fed information to a heroin addict to act as an informant." (Id. at

19.)  This argument is akin to that of the plaintiffs in Suarez,

581 F.3d 591, where the Seventh Circuit stated:

> The Suarezes do not contend that the judge Officer
> Trowbridge spoke to should not have issued a search
> warrant for their home.  Instead, they challenge the
> veracity of the statements Trowbridge made in supporting
> his request for the warrant.  This is tough sledding.
> The affidavit . . . supporting a search warrant carries
> with it a presumption of validity.  To survive summary
> judgment the plaintiffs must provide evidence that the
> officers knowingly or intentionally or with a reckless
> disregard for the truth made false statements to the
> judicial officer and show that the false statements were
> necessary to the judicial officer's determination that
> probable cause existed.  The same standard applies to any
> alleged  omissions  in  the  warrant.  Immaterial
> misstatements or omissions do not invalidate the warrant.
> . . .
> The question is whether any statement or omission that
> the Suarezes challenge was intentionally or recklessly
> false, and whether it was material to the issuance of the
> warrant.

Id. at 596 (citations, internal quotation marks, and brackets

omitted).  Before delving into the particular statements challenged

by plaintiffs, we will again note that after conducting an in

camera review of Chicago Police Department documents relating to

John Doe and two in camera interviews of Doe, we were satisfied

both that Doe actually existed and that he provided to Haljean and

Spencer the information set forth in the search warrants.[9]  Thus,

we refused to permit further discovery relating to the informant.

---

[9]  Accordingly, we need not discuss plaintiffs' undeveloped argument at
page 26 of their Combined Response that John Doe "was not a reliable basis to
obtain a warrant."

The first alleged omission raised by plaintiffs and "important evidence rebutting the presence of probable cause" is that there was an "ongoing" and "fruitless" investigation of illegal activity at 3526 North Halsted for a period of time before the searches that "netted no information that drug sales were indeed taking place." (Pls.' Combined Resp. at 20.)    In plaintiffs' view, three categories of evidence establish this "ongoing investigation." First, about a week prior to the searches, Isakson and DeJesus had arrested a woman named Lorrie Ortner for possession of a controlled substance.    (Pls.' Ex. H, Isakson Dep., at 26-27.)    Isakson testified that Ortner, in a suspected effort to avoid going to jail, had said that she knew that drugs were being sold at 3526 North Halsted.  (Id. at 30-31.)  Isakson did not believe this was "good information" because Ortner was facing jail, was unwilling to appear before a judge to testify about the drug activity, and had once lived at the address but no longer lived there.  (Id. at 32-33.)  Second, one of Ortiz's roommates, Alejandro (Alex) Rodriguez, was arrested on an outstanding warrant about two days before the searches of the apartments.  Rodriguez states in a declaration that plainclothes officers arrested him at work and took him to a police station at California and Shakespeare Avenues.[10]  (Pls.' Ex. G, Aff. of Alejandro Rodriguez, at 1.)    According to Rodriguez, the

---

[10]/  This is the station for the 14th District (and not the 23rd District, where Haljean, Spencer, Isakson, and DeJesus worked, or the 19th District, where Ziemba and Lemon-Redmond worked).

officers interrogated him repeatedly about drug and gun activity at 3526 North Halsted, and one officer offered to "put in a word for [Rodriguez] with the judge" if Rodriguez could confirm that there were guns or drugs at the residence. Rodriguez told the officer that he could not help. Third, plaintiffs contend that Haljean and Spencer themselves "admit" that there was an ongoing investigation of 3526 North Halsted in their affidavits submitted in this case, both of which state that "[b]oth my partner . . . and myself, during the week leading up to May 24, 2004, were conducting a narcotics surveillance of 3526 N. Halsted Street, with the assistance of a confidential informant." (Pls.' Ex. 2 to Ex. M, Spencer Dep. & Ex. CC, Haljean Aff.)

This evidence does not warrant the conclusion that there was an investigation of activity at the residence other than what is described in the affidavits for search warrants. With respect to the Ortner statements, Isakson testified that she did not document this information, nor did she tell anyone else about it. (Id. at 33-34.) DeJesus also stated that he did not discuss Ortner's statements with anyone prior to the searches. (Pls.' Ex. FF, Dep. of Jose DeJesus, at 47; Defs.' App. of Exs. to Reply, Ex. 54, Aff. of Jose DeJesus, ¶ 5.) Plaintiffs offer no evidence to contradict Isakson and DeJesus's testimony that they told no one about Ortner's statements. Likewise, plaintiffs offer no evidence linking the Rodriguez arrest, which was conducted by officers in

the 14th District, to Haljean and Spencer, or any other officers in the 23rd District. Furthermore, there is no basis to infer that Haljean and Spencer were connected with either the Ortner or the Rodriguez arrest. As for the statements that Haljean and Spencer were conducting a surveillance of 3526 North Halsted "during the week leading up to May 24, 2004," when asked at his deposition about this statement, Spencer stated that he and Haljean did not in fact conduct surveillance prior to May 24, but rather conducted the surveillance on that date only. (Pls.' Ex. M, Spencer Dep., at 157-59.) Haljean testified that prior to the surveillance of the 3526 North Halsted that is described in the warrant applications, he "didn't pay attention to that house." (Defs.' J.A. of Exs., Ex. 1, Haljean Dep. at 70-71.) It is also significant that the surveillance described in the affidavits is a surveillance "with the assistance of a confidential informant," which corresponds to the description of the surveillance in the warrant applications. The statements in Haljean's and Spencer's affidavits may be inartful, but they do not constitute evidence of an "ongoing" and "fruitless" investigation of activity at 3526 North Halsted. Plaintiffs fail to provide evidence that supports their assertion.[11]

---

[11]/ Plaintiffs argue in their surreply that "Spencer and Haljean admit in this case . . . that they were watching the house for one week before the raid ever took place." (Pls.' Combined Surreply at 6.) This is a misrepresentation of the statements in Spencer and Haljean's affidavits; they do not admit that they were watching the house, nor do they admit that they were doing anything "for one week." This is just one example of the numerous instances throughout plaintiffs' briefs and statements of fact in which plaintiffs' counsel mischaracterizes the evidence. (Another specific instance is discussed below.)

During his deposition, Haljean stated that John Doe "didn't appear to be majorly under the influence of drugs" at the time Doe met with the officers and provided the information about 3526 North Halsted. (Pls.' Ex. BB, Haljean Dep. at 66-67.) Plaintiffs argue that Haljean should have "relayed" this impression to Judge Berry, but they do not explain how Haljean's opinion that John Doe, a known drug user, was not "majorly" under the influence of drugs would have been material. The argument is rejected.

An item of disputed evidence is Haljean's statement in the warrant applications that he was "currently assigned to the 023rd District tactical team" and served as a "Tactical Officer." (Defs.' J.A. of Exs., Exs. 3 & 4.) Plaintiffs assert that these were misrepresentations, citing the following testimony of Haljean:

     Q.  Have you ever been a tactical officer?
     A.  No.

     . . .

     Q.  Now, you identify yourself in the complaint for the
     search warrant as tactical officer; is that correct?
     A.  Yes.
     Q.  Were you a tactical officer?
     A.  Not on the tac team, but as a tactical officer in
     plain clothes, assigned to do duties with the tac team.
     Q.  And you say just in the clause before that you were
     assigned to the 23rd District tactical team.  Is that an
     accurate statement?
     A.  Yes.
     Q.  And you were acting in your capacity as a tactical
     officer; is that correct?
     A.  Working with the tactical team.  As an incident team
     on watch, we were working with the tactical team.
     Q.  Did you tell the judge that you were a tactical
     officer?
     . . .

A.  No.
(Pls.' Ex. BB, Haljean Dep. at 26, 182-83.)  Haljean admits that he
was not <u>on</u> the tactical team, but then claims that it was accurate
to aver that he was assigned to the team.  He also wavers with
respect to whether he was a "tactical officer."  Spencer testified
that they were not on the tactical team, but also that they were
plainclothes officers on an "incident team" and that "[a]nytime
anybody sees a plain-clothes officer, just for purposes of
simplicity, they call you tactical officers."  (Pls.' Ex. M,
Spencer Dep. at 21, 30; Defs.' App. of Exs. to Reply, Ex. 59, at
27-28.)

Haljean's statements about his tactical team experience were
at best exaggerations and most likely misrepresentations.  But even
if they were deliberate lies, the salient question is whether
Haljean's team assignment and title were necessary to Judge Berry's
determination that probable cause existed.  <u>See</u> <u>Suarez</u>, 581 F.3d at
596; <u>Haywood v. City of Chicago</u>, 378 F.3d 714, 719 (7th Cir. 2004).
The answer is no.  That information was immaterial to the probable
cause determination; the substantive information contained in the
warrant applications--the information from John Doe about his drug
buys (together with Haljean's observation of activity at the
residence, for the warrant application for Molina's apartment) --
was enough to establish probable cause.

Plaintiffs next contend that Haljean's statement that he "observed numerous foot traffic to 3526 N. Halsted Ave., #1 which appeared to be narcotics related," Defs' J.A. of Exs., Ex. 3, was false. When Haljean was asked at his deposition about his surveillance of 3526 North Halsted, he stated that he, Spencer, and John Doe stood inside a restaurant across the street from the residence and watched the residence for approximately twenty to thirty minutes. (Defs.' J.A. of Exs., Ex. 1, Haljean Dep. at 61-62.) The residence had two front doors. During that period of time, Haljean saw that "two people had went up to the door on the left at different times, were let in for a short period of time and exited and left the area. And two people entered the door on the right side, and after a short period of time left." (Id. at 64.) Each of the four individuals arrived separately. Plaintiffs argue that Haljean's statement that he observed "numerous foot traffic" when it consisted of four people coming and going was a lie, or at minimum an exaggeration. In our view, whether four visitors in a short time frame constituted "numerous foot traffic" is a matter of opinion and thus cannot be characterized as a "false" statement.[12]

Plaintiffs argue that a reasonable jury could conclude that John Doe's "story" as summarized by Haljean in the warrant applications "makes no sense" because Doe claimed to have purchased

---

[12]/ Of course, Judge Berry was free to ask Haljean what he meant by using the adjective "numerous." Haljean's failure to specify an exact number was not, as plaintiffs maintain, an "omission."

heroin from both Molina and "Gordo" on the same day.  We do not find that this element of the narrative is inherently incredible. There could be a number of logical explanations for the two buys. Plaintiffs also contend that "it is incredible to believe that Molina and Ortiz--mother and son--had set up competing heroin dealerships in the same apartment building . . . ."  (Pls.' Combined Resp. at 23.)  There is no evidence, however, that they were in competition.  Plaintiffs also argue that it is "incredible" that John Doe gave the officers information "out of the kindness of his heart."  (Id. at 25.)  This argument likewise is off base. There is no evidence that John Doe gave the officers information out of "kindness."  Moreover, it is not inherently incredible that he would provide the information without receiving consideration. There could be a number of alternative reasons that would not involve the officers making a "deal" with John Doe at that particular time.[13]

Plaintiffs maintain that there is other evidence from which a "jury could reasonably conclude" that defendants' "story" about John Doe is fictitious.  (Id. at 21-26.)  As defendants point out, these arguments are problematic because they do not acknowledge plaintiff's burden.  To avoid summary judgment on the search and

---

[13] Furthermore, there is no evidentiary support for plaintiffs' contention that Haljean and/or Spencer did make a "deal" with John Doe, so their argument that the officers should have informed Judge Berry about such a "deal" is rejected.

seizure claims, plaintiffs must "provide evidence that the officers knowingly or intentionally or with a reckless disregard for the truth made false statements to the judicial officer and show that the false statements were necessary to the judicial officer's determination that probable cause existed." Suarez, 581 F.3d at 596. Simply presenting a list of reasons why plaintiffs doubt the officers's deposition testimony does not carry this burden. Nonetheless, we will address the substance of the arguments, which are without merit. One argument is that because Spencer and Haljean have no documents relating to John Doe, it would be reasonable to conclude that John Doe did not exist or that an informant was "fed" information. There is no reason to believe that the officers would have documents specifically identifying John Doe, though, precisely because he was a confidential informant.

Plaintiffs also argue: "Contrary to Spencer and Haljean's testimony that the judge welcomed them and the drug addict informant into his home, Judge Berry testified that he does not recall ever allowing an informant into his house because of obvious concerns about his and his family's safety. A jury could reasonably conclude that Defendants Spencer and Haljean are flat out lying when they say that they took an informant into the home of a presiding judge, and that they did so because there was no informant." (Pls.' Combined Resp. at 22 (citations omitted).)

Plaintiffs again mischaracterize the evidence.  Spencer testified that he, Haljean, and John Doe did not go any further than the foyer of Judge Berry's home.  (Pls.' Ex. M, Spencer Dep. at 115). Haljean also stated that they remained in the foyer.  (Pls.' Ex. BB, Haljean Dep. at 93-94.)  At his deposition, Judge Berry did not specifically recall his meeting with Spencer, Haljean, and John Doe, and he was questioned about his general practices when meeting with officers and informants regarding search warrants.   His testimony, in relevant part, was as follows:

> Q. When a John Doe would come, you would meet them outside your house?
> A. Right, or other times I would meet them somewhere, like a few blocks away at [a bowling alley]. Normally, there was a parking lot there.  We'd meet up there once in a while.
> Q. Did you ever invite or have a John Doe come inside your house?
> A. Not that I can recall.
> Q. And you indicated that there might be times when you would meet a John Doe at a bowling alley?
> A. Yes, in the outer parking lot.
> Q. Is there a reason why you would prefer to meet a John Doe at a bowling alley as opposed to at your house?
> A. Usually, it was the officer's suggestion that they didn't want to come to the house.
> Q. It kind of makes sense.  From a safety standpoint they did not want to be [sic] bring somebody who might be involved in illegal activity--
> A. That's right.
> Q. --to a judge's house, right?
> A. That's what I think, yes.
> Q. And I just want to see if I can break it down a little bit.
> Of the times that you met with a John Doe regarding a search warrant, approximately how many times would you have done that, say, at the bowling alley near your house?
> A. Probably three or four times I think.

```
Q.   How many times would you have met with a John Doe
     informant outside of your own house?
A.   Probably two or three times, I think, at the most.
Q.   Were there any other places that you would meet
     with a John Doe?
A.   I can't remember any.
```

(Pls.' Ex. N, Dep. of the Honorable John Martin Berry, at 18-19.)

The evidence is simply that Judge Berry could not recall having a John Doe come inside his house; he did not testify that it was his practice *never* to do so, nor did he attribute any practice to "concerns" about his safety or his family's safety, nor did he even state that he personally had such concerns, as plaintiffs misleadingly imply. Rather, plaintiffs' counsel asked Judge Berry to speculate on the motive for police officers' suggestions that they avoid the judge's home. Judge Berry's testimony does not contradict that of the officers. In any event, the exact location where the officers and John Doe were standing at the time they appeared before Judge Berry is immaterial.

Plaintiffs further contend that the evidence "establishes prosecutor and judge shopping." (Pls.' Combined Resp. at 23.) This argument is meritless. There is absolutely no evidence to support plaintiffs' contention that Judge Berry was "more receptive" than other judges "to taking police officers at their word." (Id. at 24.) Plaintiffs also assert that Haljean and Spencer were "prosecutor shopping," based solely on the fact that the search warrant complaints for each apartment were faxed separately to the SAO for approval. One complaint was sent by fax

twelve minutes after the other was approved.  Plaintiffs fail to explain how a short interval between the faxes implicates "prosecutor shopping," and the argument is rejected.  There is no reason to believe that the timing of the fax transmissions undercuts the credibility of the affidavits.

We reject plaintiffs' next argument that two "[l]ater events" could lead a reasonable jury to conclude that Haljean was lying about the existence of John Doe.  The first is that no foil packets were found in Ortiz's apartment; the second is that Guzman and Robles testified that they had never heard anyone refer to Ortiz as "Gordo."  Neither constitutes evidence that John Doe did not exist or that Haljean deliberately or recklessly made false statements to Judge Berry.

Many of plaintiffs' arguments, like those of the plaintiffs who unsuccessfully challenged the veracity of statements made in support of a request for a search warrant in Suarez, amount to nit-picking.  Plaintiffs have not presented evidence that Haljean made intentional or reckless misrepresentations or omissions in his warrant requests.   Therefore, defendants' motion for summary judgment will be granted as to Ortiz and Molina's claims for unreasonable search and seizure.

Because plaintiffs cannot overcome the presumption of validity of the affidavits supporting the search warrants, they cannot demonstrate that Spencer, Haljean, Isakson and DeJesus unlawfully

entered the premises.  See, e.g., Skierkewiecz v. Gonzalez, 711 F. Supp. 931, 935 (N.D. Ill. 1989) (a party cannot be liable for trespass if acting pursuant to and within the scope of a valid court order).  Accordingly, the motion will also be granted as to Ortiz's claim against those officers for trespass.

D.   **Ortiz's Claims for False Arrest,**
     **False Imprisonment, and Malicious Prosecution**

In order to prevail on a claim of arrest in violation of the Fourth Amendment, a plaintiff must show that he was arrested without probable cause; probable cause is an absolute defense to such a claim.  Gonzalez v. City of Elgin, 578 F.3d 526, 537 (7th Cir. 2009).  "A police officer has probable cause to arrest a person if, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.  In ascertaining whether an officer had probable cause, the court is to view the circumstances from the perspective of a reasonable person in the position of the officer.  The jury must determine the existence of probable cause if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.  Only if the underlying facts claimed to support probable cause are not in dispute may the court decide whether probable cause exists."  Id. (citations, ellipsis, and internal quotation marks omitted).

Ortiz was arrested for possession of controlled substances, so the issue is whether defendants had a reasonable belief that Ortiz possessed such substances.  Defendants assert that there probable cause for Haljean and Spencer to arrest Ortiz because in one of the bedrooms in Ortiz's apartment, Isakson found three items that resembled illegal narcotics (a small plastic bag containing a dark brown substance, a small clear vial containing a crystalline white substance, and an unlabeled prescription bottle, inside of which was a plastic bag containing a white chunky substance) and because one of the items was in a dresser drawer with a Department of Public Aid mailing addressed to Ortiz at that address.  Isakson told Haljean what she had found.  Haljean and Spencer, who also suspected that the items were illegal drugs, arrested Ortiz.

Plaintiffs first argue that defendants had "no reason" to believe that the items, which looked like "three ordinary household items," were illegal drugs.  (Pls.' Combined Surreply at 7.)  But we do not look at these items in a vacuum, nor did the officers. They were acting on an informant's tip that 3526 North Halsted was a drug house.  In the downstairs apartment, they found dozens of tinfoil packets of a substance resembling heroin, just like the ones described by the informant, in Ortiz's mother's purse.  And in Ortiz's apartment, they found the three items described above, photographs of which are attached as Group Exhibit 20 to defendants' Joint Appendix of Exhibits.  All of these facts are

undisputed.[14]  Given the context, and given the highly suspicious appearance of the items (which do not look like "ordinary" household items at all), there is no question that the items furnished probable cause for arrest.  It matters not that the substances were not packaged in tinfoil packets or that one of the items was suspected to be a drug other than heroin; for purposes of probable cause, drugs are drugs.  Furthermore, we reject plaintiffs' related argument that "[i]nstead of going with mere hunches," the officers were obligated to perform field tests on the substances.[15]  (Pls.' Combined Resp. at 29.)  Given the circumstances, the officers were not operating on "mere hunches," or a "guess," or "guilt by association," as plaintiffs argue in their surreply.  What the officers knew and observed here was sufficient to establish probable cause for arrest.  The fact that it was determined from subsequent testing that the items were not illegal substances does not affect the analysis; probable cause is not a "post hoc determination."  See United States v. Reed, 443 F.3d 600, 603 (7th Cir. 2006).

Plaintiffs contend that it is "highly disputed" whether the items found in the apartment were found in Ortiz's bedroom, and

---

[14]/  We realize that plaintiffs insist that no informant existed or that the officers fed information to someone who acted as a informant.  But as we have found supra, they have failed to present evidence that would reasonably permit such a conclusion.

[15]/  We find that the evidence concerning field testing and all of the parties' arguments concerning that evidence are immaterial.

they suggest that the items recovered by the officers were construction supplies kept by Rodriguez, who worked at a local school doing maintenance work, and candle-making supplies. (Pls.' Combined Resp. at 28; Pls.' Local Rule 56.1 Statement of Material Facts ¶ 45.) The officers' testimony does appear to create an issue regarding whether Isakson searched the front bedroom (which according to plaintiffs was Rodriguez's bedroom) or the middle bedroom (which according to plaintiffs was Ortiz and Guzman's bedroom). Isakson recalls that she searched Ortiz's bedroom, but she does not recall the exact location of the bedroom. (Pls.' Ex. H, Isakson Dep. at 64.) Sergeant Fabian Saldana, a supervising officer who was present that night, testified that he thought that Isakson and DeJesus searched the front bedroom and that Officer Raul Baeza searched the middle bedroom. (Pls.' Ex. K, Dep. of Fabian Saldana, at 74.) DeJesus testified that he did not search any of the bedrooms and that Isakson searched the front bedroom, which he believed to be Ortiz's. (Pls.' Ex. FF, DeJesus Dep., at 67-71.)

Plaintiffs make much of this uncertainty about whether Isakson searched the front or the middle bedroom. But the bedroom issue is a red herring because plaintiffs have failed to present any evidence to contradict Isakson's testimony that she found the plastic bag containing a dark brown substance in a drawer along with the mailing to Ortiz and found the other two items in the same

bedroom.  Whether the bedroom where the items were found with the mailing was the front or the middle bedroom, or even the bedroom where Ortiz usually slept, is immaterial.  "[W]here narcotics are found on premises that are under defendant's control, it may be inferred that he had the requisite knowledge and possession, absent other facts and circumstances which might create a reasonable doubt as to defendant's guilt.  The necessary control over the premises may be proved by showing that defendant lived there."  <u>People v. Bui</u>, 885 N.E.2d 506, 525-26 (Ill. App. Ct. 2008) (citations omitted).  Moreover, "it is well settled that mere access to an area by others is insufficient to defeat a charge of constructive possession."  <u>Id.</u> at 529.  There is no dispute that Ortiz lived in the second-floor apartment and had access to the entire apartment,[16] and plaintiffs offer nothing to refute defendants' evidence that the one of the suspicious items was found in a drawer with a mailing to Ortiz and the other items were found in the same room.

Plaintiffs' remaining argument is that "there was never a basis to identify Michael Ortiz" as "Gordo."  (Pls.' Combined Resp. at 27.)  It may have been an impolite, but not inaccurate, description of Ortiz.  "Gordo" is a Spanish word meaning "fat," and it is undisputed that Ortiz was a very large man.  But the moniker is beside the point because it was not a basis for Ortiz's arrest;

---

[16]/  He and Guzman leased the apartment and charged their roommates rent. (Pls.' Ex. B, Dep. of Shannon Guzman, at 16-19; Pls.' Ex. C, Dep. of Juan Robles, at 29.)

given that the items suspected to be illegal drugs were found with a mailing addressed to Ortiz, there was no need for the officers to determine that Ortiz was "Gordo." Ortiz was arrested for possession of controlled substances, not for distribution to John Doe.

The underlying facts that supported the officers' probable-cause determination are not in dispute, and we do not believe that a reasonable jury could find that the officers did not have probable cause to arrest Ortiz. Defendants' motion for summary judgment will therefore be granted as to Ortiz's claim for false arrest.

In addition to the false arrest claim, Ortiz asserts state-law claims for false imprisonment and malicious prosecution. Under Illinois law, lack of probable cause is an essential element of both torts. Reynolds v. Menard, Inc., 850 N.E.2d 831, 837 (Ill. App. Ct. 2006). Our ruling that Ortiz's arrest was supported by probable cause precludes Ortiz from recovering on the false imprisonment and malicious prosecution claims as well.

**E.    Ortiz's Claim for Unlawful Detention**

At Ortiz's Gerstein hearing on May 25, 2004, the judge found that there was probable cause to detain Ortiz and set bond, which Ortiz was unable to post. Ortiz's next court date was June 16, 2004, when the charges against him were *nolle prossed*.

Ortiz contends that Haljean and Spencer violated his right to due process by doing nothing after receiving the June 2, 2004 crime lab letter indicating that the items seized from Ortiz's apartment were not controlled substances.[17]  Ortiz argues that "Spencer and Haljean learned that Ortiz was innocent, but sat on that evidence for almost two weeks. . . . By not letting prosecutors know that the items taken from Ortiz' apartment were not illegal, Spencer and Haljean caused Ortiz to sit in jail for two additional weeks.  Had they turned over that information, then the prosecutor could have moved for the release that much earlier.  Without that information, however, there was no way for the prosecutor to do so."  (Pls.' Combined Resp. at 31-32.)

Ortiz cites Jones v. City of Chicago, 856 F.2d 985 (7th Cir. 1988) and Sanders v. English, 950 F.2d 1152 (5th Cir. 1992), for the proposition that the officers had the duty to "alert the prosecutor of this evidence of innocence."  (Pls.' Combined Resp. at 33.)[18]  Jones and Sanders, however, do not support Ortiz's position.  In both cases, officers deliberately concealed exculpatory witness statements from prosecutors.  In Jones, the Seventh Circuit rejected the defendant officers' argument that a

---

[17]/ "Because the seizure of a person ends after the Gerstein hearing, the Due Process Clause of the Fourteenth Amendment is the only applicable constitutional provision." Garcia, 24 F.3d at 970 n.6; see also Brokaw v. Mercer County, 235 F.3d 1000, 1018 n.14 (7th Cir. 2000).

[18]/ Plaintiff also cites, without discussion, Olson v. Tyler, 771 F.2d 277 (7th Cir. 1985), which is factually inapposite.

state's attorney's decision to prosecute broke the causal chain
between their acts and plaintiff's damages, stating that the
officers "cannot hide behind the officials whom they have
defrauded." 856 F.2d at 994. Similarly, the Fifth Circuit in
Sanders reversed a grant of summary judgment on an illegal
detention claim, stating that a jury could find that if the
defendant police officer had disclosed certain exculpatory evidence
to the prosecuting attorney's office, the plaintiff "would have
been released and the charges against him dropped long before they
were." 950 F.2d at 1162.

Here, there is no evidence that Spencer and Haljean concealed
or withheld anything from prosecutors. And although there is no
evidence regarding whether prosecutors received a letter from the
crime lab like the one that was sent to Spencer and Haljean, it is
undisputed that prosecutors have access to crime lab reports, so
the lab results in this case were not in the officers' exclusive
possession. (Defs.' App. of Exs. to Reply, Ex. 62, Dep. of Cathryn
Hufford, at 25-26.) Plaintiffs cite no authority, and we are aware
of none, holding that police officers have a duty to communicate
exculpatory information to prosecutors that prosecutors already
have or could independently obtain. There is no evidence from
which a jury could reasonably find that Haljean and Spencer were
responsible for the time interval (which we decline to label a

"delay" because of the holding in <u>Garcia</u>, which is discussed below)
between the negative test results and Ortiz's release.

A decision more closely on point is <u>Garcia v. City of Chicago</u>,
24 F.3d 966 (7th Cir. 1994), in which the plaintiff contended that
the City held him in custody in violation of his civil rights after
laboratory tests showed that the powder that had been in his
possession was not a controlled substance.  The Seventh Circuit
held that the City was not constitutionally obligated to release
the plaintiff upon receipt of the negative test results, stating:

> Once a judge makes a probable cause determination at a
> <u>Gerstein</u> hearing, . . . that determination is sufficient
> to bring the case to trial.
> What happens when the prosecutor discovers exculpatory
> evidence after a probable cause determination at a
> <u>Gerstein</u> hearing?   Not all exculpatory evidence
> irrefutably proves the defendant's innocence.   The
> decision to move for a <u>nolle prosequi</u> is a matter of
> prosecutorial discretion, and the prosecutor can proceed
> to trial if the prosecutor believes doing so is
> warranted.  In this case, in fact, the prosecutor <u>did</u>
> dismiss the case well before trial, at the preliminary
> hearing--Garcia just contends that the delay from March
> 26 until April 10, the date the court set for his
> preliminary hearing, was too lengthy.  The Due Process
> Clause, however, does not compel prosecutors to dismiss
> its cases before trial based on exculpatory evidence in
> its possession, much less compel them to do so within
> fifteen days.

24 F.3d at 971.   If the Due Process Clause does not compel
prosecutors to dismiss cases before trial based on negative
laboratory results, then it does not compel police officers to
communicate with prosecutors about those results when the results
are equally available to prosecutors.   Defendants' motion for

summary judgment will be granted as to Ortiz's claim for unlawful detention.

**F.  Molina's Claim for Unlawful Delay of a Gerstein Hearing**

Plaintiffs claim that defendants Ziemba and Lemon-Redmond unreasonably "delayed May Molina from attending the first available Gerstein hearing while they were updating her arrest record for their own clerical purposes." (Pls.' Combined Resp. at 33.)  The facts are as follows.  Molina arrived at the 19th District lock-up around 4:25 a.m. on May 25, 2004.  Defendants Ziemba and Lemon-Redmond were working in the lockup from 5:30 a.m. to 1:30 p.m. that day.  Molina was photographed and fingerprinted by 5:00 a.m.  A fingerprint verification was performed, and Molina's identity was confirmed at 7:01 a.m. through LEADS, a law enforcement agency database.  Molina's information was then forwarded to the "Instant Update Unit," which was responsible for updating her rap sheet from an old typewritten form into a computer database and determining whether Molina had outstanding warrants.  At 11:17 a.m., the Instant Update Unit finished its work.  At 12:12 p.m., Molina's records were faxed to the lockup where she was being held, and she was cleared to be sent to bond court.  Molina was not taken to bond court that day, and the parties dispute whether a bond court hearing was available that afternoon.  At 3:13 a.m. on May 26, 2004, Molina died in the lockup awaiting bond court.  In plaintiffs' view, "there was no

reason why Molina could not have been taken for [a] <u>Gerstein</u> hearing" after her identity was confirmed at 7:01 a.m.; the administrative work to update her rap sheet that morning could have been done later and should not have been a prerequisite to clearing her for a bond court appearance. (Pls.' Combined Resp. at 34.)

In <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44, 56 (1991), the Supreme Court held that a probable cause determination within forty-eight hours of arrest is generally sufficient, but noted that such a hearing "may nonetheless violate <u>Gerstein</u> if the arrested individual can prove that his or her probable cause determination was delayed unreasonably." The Seventh Circuit has stated that "the reasonableness of a length of detention typically is a question best left open for juries to answer based on the facts presented in each case." <u>Chortek v. City of Milwaukee</u>, 356 F.3d 740, 747 (7th Cir. 2004) (internal quotation marks omitted). But we need not even reach this issue because plaintiffs have failed to show that Ziemba or Lemon-Redmond was personally responsible for any delay in taking Molina to a <u>Gerstein</u> hearing.

To establish personal liability in a § 1983 action, a plaintiff must show that the government official "caused the deprivation of a federal right." <u>Luck v. Rovenstine</u>, 168 F.3d 323, 327 (7th Cir. 1999). "An official causes a constitutional violation if he sets in motion a series of events that defendant

knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights." <u>Brokaw v. Mercer County</u>, 235 F.3d 1000, 1012 (7th Cir. 2000). An official satisfies this personal responsibility requirement if he acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge or consent. <u>Id.</u>

Plaintiffs assert in a conclusory fashion that Ziemba and Lemon-Redmond "unreasonably detained" Molina, Pls.' Combined Resp. at 33, and that "[t]he two officers who held May Molina during [the] administrative update were Ziemba and Lemon-Redmond," Pls.' Combined Surreply at 13. But the only factual statement plaintiffs make about the involvement of these two defendants is that "Ziemba and Lemon-Redmond were working in the 19th District lockup from 5:30 a.m. to 1:30 p.m. on May 25, 2004." (Pls.' Local Rule 56.1 Statement of Material Facts ¶ 71.)

We have reviewed the defendants' deposition testimony in an attempt to ascertain their roles. Ziemba was a "lockup keeper." (Defs.' J.A. of Exs., Ex. 31, Dep. of Catherine Ziemba, at 7.) Lemon-Redmond was a "detention aide." (Defs.' J.A. of Exs., Ex. 42, at 5.) They were not involved in any of the administrative tasks like updating Molina's rap sheet. There are no facts indicating that either defendant was responsible for the length

of Molina's detention or was even aware of the length of her detention or that it might be wrongful. Merely being on duty at the time Molina was in the lockup does not by itself support a finding of liability for the length of detention. Plaintiffs fail to establish that either Ziemba or Lemon-Redmond had any duty with respect to the length of Molina's detention, and they fail to cite any case law that is on point. Accordingly, defendants' motion for summary judgment will be granted as to Molina's claim for unlawful delay of a <u>Gerstein</u> hearing.

**G.    Guzman's Claim for Conversion**

Guzman brings a conversion claim against Haljean and Spencer, alleging that the officers stole money from her purse and money and jewelry from a lockbox that was in Molina's apartment. To prevail on her conversion claim, Guzman must prove that defendants "wrongfully and without authorization assumed control, dominion, or ownership over [her] property." <u>Loman v. Freeman</u>, 890 N.E.2d 446, 461 (Ill. 2008).

Guzman testified as follows about the events of May 24, 2004. She was watching television with Molina in Molina's bedroom in the first-floor apartment when the police arrived to conduct the search. Guzman had her purse with her; it contained about $350.00. (Pls.' Ex. B, Guzman Dep., at 111.) During the search, Guzman and Molina were instructed to go into the dining room, where they were handcuffed. Guzman left her purse in Molina's

bedroom.  When she was asked for identification, she indicated that it was in her purse in Molina's room.  An unidentified officer then brought her purse into the living room, looked for Guzman's identification, found it, and put it back in the purse. The officer then took her purse into the back bedroom, came back out, and told Guzman to leave.  (Id. at 133-34.)  Guzman went into the back bedroom to retrieve her purse, where she was rebuffed and threatened with arrest if she did not leave the apartment.  Guzman left, and when she later returned, she found her purse on top of a pile of clothes in a bedroom.  Her money was missing.  (Id. at 173.)  Also missing was $2000.00 and items of jewelry that Guzman had kept in two lockboxes in Molina's bedroom.  Guzman had given the money to Molina to keep in the lockboxes about five days before the search.  Asked at her deposition about the last time that she had seen the money in the lockboxes, Guzman testified as follows:

> Q.   When was the last time you saw the money in the lockbox?
> A.   I don't know.
> Q.   Well, you gave it to May Molina approximately five days before the raid; is that right?
> A.   Yeah.
> Q.   What is the last--did you see the money, physically see the money, at any point from the time you gave it to Molina and it went in the lockbox to the night of the raid?
> A.   I seen it, but not--I don't know exactly when.  I was--maybe I think I was getting something out of the box.
> Q.   What else was in the box?
> A.   Paperwork, her birth certificate, all her important paperwork for her, her son, things like that.

Q.    Okay.  And what was your reason for being in the lockbox in that five-day window period between when it went in there and the raid?

A.    I think--I think it was something for her son.

Q.    What was it?

A.    I don't remember.

Q.    So you don't remember what caused you to go in the lockbox?

A.    No.

Q.    Did you go in the lockbox?

A.    Yes, I did.

Q.    Did you get the key from May?

A.    Yes.

Q.    Where was the lockbox kept?

A.    They were underneath her bed.

Q.    So you went underneath her bed and got the lockbox that contained your cash; is that right?

A.    Correct.

Q.    What did you get out of it, if anything?

A.    Something for her son.  She was looking for something.  I don't remember what it was.

.  .  .

Q.    And at the time you went in the lockbox, did you see whether all of the $2,000 was in there?

A.    No, I didn't see if it was all there.

Q.    So you don't know one way or the other whether the money was in there when you went in there to look for these papers?

A.    No.

Q.    Besides the fact that money was missing, do you have any other basis for believing that anyone at the Chicago Police Department took the money?

A.    Say that again.

Q.    Yes.  Besides the fact it was missing after the raid, do you have any other basis for believing that somebody at the Chicago Police Department took the money?

A.    I don't understand the question.

Q.    Did you see anyone take the money?

A.    No.

Q.    Did you hear anyone say, "I took the money"?

A.    No.

Q.    Did you hear anyone on the night of the raid say, "We found cash"?

A.    No.

Q.    Is there any other basis for believing that somebody at the Chicago Police Department took your money?

A.    No, just what I think.

(Defs.' J.A. of Exs., Ex. 22, at 180-183.)  In an affidavit signed

and filed over a year after her deposition, Guzman states that she

"had looked inside the lockboxes approximately one day before the

raid, and the money envelopes and jewelry all appeared to be intact

in the lockboxes."  (Pls.' Mot. to Supplement Local Rule 56.1

Statement, Ex. 3, Aff. of Shannon Guzman ¶ 5.)

The officers did not inventory any money or jewelry in

relation to the searches or arrests of Molina and Guzman.

Defendants contend that "there is no credible evidence of any kind

favoring" Guzman in relation to her conversion claim.  (Ten Defs.'

Mem. in Supp. of Mot. at 23.)  We do not weigh credibility issues

at the summary judgment stage, see Autozone, Inc. v. Strick, 543

F.3d 923, 934 (7th Cir. 2008), but we do assess whether Guzman has

come forward with evidence that would reasonably permit a jury to

find in her favor on this claim.  She has failed to do so.

Guzman's testimony is insufficient to demonstrate that it is more

probable than not that any of the officers stole her cash and

jewelry.  And even if a reasonable inference could be drawn that

one of the officers stole Guzman's property, there is no evidence

whatsoever pointing to Haljean or Spencer in particular as the

culprit.

Guzman states in a footnote that "[i]f the Court finds that

Guzman has failed to meet any of the elements to prove conversion,

then Guzman asserts a due process claim based on Defendants depriving her of property without due process of law. Ordinarily, such a claim might be barred by the availability of a tort action. But if that remedy is not available to Guzman, then her due process rights were violated." (Pls.' Combined Resp. at 39 n.4 (citations omitted).) Defendants correctly point out that this footnote is a thinly-veiled attempt by plaintiffs to amend the complaint, after several previous tries. It comes much too late. Moreover, such an amendment would be futile. That Guzman cannot prove a conversion claim does not render the claim "unavailable."

Summary judgment in favor of defendants will be entered as to Guzman's state-law claim for conversion.

In light of our rulings, we need not discuss defendants' arguments regarding qualified immunity or the Illinois Tort Immunity Act.

## **CONCLUSION**

For the reasons explained above, the motion of defendants Richard Haljean, Nick Spencer, Nari Isakson, and Jose M. DeJesus for summary judgment [313] is granted. The motion of defendants Tamara Lemon-Redmond and Catherine Ziemba for summary judgment [316] is granted. Our decision today disposes of all remaining claims against the individual defendants (Counts III, VI, X, XI, XII, and XIII).

A status hearing is set for March 24, 2010, at 11:00 a.m.

DATE:       February 18, 2010

ENTER:      _____

John F. Grady, United States District Judge