04-7423.121                                                  December 20, 2012

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| APRIL ORTIZ, as Administrator for the ESTATE OF MAY MOLINA, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | No. 04 C 7423 |
| CITY OF CHICAGO, et al., ) ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

The Court of Appeals reversed the summary judgment entered by this court in favor of certain defendants and remanded the case for further proceedings. <u>Ortiz v. City of Chicago</u>, 656 F.3d 523 (7th Cir. 2011). The Court held that we had erred in excluding the testimony of the plaintiffs' medical expert, Dr. Howard Adelman, a pathologist. Dr. Adelman has died, and the plaintiff has retained a new expert, Dr. James Bryant, a pathologist certified by the American Board of Pathology in anatomic and clinical pathology. Dr. Bryant has provided a report (Pl.'s Resp., Ex. A) and given a deposition (Pl.'s Resp., Ex. B) in which he expresses the same opinions that the Court of Appeals held were admissible in evidence when expressed by Dr. Adelman, namely, (a) that out-of-control diabetes mellitus caused or contributed to the death of May Molina and (b) that a heroin overdose was not the cause of her death. The

- 2 -

defendants have moved *in limine* to bar the testimony of Dr. Bryant on the ground that his opinions fail to satisfy the admissibility standards of Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). The parties have briefed the motion and provided the court with voluminous exhibits in support of their positions.

## **INTRODUCTION**

A preliminary review of the applicable law will be helpful in our analysis of the parties' arguments. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Testimony that does not meet these standards must be excluded, and the court should concentrate on the method used by the witness to reach his opinion rather than the factual underpinnings of the opinion:

> [T]he court's gatekeeping function focuses on an examination of the expert's methodology. The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that

- 3 -

> analysis are factual matters to be determined by the trier of fact . . . .

Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000) (citing Daubert, 509 U.S. at 595). In Gayton v. McCoy, 593 F.3d 610, 616 (7th Cir. 2010) (citing Daubert, 509 U.S. at 596), the Court stated:

> Determinations on admissibility should not supplant the adversarial process; "shaky" expert testimony may be admissible, assailable by its opponents through cross-examination.

In the instant case, the Court of Appeals remarked: "The admissibility determination is not intended to supplant the adversarial process, and so even 'shaky' testimony may be admissible." 656 F.3d at 536.

With these principles in mind, we turn to the parties' arguments concerning Dr. Bryant's opinions.

**OUT-OF-CONTROL DIABETES AS THE
CAUSE OR A CONTRIBUTING CAUSE OF MOLINA'S DEATH**

May Molina was arrested on 10:07 p.m. on May 24, 2004. She remained in custody from that time until she was found dead in her cell at the Chicago Police Department's 19th District lockup at 2:45 a.m. on May 26, 2004. Molina had Type II diabetes mellitus that required medication (Glipizide and Metformin) to control her blood sugar. She had no medication during the more than 24-hour period she was in custody.

In his report, Dr. Bryant assumes that Molina took her pills shortly before she was arrested. He states that the "half-life" of Glipizide is 2-5 hours and for Metformin, 6.2 hours.

- 4 -

At the time of her autopsy, which was conducted by Cook County Medical Examiner Dr. Eupil Choi, Molina's "vitreous glucose" level[1] was 112 mg/dL.

In forming his opinion that excessively high glucose, known as hyperglycemia, was the cause or a contributing cause of Molina's death, Dr. Bryant relies on a work entitled Postmortem Chemistry, which is attached as Exhibit H to plaintiff's response.[2] (Dr. Adelman relied on a different work that contained a somewhat similar statement.) On page 242, the authors state:

> Initial postmortem vitreous glucose levels are approximately 85% of antemortem levels, and, due to postmortem glycolysis,[3] may decline to zero within four to five hours.

On the basis of this authority, Dr. Bryant concludes that because Molina's glucose level was 112 mg/dL at the time of the autopsy (which he assumes was performed by Dr. Choi at about 8:00 a.m. on May 26, 2012, four or five hours after Molina's death), the antemortem level "was about 700 mg/dL, which is consistent with out of control diabetes and nearly no diabetic medications in her blood." He goes on to state that "[i]f she had timely received her

---

[1] This term refers to the level of glucose in the vitreous body of the eye.

[2] Victor W. Weedn et al., Postmortem Chemistry, in Forensic Science Advances and Their Application in the Judiciary System 235 (Lawrence Kobilinsky ed., 2011).

[3] Glycolysis is the "breaking down of sugars into simpler compounds, chiefly pyruvate or lactate." Dorland's Illustrated Medical Dictionary 657 (25th ed. 1974).

- 5 -

medications (e.g., glipizide and metformin), then she would not have died because she would not have been hyperglycemic. Molina likely would not have died from out of control diabetes." (Pl.'s Resp., Ex. A at 3.)

The defendants attack this opinion on several grounds.

First, Dr. Bryant admitted in his deposition that he did not know glipizide's "duration of action" as opposed to its half-life. This means he does not know at what point a patient's diabetes might go out of control as a result of not taking the prescribed medication. He would defer that kind of question to a clinical pharmacologist. (Defs.' Mem. in Supp. of Mot., Ex. B, Dep. of Dr. James Bryant, at 125-129.)

The defendants argue that this lack of knowledge on Dr. Bryant's part requires that his opinion be excluded. We disagree. Dr. Bryant does not base his opinion on the medication's duration of action, but, rather, on an inference regarding Molina's antemortem glucose level given the level at the time of the autopsy, and for this inference he relies on Postmortem Chemistry. As we see it, the statements in Dr. Bryant's report about the half-life of the medications are basically irrelevant to his opinion about the cause of death.

The defendants say that Dr. Bryant's reliance on Postmortem Chemistry "was misplaced for two key reasons." (Defs.' Mem. at 9.) First, "the article itself acknowledge[s] that postmortem chemistry

literature is in its infancy and has not reached <u>any</u> degree of reliability." (Defs.' Mem. at 9 (emphasis added).) This is not a fair characterization of the article. The authors do state that the "bulk of the postmortem chemistry literature is older and has not been updated to more modern equipment and procedures. Within all these parameters measures of 'normal' for 'postmortem' levels as well as disease cutoff values need to be established." But, in the very next sentence, the authors conclude that "[d]espite these problems laboratories do attempt to establish reference ranges, and pathologists do find postmortem clinical testing to be valuable." (Pl.'s Resp., Ex. H, at 236-37.) Moreover, in the section of the article specifically dealing with "Diabetic States," the authors state that "<u>[a]lthough vitreous glucose is useful for diagnosis of hyperglycemia</u>, it is not useful for hypoglycemia." (Pl.'s Resp., Ex. H, at 242.)

The defendants also argue that Dr. Bryant agreed in his deposition "that postmortem chemistry was unreliable." (Defs.' Mem. at 9.) In support of this statement, the defendants cite page 142, lines 3-6 of the transcript of Dr. Bryant's deposition and include that page in their Exhibit 2, their excerpts from the deposition. They do not cite the previous page, nor is it included in their excerpts. Plaintiff's Exhibit B, on the other hand, includes both pages 141 and 142, which contain all of the relevant questions and answers:

- 7 -

> Q. And you agree with me that there could be factors which would undermine the implied glucose level of 700 milligrams per deciliter?
>
> A. I'm calling it a rule of thumb.
>
> Q. As you testified earlier?
>
> A. Right. I'm calling it a rule of thumb, but I don't think it's so far off that the 700 would only be 100, okay? The 700 – if we're going to talk about how far off it might be, it could be 600; it could be 800.
>
> Q. In an area that you have described as unestablished; is that fair?
>
> A. Right, the rule of thumb. Not the kind of accuracy that a physicist would like.

Dr. Bryant's testimony makes clear that in his opinion the information in the Postmortem Chemistry article is reliable, even though not necessarily "generally accepted," and not as accurate as "a physicist would like." As far as "general acceptance" is concerned, there is no such requirement for admissibility. As the Court stated in Daubert, "To summarize: 'General acceptance' is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence . . . ." 509 U.S. at 597. As far the necessary degree of "certainty" is concerned, "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." 509 U.S. at 590.

The other reason Dr. Bryant's reliance on Postmortem Chemistry is misplaced, according to defendants, is that "he did not

- 8 -

correctly apply the mathematical calculation actually provided in the article." (Defs.' Mem. at 10.)

Dr. Bryant relied on the statement in <u>Postmortem Chemistry</u> that the initial postmortem vitreous glucose level is approximately 85 percent of the antemortem level and that it may decline to zero within four to five hours. He reasoned that because the autopsy found Molina's vitreous glucose level to be 112 mg/dL five to six hours after her death, it would have been about 700 mg/dL prior to her death.

The defendants argue that this reasoning is based upon the faulty premise that Dr. Choi's autopsy was performed at about 8:00 a.m. and overlooks Dr. Choi's deposition testimony that it was performed at 5:00 a.m. Thus, the 112 mg/dL was not the reading five to six hours after death, but was the <u>initial</u> reading taken only two and one-half hours after death.

The defendants take it for granted that Dr. Choi's testimony is conclusive as to when the autopsy was performed. Dr. Bryant's assumption that it was performed at about 8:00 a.m. is based upon his knowledge that this is when the County Medical Examiner's Office normally opens in the morning. The plaintiff may wish to challenge Dr. Choi's memory that he performed an autopsy at about 5:00 a.m.,[4] but, whether she does or not, Dr. Bryant's opinion that

---

[4] The defendants attach to their reply brief a one-page excerpt from Dr. Choi's deposition. (Defs.' Reply, Ex. 10.) In this excerpt, the following testimony appears:

- 9 -

hyperglycemia caused or contributed to cause the death is not necessarily undermined if he is wrong about the time of the autopsy. If, as stated in Postmortem Chemistry, the level can decrease to zero within four or five hours after the initial postmortem reading, that would be an average of somewhere between 20 percent and 25 percent per hour. Assuming that Molina's level had decreased 25 percent per hour during the two and one-half hours between 2:30 a.m. and 5:00 a.m., this would be a decrease of 62.5 percent. This would mean that her antemortem level at 2:30 a.m. had been 298.7 mg/dL.[5]

Molina's diabetic history shows that her glucose levels were frequently out of control, even when she was under close medical supervision, as when she was in Norwegian American Hospital in

---

    Q.  How long were you in the cell for?
    A.  10, 15 minutes.
    Q.  What did you do after you left the cell?
    A.  I came back to the office.
    Q.  And how soon after you got back to the office did you conduct an
        autopsy?
    A.  I know the investigator was there according to the records 4:55 - 4:45.
        So back to office maybe about after the [sic] 5:00.

(Defs.' Reply, Ex. 10, Choi Dep. at 100, ll. 13-21.) This reference to "the investigator" may indicate another person who would have knowledge about the time of the autopsy, and the reference to "records" that show "4:55 - 4:45" would also seem to be relevant. The transcript does not indicate whether the "records" were present at the deposition. Neither party has mentioned the investigator or the records.

[5]/ This calculation assumes a linear decrease in the glucose level and can be expressed as $(1 - .25t)x = 112$, where $t = 2.5$ (hours). The result, 298.7, would be greater than 180 mg/dL, the level that Dr. Bryant testified that he "think[s]" constitutes out-of-control diabetes. (Pl.'s Resp., Ex. B, Bryant Dep. at 142-143.)
    Dr. Bryant's uncertainty about the level of glucose considered out of control will be something for the jury to consider. As far as we can recall, Dr. Adelman's opinion, held admissible by the Court of Appeals, did not include any specific information about the level considered to be out of control.

- 10 -

March 2003. On March 5, 2003, she had a reading of 137 mg/dL, and on March 6, 2003, readings of 291 mg/dL and 420 mg/dL.[6] These Norwegian American Hospital records were among the materials considered by Dr. Bryant in reaching his opinion about the cause of death. That fact that Molina's glucose levels were unpredictable would tend to support the likelihood that her antemortem level could have been higher than 298.7 mg/dL.

Another factor Dr. Bryant considered was that, in his view, there was no alternative explanation for Ms. Molina's death. Dr. Choi's theory of a heroin overdose was, in Dr. Bryant's opinion, unsupported, as we will discuss in the next section of this opinion. Arguably, that leaves hyperglycemia as the likely cause cause of Molina's death.

It is important to note that in reaching his opinion, Dr. Bryant relied on the same records the Court of Appeals found adequate to support Dr. Adelman's opinion.[7] Like Dr. Adelman, Dr. Bryant is an experienced pathologist. He has performed roughly 4,000 autopsies, at least 5 of them where the cause of death was uncontrolled diabetes. (Pl.'s Resp., Ex. B, Bryant Dep. at 159-60.)

---

[6] Interestingly, the nurse's notes at the time of the 420 mg/dL reading indicate that Ms. Molina was "asymptomatic." (Pl.'s Ex. J at 22, Bates 93.)

[7] "Based on this information [the records reviewed by Dr. Adelman], it is plain that the district court's central reason for excluding Dr. Adelman's testimony – that his opinion was based on insufficient data – was founded on an erroneous understanding of the factual record. This alone constitutes an abuse of discretion requiring reversal." Ortiz, 656 F.3d at 537.

- 11 -

It appears to the court that the defendants' challenges to Dr. Bryant's opinion that "out of control diabetes" caused or contributed to Molina's death go to its "factual underpinnings" rather than to the methodology by which he reached it. His opinion may be "shaky," but, as the cases have held, this is not a basis for barring the opinion from evidence. The defendants will have ample opportunity to challenge the opinion by cross-examination and by presenting contrary evidence.

## **OPIATE INTOXICATION AS A CAUSE OF DEATH**

The autopsy revealed that Molina had ingested six small tinfoil packets of heroin (presumably just before her arrest), and Dr. Choi concluded that "opiate intoxication" was the cause of her death. Dr. Bryant disagrees, and, if permitted, will testify that Dr. Choi's conclusion "was not substantiated by the evidence." (Pl.'s Resp., Ex. A at 3.) Dr. Bryant's reasoning is as follows:

> Morphine, the main metabolite of heroin, was present at a level of 72 ng/mL. This is a therapeutic level for morphine. If a physician was providing morphine to a patient for pain relief as might [sic] done for a patient with multiple bone fractures, this plasma level of 72 ng/mL would be therapeutic, not toxic, and not lethal. The therapeutic level for surgical anesthesia is 65-80 ng/mL. The toxic level begins at 200-5,000 ng/mL. See Jerrold B. Leikin, M.D. and Frank P. Paloucek, PharmD, *Poisoning and Toxicology Handbook* (published by Lexi-Comp, Inc.). In order to prove that heroin overdose is the cause of death in a person who swallows bags to hide them, unmetabolized heroin in large quantities should be present in the blood to account for the death. None was demonstrated. Dr. Choi makes his diagnosis with a leap in logic based on no evidence except the presence of the

packets in the stomach and duodenum.  He did not prove his case.

The defendants argue that Dr. Bryant has misinterpreted the Leikin and Paloucek Handbook he relies on for the proposition that the morphine level of 72 ng/mL is a therapeutic level (i.e., a level used for treatment) and that the toxic level begins at 200-5,000 ng/mL.  One of the authors, Dr. Leikin, has provided a Declaration, which the defendants rely on to prove their point. (Defs.' Mem., Ex. 4.)  As the plaintiff points out, Dr. Leikin's Declaration is not the same as a deposition, and the plaintiff has had no opportunity to cross-examine him.  For that reason alone we would be hesitant to bar Dr. Bryant's opinion on the basis of Dr. Leikin's Declaration.  Putting that consideration aside, however, and taking Dr. Leikin's statements at face value, our conclusion is that his declaration does not justify the bar the defendants seek. Dr. Leikin states:  "The Handbook does not, and never was intended to, convey that 72 ng/mL of morphine can never be a lethal level." (Leikin Decl. ¶ 6.)  He cites a study of heroin fatalities in San Francisco and Connecticut in which some of the morphine concentrations were as low as 50 ng/mL and even 10 ng/mL.  (Leikin Decl. ¶ 10.)  Dr. Leikin concludes:

> In conclusion it is entirely possible that a person who dies from a heroin overdose may have only 72 ng/mL of morphine in his or her system postmortem, and the Handbook does not say otherwise.  Some of the risk factors that could precipitate death in an individual with the relatively low level 72 ng/mL of morphine in his or her system include morbid obesity, sleep apnea, an

> already depressed respiratory system, and cirrhosis of the liver. Dr. Bryant's conclusion that the Handbook confirms that 72 ng/mL can never be a fatal level of morphine found in an adult's blood stream is incorrect, and is a misinterpretation of the Handbook.

(Leikin Decl. ¶ 11.) Plaintiff submits a copy of the relevant page of the Handbook. Under the title "Morphine, Blood," it states: "Heroin is metabolized to morphine, therefore morphine detection may indicate heroin use. The "therapeutic range" of morphine is given as 65-80 ng/mL, and under the heading "Critical Values," the "Toxic" level is given as >200 ng/mL. (Pl.'s Resp., Ex. K.)

This information in the Handbook is undoubtedly useful, but we do not read it to say that under no circumstances can a person ever die from a morphine blood level of less than 200 ng/mL. But neither does Dr. Bryant. Nothing in his report says that he is certain about anything. He says that "[i]t is [his] <u>opinion</u> that heroin overdose was not the cause of Molina's death," and that Dr. Choi's opinion to the contrary "was not substantiated by the evidence." (Pl.'s Resp., Ex. A at 3 (emphasis added).) Recall what the Supreme Court said about the need for scientific certainty: "Of course, it would unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." <u>Daubert</u>, 509 U.S. at 590.

Dr. Bryant's other basis for finding Dr. Choi's opinion to be unsupported by the evidence is that Dr. Choi failed to perform a

- 14 -

test to determine whether there was unmetabolized heroin in Molina's blood. The defendants argue that because there had been no test to determine whether there was unmetabolized heroin, Dr. Bryant is missing a "key data point" for his opinion that heroin was not the cause of death. As the plaintiff points out, however, it appears to be Dr. Choi who may be missing a key data point to support his opinion that heroin ingestion *was* the cause of death.

We believe that Dr. Bryant's opinion that opiate intoxication was not the cause of death, and his reasons for that opinion, will be helpful to the jury. His methodology in reaching the opinion is in compliance with Rule 702, and any weakness in the factual underpinnings goes to the weight of the opinion, not its admissibility. The question for the jury will be which opinion is *more probably* correct. Dr. Bryant and Dr. Choi disagree, but the fact "[t]hat two different experts reach opposing conclusions from the same information does not render their opinions inadmissible." Walker v. Soo Line R.R., 208 F.3d 581, 589 (7th Cir. 2000).

## **CONCLUSION**

The defendants' motion in limine to bar the opinions of James Bryant [483] is denied.

- 15 -

DATE:            December 20, 2012

ENTER:           _____
                 John F. Grady, United States District Judge