**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| APRIL ORTIZ, as Administrator for | ) | |
| THE ESTATE OF MAY MOLINA, | ) | |
| Deceased, | ) | |
| | ) | Case No. 04 C 7423 |
| Plaintiff, | ) | |
| | ) | Hon. John F. Grady |
| v. | ) | United States District Court Judge |
| | ) | |
| CITY OF CHICAGO, *et al.* | ) | |
| | ) | Hon. Arlander Keys |
| Defendants. | ) | United States Magistrate Judge |
| | ) | |

**DEFENDANT CITY OF CHICAGO'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR JUDGMENT AS A MATTER OF LAW AND ALL DEFENDANTS'
<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A NEW TRIAL</u>**

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

STANDARD OF REVIEW ..................................................................................................3

ARGUMENT FOR JUDGMENTAS A MATTER OF LAW.....................................................4

   I.   JUDGMENT IN FAVOR OF DEFENDANT CITY OF CHICAGO SHOULD BE
       GRANTED AS A MATTER OF LAW BECAUSE THE VERDICT WAS AGAINST
       THE MANIFEST WEIGHT OF THE EVIDENCE. .........................................................4

      A.   There was No Evidence of a Widespread Practice of Denying Medication or
            Medical Attention to Arrestees in Lockup.................................................................6

      B.   There was No Evidence of a Substantial Risk to Detainees. ......................................7

      C.   There was No Evidence that the Superintendent was Deliberately Indifferent to a
            Known Risk or Consequence....................................................................................10

      D.   There is No Constitutional Requirement to Have a Medically Trained Person in the
            Police Lockup. .........................................................................................................13

ARGUMENT FOR ALL DEFENDANTS' MOTION FOR NEW TRIAL PURSUANT TO
FRCP 59(a) ......................................................................................................................13

   I.   PROHIBITING THE TESTIMONY OF THE CITY OF CHICAGO'S MEDICAL
       EXAMINER AS TO CAUSE OF DEATH WAS ERROR. ..............................................13

   II.  THE COURT'S OVERRULING OF DEFENDANTS' OBJECTIONS TO JURY
       INSTRUCTIONS WAS AN ABUSE OF DISCRETION.................................................18

      A.   The Standard for Liability for the Deliberate Indifference Claim was Erroneously
            Lowered, Prejudicing the City of Chicago. .............................................................18

      B.   The Instruction Setting out Plaintiff's Allegations of *Monell* Claims was Improper.
            .................................................................................................................................21

  III.  THE COURT ABUSED ITS DISCRETION IN ITS RESPONSES TO JURY NOTES
       DURING DELIBERATIONS AND BY PROVIDING THE JURY WITH
       ADDITIONAL INSTRUCTIONS...................................................................................22

      A.   The Court's Additional Instructions Nos. 1 and 3 Misstate the Law. ......................22

      B.   The Court's Additional Instructions Nos. 2 and 4 Were Repetitive, Non-Responsive
            to the Juror's Questions, and Caused the Jurors to Confuse the Claims. .................24

      C.   The Additional Instructions Unduly Influenced the Outcome of the Case. .............26

IV. THE COURT'S STATEMENT OF THE CASE WAS AN ABUSE OF DISCRETION. 27

V. THE COURT IMPROPERLY ALLOWED TESTIMONY OF PLAINTIFF'S EXPERT MICHAEL BRASFIELD REGARDING STATISTICS CREATED BY PLAINTIFF'S COUNSEL. ............................................................................................................29

VI. THE COURT IMPROPERLY ALLOWED EXPERT TESTIMONY FROM PLAINTIFF'S ATTORNEY SEAN GOODWIN, WHO ADMITTED HAVING NO RELEVANT EXPERTISE AND WAS NEVER DISCLOSED AS AN EXPERT. ........35

VII. THE DEFENDANTS SHOULD HAVE BEEN PERMITTED TO IMPEACH JASMINE VACCARELLO'S TESTIMONY WITH HER HISTORY OF DRUG USE AND PRIOR ARRESTS. ...............................................................................................................39

    A. The Court Erred in Excluding Testimony of Vaccarello's Drug Use. .....................40

    B. The Court Erred in Excluding Testimony of Vaccarello's Prior Arrests in 2004. ....43

VIII. THE COURT'S RULING ON HEARSAY STATEMENTS WAS IN ERROR. ......44

IX. COURT'S SUA SPONTE ORDER TO PRODUCE 10 YEARS OF FINANCIAL RECORDS IN RELATION TO EXPERT WITNESSES AND THEIR EMPLOYERS WAS ERROR. ...........................................................................................................46

    A. The Court's Ruling Requiring Production of Documents Outside the Scope of Plaintiff's Discovery Requests was Erroneous.........................................................46

    B. The Court's Ruling Requiring Production of Ten Years of Billings and Past Testimony was Erroneous and Prejudicial to Defendants. .......................................48

X. THE COURT ERRED BY ALLOWING JURY TO SEE INCOMPLETE PORTIONS OF EVIDENCE. ...................................................................................................50

XI. PLAINTIFF DID NOT PROVE THE CITY OF CHICAGO WAS LIABLE UNDER *MONELL*.................................................................................................................51

**CONCLUSION** ....................................................................................................................**51**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Binakonsky_v. Ford Motor Co.,*
    133 F.3d 281 (4th Cir. 1998) ............................................17

*Board of County Commissioners of Bryan County, Oklahoma v. Brown,*
    520 U.S. 397 (1997)............................................................ *passim*

*Bradley v. Brown,*
    42 F.3d 434 (7th Cir. 1994) ..............................................37

*Brazos River Auth. v. GE Ionics, Inc.,*
    469 F.3d 416 (5th Cir.2006) ..............................................11

*Calhoun v. Ramsey,*
    408 F.3d 375 (7th Cir. 2005) ...........................................9, 10

*Cary Oil Co. v. MG Refining & Mkt'g,*
    257 F.Supp.2d 751 (S.D.N.Y. 2003).................................48

*Chapman v. Keltner,*
    241 F.3d 842 (7th Cir.2001) ..............................................21

*City of Canton v. Harris,*
    489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)................................. *passim*

*Cobige v. Chicago,*
    651 F.3d 780 (7th Cir.2011) ..............................................13

*Cornfield by Lewis v. Consolidated High School Dist. No. 230,*
    991 F.2d 1316 (7th Cir. 1993) .....................................7, 13, 19

*Daubert v. Merrell Dow Pharmaceuticals, Inc,*
    509 U.S. 579 ...............................................14, 17, 33, 37

*DeLatorre v. Minnesota Life,*
    Case No. 04 CV 3591, 2005  WL 2338809, *6 -7  (N.D.Ill.,2005)........................16

*e360 Insight, Inc. v. Spamhaus Project,*
    658 F.3d 637 (7th Cir. 2011) ..............................................38

*Estelle v. Gamble,*
    429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)................................13

*Farmer v. Brennan,*
    511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).......................................................13

*Frost v. Teco Barge Line, Inc.,*
    Case No. 04-CV-752-DRH, 2007 WL 420152 (S.D. Ill. Feb. 5, 2007) ..........................37, 38

*Generac Power Sys., Inc. v. Kohler Co.,*
    Case No. 11-CV-1120, 2013 WL 870630 (E.D. Wis. March 7, 2013)..................................28

*Gibson v. Dart,*
    No. 13 C 4379, 2013 WL 3490722 ......................................................................................21

*Grieveson v. Anderson,*
    538 F.3d 763 (7th Cir.2008) ................................................................................................21

*Hallett v. Richmond,*
    No. 05 C 50044, 2009 WL 5125628 (N.D. Ill. May 15, 2009) ...........................................43

*Hayes v. Raytheon Co.,*
    808 F.Supp. 1326 (N.D. Ill. 1992) ......................................................................................33

*Heston v. Taser Intern., Inc.,*
    431 Fed.Appx. 586, 2011 WL 1707048 (9th Cir., 2011)....................................................16

*Hillard v. Hargraves,*
    197 F.R.D. 359 (N.D. Ill. 2000)............................................................................................4

*Jackson v. Marion County,*
    66 F.3d 151 (7th Cir.1995) ...................................................................................................9

*Kedzior v. Talman Home Fed. Sav. & Loan Ass'n of Illinois,*
    No. 89 C 4188, 1990 WL 70855 (N.D. Ill. May 10, 1990) .................................................47

*Kunz v. Defelice,*
    538 F.3d 667 (7th Cir. 2008) ...............................................................................................41

*Lanigan v. Village of East Hazel Crest,*
    110 F.3d 467 (7th Cir. 1997) ...............................................................................................20

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.,*
    387 F. Supp. 2d 794, 817 (N.D. Ill. 2005) ..........................................................................33

*Mathewson v. National Automatic Tool Co.,*
    807 F.2d 87 (7th Cir. 1986) ...................................................................................................5

*McNabola v. Chicago Transit Authority,*
    10 F.3d 501 (7th Cir. 1993) ..............................................................................................7, 19

*Molnar v. Booth*,
229 F.3d 593 (7th Cir. 2000) ............................................................................... 18

*Monell v. New York City Dept. of Social Services*,
436 U.S. 658 (1978) ................................................................................... *passim*

*O'Conner v. Commonwealth Edison Co.*,
13 F.3d 1090 (7th Cir. 1994) ............................................................................... 37

*Ortiz v. Chicago*,
656 F.3d 523 (7th Cir.2011) ................................................................................ 13

*PPM Finance, Inc. v. Norandal USA, Inc.*,
392 F.3d 889 (7th Cir.2004) ................................................................................ 11

*Palmer v. Marion County*,
327 F.3d 588 (7th Cir.2003) .................................................................................. 9

*Porter v. Whitehall Labs., Inc.*,
9 F.3d 607 (7th Cir. 1993) ............................................................................. 37, 38

*Sara Lee Corp. v. Kraft Foods Inc.*,
276 F.R.D. 500 (N.D.Ill., 2011) .......................................................................... 11

*Scaggs v. Consolidated Rail Corp.*,
6 F.3d 1290 (7th Cir. 1993) ................................................................................... 3

*Selle v. Gibb*,
741 F.2d 896 (7th Cir. 1984) ................................................................................. 5

*Steffen v. Meridian Life Insurance Co.*,
859 F.2d 534 (7th Cir. 1988) ................................................................................. 5

*U.S. v. Greene*,
497 F.2d 1068 (7th Cir. 1974) ............................................................................. 50

*U.S. v. Haddad*,
10 F.3d 1252 (7th Cir. 1993) ............................................................................... 50

*U.S. v. Harvey*,
959 F.2d 1371 (7th Cir. 1992) ............................................................................. 50

*U.S. v. Price*,
516 F.3d 597 (7th Cir. 2008) ............................................................................... 51

*United States v. Bailey*,
510 F.3d 726 (7th Cir. 2007) ............................................................................... 42

*United States v. Gallardo*,
   497 F.3d 727 (7th Cir. 2007) ...............................................................42

*United States v. Harris,*
   388 F.2d 373 (7th Cir.1967) ...............................................................25

*United States v. Romandine*,
   289 Fed. Appx. 120 (7th Cir. 2008).....................................................41

*United States v. Tingle*,
   183 F.3d 719 (7th Cir. 1999) ...............................................................18

*United States v. Williams*,
   81 F.3d 1434 (7th Cir. 1985) .................................................................4

*Wells v. City of Chicago,*
   2012 WL 116040 (N.D.Ill., 2012) ......................................................8, 9

*Wiedemann v. Galiano*,
   722 F.25 335, 337 (7th Cir. 1983) ..........................................................4

*Wisconsin Electric Power Co. v. Union Pacific Railroad Co.,*
   No. 06-C-515, 2008 WL 934431 (E.D. Wis. March 31, 2008) .............48

*Zimmerman v. Chicago Bd. of Trade*,
   360 F.3d 612 (7th Cir. 2004) ..................................................................3

**Other State Cases**

*Pontiac Nat. Bank v. Vales,*
   993 N.E.2d 463 (Ill. App. Ct. 4th Dist. 2013)..................................48, 49

*Trower v. Jones*,
   520 N.E.2d 297 (1988)...........................................................................49

Defendants, by their attorneys Greenberg Traurig, LLP, acting as Special Assistant Corporation Counsel for the City of Chicago (the "City") and all individually named defendants, move this Honorable Court to grant the City of Chicago's renewed Motion for Judgment as a Matter of Law pursuant to Federal Rules of Civil Procedure Rule ("FRCP") 50(b), or in the alternative to grant all Defendants' motion for a new trial pursuant to FRCP 59(a). In support of their motions, Defendants state as follows:

## **INTRODUCTION**

Although Plaintiff Sal Ortiz ("Ortiz or "Plaintiff") called a sundry of witnesses in his case-in-chief, and referred to discovery responses the City provided during litigation, Plaintiff could not prove the basic elements of Section 1983, municipal liability.[1] This Court should therefore grant Defendant City of Chicago's Rule 50(b) motion for judgment as a matter of law. As this brief makes clear, the Court's interpretation of the City's responses to requests to admit was fatally flawed, and Plaintiff failed to present evidence needed to establish liability under *Monell v. New York City Dept. of Social Services,* 436 U.S. 658 (1978). Accordingly, the jury's verdict was against the manifest weight of the evidence, inconsistent and contrary to law.

In addition, Defendants are entitled to, a new trial under FRCP 59(a) for several reasons. First, the Court's order prohibiting the medical examiner from testifying as to Molina's cause of death was erroneous and prejudicial to Defendants. Second, the Court abused its discretion by giving certain jury instructions which misstated the law, and significantly lessened Plaintiff's burden for establishing municipal liability. In particular, the Court's definition of "deliberate indifference" was erroneous, and the Court abused its discretion by eliminating Plaintiff's

---

[1] The Court substituted in Sal Ortiz for April Ortiz as the Plaintiff on October 8, 2013 (Ex. 1: Oct. 8, 2013 Tr., pp. 18-19.)

requirement to establish that a widespread practice of constitutional violations occurred. Third, the Court improperly responded to juror questions with additional instructions that unfairly highlighted the erroneous instructions prejudicial to Defendants and provided non-responsive information which was biased toward Plaintiff. Fourth, the Statement of the Case delivered by the Court to the venire was inaccurate and highly prejudicial to Defendants. Fifth, Plaintiff's police practices expert, Michael Brasfield ("Brasfield"), was permitted to testify extensively regarding the number of arrestees who "needed" medical attention based on information contained in the Arrest Reports and statistics provided him by Plaintiff's counsel, notwithstanding that the Court ultimately concluded such opinions based on this data were inadmissible. Sixth, an attorney from Plaintiff's counsel's law firm, Sean Goodwin ("Goodwin"), offered the same testimony that the Court said Brasfield could not give, and presented it in the guise of a statistician, despite the fact that he was not an expert, clearly was not an unbiased party, and had no educational or professional background in statistics. Seventh, the Court erred by preventing the jury from hearing the truth about third-party witness Jasmine Vaccarello's ("Vaccarello") drug and arrest histories, which were highly probative and not overly prejudicial. Eighth, the Court allowed hearsay statements from two of Molina's cell mates that did not fall within any hearsay exception. Ninth, although not properly requested in discovery, the Court required the City to produce to Plaintiff ten years of financial billing history and testimony on behalf of the City of Chicago by Defendants' police practices expert Thomas Walton ("Walton") and Grant Thorton, the employer of Judith Roberts ("Roberts"), the City's expert's statistician. Tenth, the Rule of Completeness dictated that the entire expert report of Roberts should have been admitted into evidence instead of the discrete portion selected by Plaintiff that was taken wholly out of context.

In addition to the City's renewed motion for judgment as a matter of law, all Defendants request a new trial for the reasons stated herein.

## STANDARD OF REVIEW

FRCP 50(b) provides that if a party moves for judgment as a matter of law under FRCP 50(a), "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." FED. R. CIV. P. 50(b). The Court should grant judgment as a matter of law where there is no legally sufficient basis for a reasonable jury to find for the nonmoving party. *See* FED. R. CIV. P. 50(a); *Zimmerman v. Chicago Bd. of Trade*, 360 F.3d 612, 623 (7th Cir. 2004). FRCP 50(b) allows the trial court to reopen its judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. *Cone v. W. Va. Pulp & Paper Co.,* 330 U.S. 212, 216 (1947). FRCP 50(b) further permits the trial Court to "resolve any doubt as to the sufficiency of the evidence subsequent to the rendition of the verdict, thereby placing the case in such a posture that in the event it should be concluded upon review that the court erred in directing a verdict, the original verdict may be reinstated without a new trial." *Shaw v. Edward Hines Lumber Co.,* 249 F.2d 434, 438 (7th Cir. 1957); *Johnson v. N.Y. N. H & H.R. Co.,* 344 U.S. 48, 53 (1952) (trial court may set aside a verdict and order a new trial or direct entry of judgment in favor of movant under Rule 50(b)).

Under FRCP 59(a), "a new trial may be granted to all or any of the parties on all or some of the issues after a jury trial for any reason for which a new trial has been granted in an action at law in a federal court." FED. R. CIV. P. 59(a). The Court should grant a motion for a new trial when the clear weight of the evidence is against the jury verdict or for some other reason the trial was not fair to the moving party. *See Scaggs v. Consolidated Rail Corp.*, 6 F.3d 1290, 1293 (7th Cir. 1993). Conduct by the court, counsel or jury that improperly influences the

3

deliberative process is grounds for a new trial. See *Hillard v. Hargraves*, 197 F.R.D. 359 (N.D. Ill. 2000) (*citing McNabola v. Chicago Transit Authority*, 10 F.3d 501, 516 (7th Cir. 1993)); *Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 636 (7th Cir. 1996). The moving party must establish that misconduct occurred and caused prejudice to him. *Wiedemann v. Galiano*, 722 F.25 335, 337 (7th Cir. 1983). The total impact of all errors or irregularities at trial determines whether a party is entitled to a new trial. *United States v. Williams*, 81 F.3d 1434, 1443-44 (7th Cir. 1985) (*citing United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995)).

## ARGUMENT FOR JUDGMENT AS A MATTER OF LAW AS TO THE CITY OF CHICAGO

**I.     JUDGMENT IN FAVOR OF DEFENDANT CITY OF CHICAGO SHOULD BE GRANTED AS A MATTER OF LAW BECAUSE THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

Pursuant to FRCP 50(b), Defendant City renews its FRCP 50 Motion for Judgment as a Matter of Law. The City restates and incorporates by reference all arguments set forth in its oral motion for a directed verdict pursuant to Rule 50(a), as if fully set forth herein. (*See* Ex. 2: Oct. 24, 2013 Tr. at 2-6.) Here, the jury verdict is against the manifest weight of the evidence. It also is inconsistent with, and contrary to, law.

Judgment as a matter of law should be entered on behalf of the City because the sufficiency of the evidence cannot sustain a verdict for Plaintiff. As detailed in the City's oral motion for a judgment as a matter of law made in open court on October 24, 2013, Ortiz failed to present evidence that (1) there was a widespread practice of denial of medication or medical attention to detainees in Chicago Police Department lockup; (2) there was a substantial risk of denying medical attention or medication to arrestees while in lockup; (3) the Superintendent of the Chicago Police Department had knowledge of the alleged denial of medical attention or medication to arrestees while in lockup or knowledge of a substantial risk that either may

4

occur; and (4) there is a constitutional requirement to have a medically trained person in the police lockup.

In determining whether a jury verdict may stand, the Court examines whether the evidence presented, combined with all reasonable inferences which may be derived from it, were sufficient to support the verdict. *Steffen v. Meridian Life Insurance Co.*, 859 F.2d 534, 546 (7th Cir. 1988). The evidence is viewed in the light most favorable to the prevailing party. *Mathewson v. National Automatic Tool Co.,* 807 F.2d 87, 90 (7th Cir. 1986). "This evidence must provide a sufficient basis from which the jury could have reasonably reached a verdict without speculation or drawing unreasonable inferences which conflict with the undisputed facts." *Selle v. Gibb*, 741 F.2d 896, 900 (7th Cir. 1984) (citations omitted). Here, however, Plaintiff failed to provide sufficient evidence that would permit the jury to reach a verdict without speculation or unreasonable inferences.

The Court's ruling on the motion addressed only one element of proof of a *Monell* claim. The Court stated:

> I think that the admission of the defendant that what occurred in the Molina lockup was in accordance with the policy and practices of the police department eliminates the normal proof you need to establish the existence of a pattern and practice. We know that there was a pattern and practice, so we don't have to look at statistics, we don't have to look at how often people were taken to the hospital or whether they needed to be taken to the hospital. We look at what the individual defendants did in this case, and then we add to that the fact that how they acted was pursuant to the City's official policy and practices. The *Monell* case is made if the jury finds that the practices were unreasonable. So the motion is denied.

(Ex. 2: Oct. 24, 2013, Tr. p. 6.)

A.    There was No Evidence of a Widespread Practice of Denying Medication or Medical Attention to Arrestees in Lockup.

It is not disputed that the Chicago Police Department policy at issue in this case requires that detainees in police lockups who require medication or medical attention be taken to a hospital for treatment. Plaintiff argued that the individual defendants did not follow the written policy, and instead ignored requests for medical attention that May Molina allegedly made to the officers. According to Plaintiff, ignoring such requests is the defacto policy. However, Plaintiff failed to provide any evidence to support this contention.

The City argued that a directed verdict was proper given this lack of evidence of a widespread practice. However, the Court seemed to rule that the City of Chicago's admission in a Request to Admit that Molina was treated in a way consistent with the written policy and practices of the Chicago Police Department was proof of a widespread practice of denying medical attention to detainees in Chicago.[2]

The Court's rationale for denying the motion is flawed for several reasons: (1) the City never admitted that its policies and practices regarding the treatment of arrestees in a lockup were unreasonable or deficient in any way. The City admitted that there is a policy in place to provide medical attention to arrestees in a lockup who need it-namely – the policy that requires sending such persons to a hospital to receive that care. (Ex. 3: Response to Request to Admit No. 19, where Defendants "admit that their treatment of Molina in 2004 was consistent with the applicable General Orders promulgated by the Chicago Police Department at the time.") The City and each individual defendant denied that Molina ever indicated a need for

---

[2] The City admitted the following, (a) "Defendants admit that Molina was treated in a manner consistent with the Chicago Police Department's policies and practices;" and (b) "Defendants admit that the policies for providing necessary medical attention to arrestees in a lockup are the same at each of the various facilities in the City of Chicago." (Ex. 3: Plaintiff's Trial Exhibit ("PX") 20, Answers to Plaintiff's First Set of Requests to Admit to All Defendants, dated January 11, 2008.)

medication or medical attention while she was in custody, or that she displayed a need such that a layperson could objectively perceive it. Not giving detainees medication while in the lockup is not the issue. Rather, the issue is the failure to follow the written policy; (2) the Court erroneously assumed that the allegations made against the individual defendants in this case can be imputed to all officers and detention aides throughout the entire Chicago Police Department; and (3) the Court erroneously assumed that the harm allegedly caused Molina is proof of a widespread practice of denying medication or medical attention to all detainees. The court's erroneous assumptions constitute plain error.

For Plaintiff to prove that a widespread practice exists, there must be evidence of it. It is Plaintiff's burden to establish that the municipal practices she alleges were, on or before the date of the incident, "widespread, enduring practices that violate constitutional rights in a systematic manner." *Cornfield by Lewis v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993); *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 511 (7th Cir. 1993). The City's admission at issue simply supports its own position – namely, that its officers did not violate Molina's constitutional rights and treated Molina in accordance with the policy and practice of the police department. That the jury chose to believe the testimony of Plaintiff's witnesses rather than Defendants' regarding how Molina was treated does not magically morph the City's denial of wrongdoing and its admission that it follows a facially-valid policy into an admission of widespread constitutional violations. Plaintiff must do more to prove a widespread practice of constitutional violations. He has not met his burden.

B.      There was No Evidence of a Substantial Risk to Detainees.

As noted above, Plaintiff provided no evidence that detainees other than Molina were in any way harmed by the policy at issue. Further, Plaintiff provided no evidence that any other

detainees were even at risk of being harmed. Plaintiff adduced no evidence that any detainee besides Molina needed medical attention or medication while in a police lockup. Plaintiff purported to provide such evidence by way of a spreadsheet created by counsel that details approximately 3,265 detainees (out of approximately 35,000) who answered affirmatively the questions, "do you have a serious medical condition" or "are you presently taking medication." However, there is no evidence that indicates that any of those 3,265 detainees were in <u>need</u> of medical attention or medication, or requested and were denied medication, during the brief time they were in police custody. Thus Plaintiff's argument that those who answered "yes" to these questions at intake were actually denied the medication or medical attention that they needed at that time is pure speculation. The "mere probability" that an alleged practice will cause a lockup keeper to inflict constitutional injury is insufficient to establish causation. Plaintiff must show that the City's lockup keepers were "highly likely to inflict the particular injury suffered by the plaintiff," and the injury must have been the "plainly obvious consequence" of the alleged policy. *Board of County Commissioners of Bryan Cty., Oklahoma v. Brown*, 520 U.S. 397, 412 (1997).

Plaintiff submitted no evidence of arrestees who were allegedly harmed by the policy which requires a medically-trained person administer medicine or treatment. The Seventh Circuit has held that:

> "[t]he usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers."

*Wells v. City* of Chicago, No. 09 C 1198, 2012 WL 116040, *17 (N.D.Ill., Jan. 16, 2012) (*citing*

*Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir.1995)). Plaintiff did not show a "series of bad acts." In fact the Plaintiff did not submit any evidence that a single arrestee suffered harm as a result of the City's policies and practices with respect to medical attention in lockup, besides Molina.

In *Wells v. City of Chicago*, a case that also involved a denial of medical care claim, the plaintiff introduced evidence of four incidents in which an arrestee alleged he was denied medical attention. The Court granted the City's motion for summary judgment, stating that, "combining these cases with the evidence in the present case, there is not enough to permit a reasonable jury to find a widespread unconstitutional practice sufficient to impose liability on the City. It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. Rather, [t]he <u>plaintiff must introduce evidence demonstrating that the unlawful practice</u> was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." 2012 WL 116040 at *18 (internal citations omitted).

Here, Plaintiff did not put a single person – out of the approximately 2,300 he alleges were also in "need" – on the stand to testify that he or she was denied the medication or medical attention he or she needed while in custody. Only evidence concerning Molina as presented to the jury. The Seventh Circuit has made clear that proof of one or two bad acts is insufficient to establish a widespread unconstitutional practice of which policymakers must have been aware. *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003); *Jackson*, 66 F.3d at 152. Even multiple occurrences are insufficient unless plaintiff "weave[s] these separate incidents together into a cognizable policy." *Phelan v. Cook County,* 463 F.3d 773, 790 (7th Cir. 2006).

In *Calhoun v. Ramsey*, another denial of medical care case, the Seventh Circuit explained

why it is imperative to have more than one incident to establish liability against a municipality.

As the Court stated:

> A second way of complaining about an express policy is to object
> to omissions in the policy. This, as we understand the argument, is
> what Calhoun is doing. In fact, we think that it is more confusing
> than useful to distinguish between claims about express policies
> that fail to address certain issues, and claims about widespread
> practices that are not tethered to a particular written policy. In both
> of these situations, the claim requires more evidence than a single
> incident to establish liability. See *Tuttle*, 471 U.S. at 822–23, 105
> S.Ct. 2427 (challenging the City's police officer training policy as
> inadequate). This is because it is necessary to understand what the
> omission means. No government has, or could have, policies about
> virtually everything that might happen. The absence of a policy
> might thus mean only that the government sees no need to address
> the point at all, or that it believes that case-by-case decisions are
> best, or that it wants to accumulate some experience before
> selecting a regular course of action. At times, the absence of a
> policy might reflect a decision to act unconstitutionally, but the
> Supreme Court has repeatedly told us to be cautious about drawing
> that inference. *See, e.g., Bd. of the County Comm'rs of Bryan
> County v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d
> 626 (1997) (rejecting *Monell* claim based on absence of more
> thorough screening of candidates for sheriff's deputy); *City of
> Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d
> 412 (1989) (rejecting a failure-to-train claim).

*Calhoun v. Ramsey,* 408 F.3d 375, 379-380 (7th Cir. 2005).

Like the Plaintiff references above, Ortiz failed to meet his burden of showing a

substantial risk to detainees.

      C.    <u>There was No Evidence that the Superintendent was Deliberately Indifferent
to a Known Risk or Consequence.</u>

Plaintiff presented no evidence that the Superintendent of the Chicago Police

Department was aware of any increased risk to detainees as a result of the policy regarding

medication in lockups, or that there was a widespread denial of medical care to detainees due

to the policy. Plaintiff contended that the actions or omissions of the individual defendants

increased the risk of harm to Plaintiff and to all detainees, and that the Superintendent was deliberately indifferent to that risk. But "deliberate indifference is a stringent standard of fault, requiring <u>proof</u> that a municipal actor disregarded <u>a known or obvious consequence of his action</u>." *Bd. of the Cty. Comm'rs*, 520 U.S at 410. In order to satisfy this "stringent standard of fault," a plaintiff must prove two elements of "deliberate indifference": (1) awareness of <u>a pattern of constitutional violations</u>; and (2) <u>acquiescence in such a pattern</u>. *See Canton v. Harris*, 489 U.S. 378, 397 (1989).

The only evidence presented concerning the Superintendent's knowledge was by the City's 30(b)(6) witness, Commander Eric Washington. Commander Washington testified to the following:

(a) The Superintendent of the Chicago Police Department issues the Chicago Police Department's General Orders. (Ex. 4:, Oct. 23, 2013, Tr. p. 64);

(b) It is mandatory that all officers and detention aides follow the Chicago Police Department's General Orders. (*Id.*);

(c) If there were one example of a lockup keeper or supervisor failing to follow the General Orders, that information would not necessarily be brought to the attention of the Superintendent. (*Id.*, at 66);

(d) From 2000 to 2004, Superintendents Hillard and Cline, would be notified of any pattern of issues within the police department at their daily executive management meeting. Any issues relating to violations of the General Orders or inconsistent practices would be reported up the chain of command of the Chicago Police Department. (*Id.*, at 66-67);[3]

---

[3] Commander Washington also attempted to testify in regard to the specific knowledge he gained from his conversations with former Superintendents Hillard and Cline, but the Court *sua sponte* ruled that the testimony would constitute hearsay. (Ex. 4: Oct. 23, 2013 Tr., pp 67-69). This *sua sponte* hearsay ruling was error. *See Sara Lee Corp. v. Kraft Foods Inc.* 276 F.R.D. 500, 502-504 (N.D.Ill., 2011)("Consistent with the purposes underlying the rule, a Rule 30(b)(6) witness may "testify not only to matters within his personal knowledge but also to 'matters known or reasonably available to the organization.' " *PPM Finance, Inc. v. Norandal USA, Inc.,* 392 F.3d 889, 894–95 (7th Cir. 2004) (quoting Rule 30(b)(6)). Conceptually, courts have attempted to square Rule 30(b)(6) with the personal knowledge requirement by explaining that a Rule 30(b)(6) witness "testifies 'vicariously,' for the corporation, as to its knowledge and perceptions." *Brazos River Auth. v. GE Ionics, Inc.,* 469 F.3d 416, 434 (5th Cir.2006). When it comes to using Rule 30(b)(6) depositions at trial, strictly imposing the personal knowledge requirement would only recreate the problems that Rule 30(b)(6) was created to solve.").

(e) Washington attended many of the daily executive management meetings, which were also attended by the deputy superintendents from each bureau including, but not limited to, the general counsel, internal affairs division ("IAD"), the bureau of patrol, the Office of Professional Standards, Detective division, Chief of Staff, and he never heard of any widespread problems, issues, or complaints concerning the denial of medical attention in lockups. (*Id*., at 69-76); and

(f) Washington also attended hundreds of community meetings and forums and he never heard of any public complaints concerning the treatment of detainees in the lockup. (*Id*., at 72-74).

Thus, Plaintiff failed to present <u>any evidence</u> of a pattern of constitutional violations and failed to present any evidence of the Superintendent's actual knowledge or acquiescence concerning known or obvious detrimental consequences of the City's operative policy for providing medical care to arrestees. However, in order to establish Section 1983 municipal liability, Plaintiff must establish both the existence of a widespread practice and deliberate indifference by the final policy maker. Accordingly, the jury's verdict against the City must be overturned.

The City also objects to the Court's *sua sponte* limiting instruction given to the jury during Commander Washington's testimony. Without any provocation, the Court instructed the jury that Commander Washington's testimony concerning the public meetings was useful "for whatever value you think it has on the question of whether the superintendent had notice that adequate care was not being rendered to inmates in lockups, but it has <u>nothing to do with what the obligation of the City has in regard to medical care at the lockups</u>. That is determined not by community meetings but by the Constitution." (*Id.* at 73-74.) (emphasis added). The Court's instruction that notice to the Superintendent's problem is not relevant to the claim against the City is erroneous and a misstatement of the law. The law requires that the final

---

Defendants also object to the Court's instruction to the jury concerning its hearsay ruling during Commander Washington's testimony. This unsolicited statement to the jury was unnecessary and prejudicial to the Defendants as the jury could have taken the statement as the Court criticizing the credibility of Commander Washington. *Id*., at 69:11-18.

policymaking authority – here, the Superintendent – must be aware of and acquiesce to municipal practices that cause constitutional violations. *See Canton*, 489 U.S. at 397 (1989). The Court's elimination of a necessary element of a *Monell* claim is plain error.[4]

     D.    <u>There is No Constitutional Requirement to Have a Medically Trained Person in the Police Lockup.</u>

While it is clearly established that the Constitution requires police to provide care for the serious medical conditions of persons in custody, *see Farmer v. Brennan*, 511 U.S. 825 (1994); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285 (1976); *Ortiz v. Chicago*, 656 F.3d 523 (7th Cir.2011); *Cobige v. Chicago*, 651 F.3d 780 (7th Cir. 2011), there is no evidentiary or legal support for the proposition that a medically-trained person must be present in the lockup. To the extent this Court believes that the admitted lack of medically-trained persons in the lockup constitutes the City's "widespread practice" Plaintiff must establish in order to satisfy the elements of a *Monell* claim, Plaintiff failed to prove how the absence of such a person in the lockup constitutes a constitutional violation. *Cornfield by Lewis*, 991 F.2d 1316, 1326 (7th Cir. 1993) (necessary element of *Monell* practices claim is "widespread, enduring practices that violate constitutional rights in a systematic manner.").

For these reasons, the City's FRCP 50(b) Motion should be granted.

**ARGUMENT FOR ALL DEFENDANTS' MOTION FOR NEW TRIAL PURSUANT TO FRCP 59(a)**

**I.    PROHIBITING THE TESTIMONY OF THE CITY OF CHICAGO'S MEDICAL EXAMINER AS TO CAUSE OF DEATH WAS ERROR.**

The Court's decision to grant Plaintiff's Motion *in Limine* No. 3 and prohibit the Cook County medical examiner's testimony concerning Molina's cause of death was reversible error.

---

[4] The court could have employed the same reasoning it utilized to admit the hearsay statements of Diane Rice and Vaccarello by admitting Washington's testimony for the limited purpose of showing what "notice," if any, was provided to the Superintendent (See Section III, VIII, infra.). Instead, the court made inconsistent rulings.

The cause of Molina's death an integral issue in the case, and the Cook County medical examiner was the only person to physically examine Molina's remains after her death. However, the Court prohibited Defendants from presenting any evidence of the medical examiner's conclusions as to Molina's cause of death. The court's basis for doing so was erroneous.

Plaintiff moved *in limine* to bar the cause of death testimony from Dr. Eupil Choi ("Choi"), and this motion was fully briefed. (Dkt. Nos. 552, 605 & 614.) The Court denied the motion stating "there's nothing in that memorandum that persuades me that Dr. Choi knows anything about how much heroin is required to cause death. … And just on the basis of what he said in his deposition, I am unable to say that he's qualified to say that heroin was the cause of death, or even might or could have been the cause of death. So I am going to grant that motion. … he can testify, of course, to the finding of the tinfoil packets and the amount of heroin in the system, but as far as whether or not that was the cause of death for purposes of this trial and for purposes of the *Daubert against Dow Chemical*, he's not qualified." (Ex. 5: Oct. 7, 2013 Tr., p. 4.) The Court further stated as follows:

> Dr. Choi will not be allowed to testify that heroin was the cause of death or – actually, I suppose due to his lack of knowledge, he can't testify that any cause of death – I mean … not just that he can't testify that heroin was, but he can't testify that something else wasn't. So my ruling is that Dr. Choi will not be permitted to testify to the cause of death. His role as a medical examiner is very different from his role as a witness under the *Daubert* rule.

(*Id.* at 7-8.)

Under both Federal Rule of Evidence ("FRE") 702 and *Daubert,* Dr. Choi's testimony should not have been barred. Dr. Choi had the "knowledge, skill, experience, training, and education" to reliably opine as to cause of death. FED. R. EVID. 702. Dr. Choi was the Deputy

Cook County Medical Examiner who conducted the autopsy on May Molina following her death. At the time, Dr. Choi had been employed as a Deputy Medical Examiner in Cook County since 1976 and had nearly 30 years of experience. He was Board-certified in pathology, forensic pathology, and anatomic and clinical pathology. (Dkt. 605-1, 6:8-17:1) As a trained physician, pathologist, and M.E., Dr. Choi was responsible for determining the cause of death in all the autopsies that he performed. (*Id*., 38:16-24; 39:1-9). Dr. Choi did not make those determination in a vacuum. He had ample information to determine the cause of death of Mary Molina.

There is no doubt that Dr. Choi's determination of Molina's death was based on sufficient facts and information. Dr. Choi had the unique ability to go to the scene of Molina's death, collect police investigation notes (including Molina's arrest records and arrest report), and hear the reports of witnesses (in this case, the other detainees), who were present when Molina died. (*Id.*, 52:21-24; 58:12-13, 59:1-15; 68:21-24; 69:1-17). In addition, Dr. Choi visually and physically examined Molina. Dr. Choi also had available to him, numerous scientific tests in order to rule out potential causes of death.

Besides being the only expert in this case who directly examined Molina before he made his final determination of cause of death, Molina's family informed Dr. Choi about Molina's medical history and the types of medications she was taking. On May 27, 2004, prior to issuing the final death certificate, Dr. Choi received a call from Molina's niece, who informed him that Molina was on some medication for various medical conditions, including thyroid, diabetes, and hypertension. Molina's niece also informed Dr. Choi that Molina did not have a history of heavy drinking and did not do drugs, but that she did smoke cigarettes. (*Id.*, 71:6-24; 72:14-8; 82:5-21; 83:7-11; 84:14-24; 85:1-11; 86:1-5-8; 87:17-22). Dr. Choi considered this additional information prior to making his final determination of cause of death. (*Id*. 86:9-20).

15

Further, Dr. Choi relied upon a series of scientific tests to find out more information about Molina's infirmities. For example, Dr. Choi reviewed Molina's levels of sodium, potassium, urea nitrogen, creatinine, and glucose to rule out alternative causes of death. (*Id.*, 126:15-127:13, 221:2-16). In addition, the histology report and Dr. Choi's notes from his autopsy confirmed that Molina did not have myocarditis, pneumonia, any lung infections, glomenditis, meningitis, myositis, subdural hematoma, blood clots in the brain, flexion, intracebral head rush, stroke, or dilation in the brain. Her pancreas, kiDkt. eys nervous system and tongue were normal, and her spleen was congested consistent with cirrhosis. (*Id.* 119:5-24; 120:1-3; 122:8-24; 123:1-7; 172:23-24; 173:1-11; 174:6-24; 175:1). Dr. Choi reviewed all the test results routinely performed in autopsies, including the histology report, prior to making the final determination. (*Id.*, 127:14-20). In sum, Dr. Choi based his cause of death opinion on the information regarding Molina's medical ailments, the types of medications she took, the anatomic findings he visually observed and the chemistry lab results of a plethora of body tissue and fluid samples.

While performing the autopsy, Dr. Choi also recovered six tin-foil packets of heroin inside Molina's body. He received and reviewed the toxicology report which confirmed the levels of morphine, *i.e.* heroin, in Molina's system. (*Id.* 129:4 – 133:22, 136:6-17). Based on the totality of the evidence, Dr. Choi had more than sufficient information to provide a scientifically-reliable opinion as to Molina's cause of death. *See, e.g., DeLatorre v. Minnesota Life*, 2005 WL 2338809, at *6 -7 (N.D.Ill., 2005) (finding Cook County medical examiner qualified to testify based on his medical knowledge of the effects of morphine on the human body and his conclusion of death by intoxication); *Heston v. Taser Intern., Inc.,* 431 Fed.Appx. 586, 588, 2011 WL 1707048, at *1 (9th Cir. 2011) ("Dr. Haddix is a board-certified medical

examiner at Stanford University who has performed thousands of autopsies like the one she performed on Heston … [she is] sufficiently qualified by 'knowledge, skill, experience, training, or education' to testify regarding … causes of his death.").

The Court erred when it failed to find that this amount of data and information was sufficient for a medically-trained, Board-certified doctor to rely upon, in order to form an opinion as to cause of death.   As the *Daubert* court noted, "[t]he inquiry envisioned ... is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharmaceuticals, Inc,* 509 U.S. 579, 594-95 (1993) (footnote omitted).

Further, to the extent Dr. Choi's testimony contained a combination of fact and expert witness observations, the Court erred by ruling that Dr. Choi could not opine on the cause of death in this case as a fact witness. As the Fourth Circuit has noted, a medical examiner is a proper fact witness who can opine on cause of death.   Its Court of Appeals has held that *Daubert* does not apply to fact witnesses, such as a medical examiner, who examines the victim of an accident. *Binakonsky v. Ford Motor Co.,* 133 F.3d 281 (4th Cir. 1998).  A witness who is not testifying as an expert may testify to opinions or inferences which are rationally based on his perception of the facts if it is helpful to a clear understanding of a fact in issue and not based on scientific, technical, or specialized knowledge.  FED. R. EVID. 701.

Defendants were prejudiced by being prohibited from calling Dr. Choi to testify as to cause of death.  Further, the Court's ruling precluded Defendants' witnesses from testing about his findings, which undermined the credibility of Defendants' cause of death medical expert, Dr.

Steven Aks ("Aks"). During closing arguments, as well as Aks' cross examination, Plaintiff's counsel attacked Aks for failing to identify anybody who had died from ingesting heroin, and Aks was restricted from identifying Molina herself. (*See* Ex. 6: Oct. 29, 2013 Tr., p. 31.)

## II. THE COURT'S OVERRULING OF DEFENDANTS' OBJECTIONS TO JURY INSTRUCTIONS WAS AN ABUSE OF DISCRETION.

While the district court is afforded substantial discretion with respect to the precise wording of jury instructions, the final result must, read as a whole, completely and correctly state the law. *United States v. Tingle*, 183 F.3d 719, 729 (7th Cir. 1999). A verdict based on jury instructions that are misguided or erroneous should be reversed if the error prejudiced a litigant. *See Molnar v. Booth*, 229 F.3d 593, 602 (7th Cir. 2000). Here, the Court's misstatements of the law negatively impacted Defendants, resulting in a verdict against all defendants for $1 million.

### A. The Standard for Liability for the Deliberate Indifference Claim was Erroneously Lowered, Prejudicing the City of Chicago.

In its jury instructions, the Court lowered Plaintiff's burden as to the City of Chicago. Specifically, the Court's Instruction Nos. 10, 12, 17, 18 are all improper in that they misstate the law and lower the Plaintiff's burden for proving the City's liability.

#### 1. The Court Erroneously Eliminated the Requirement of Proving a Widespread Practice.

As discussed, *supra* in Section I to the City's FRCP 59 motion, the Court did not require Plaintiff to prove that there was a "widespread practice" of denying medical care to detainees. Rather, the Court's Instruction No. 18 instructed the jury that "City of Chicago admitted that Molina was treated in a manner consistent with the Chicago Police Department's policies and practices," and limited the jury's fact-finding question solely to "whether the Police

Department's policy-maker, the Superintendent of Police, was deliberately indifferent in allowing any policy or practice you find to have caused harm to Molina to continue." (Dkt. 669.) It is Plaintiff's burden to establish that the municipal practices she alleges were, on or before the date of the incident, "widespread, enduring practices that violate constitutional rights in a systematic manner." *Cornfield by Lewis v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993); *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 511 (7th Cir. 1993). This instruction erroneously eliminated the Plaintiff's burden of proving that there was a "widespread practice" of harming detainees clearly influenced the outcome of the case, and is a plain error.

> 2. The Court Erroneously Eliminated the Requirement of Deliberate Indifference to Pattern of Harm or Constitutional Violations.

The Court gave Instruction No. 12 over Defendants' objections that "deliberate indifference means that the Superintendent actually knew there was a substantial risk that the City's official policies and practices would cause serious harm to the health of lockup detainees…" (Ex. 7: Oct. 29, 2013 Tr., pp. 22-30; Dkt. 669.) However, the Plaintiff's burden is greater than that which is reflected in the instruction. "Deliberate indifference is a stringent standard of fault, requiring ***proof*** that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of the County Comm'rs*, 520 U.S at 410. In order to satisfy this "stringent standard of fault," a plaintiff must prove two elements of "deliberate indifference": (1) awareness of a pattern of constitutional violations; and (2) acquiescence in such a pattern. *See Canton*, 489 U.S. 378, 397 (1989). Under *Canton*, a pattern of actual violations is required, not just the risk that a harm or violation may occur. The Court's instruction here improperly lessened Plaintiff's burden of proof, causing prejudice to

19

Defendant City of Chicago, and is grounds for a new trial.

> 3. The Superintendent Must Do More Than Merely "Allow" a Policy to Continue.

Defendants also objected to the Court's Instruction Nos. 17 and 18, which required Plaintiff to prove only that the final policymaking authority "allowed" a practice to "continue," rather than requiring them to prove that the final policymaking authority approved or acquiesced to the practice. (Ex. 7: Oct 29, 2013 Tr., pp. 49-52; Dkt. 669.) This instruction related to the "deliberate indifference requirement of municipal liability, and in order to satisfy this "stringent standard of fault," a plaintiff must prove two elements: (1) awareness of a pattern of constitutional violations; and (2) <u>acquiescence in such a pattern</u>. *See Canton*, 489 U.S. 378, 397 (1989). The Seventh Circuit has required more than simply "allowing" a practice to continue. To act with deliberate indifference is to "turn a blind eye for fear of what [one] might see." *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 477 (7th Cir. 1997). The Court's instruction, as written, minimized the Plaintiff's burden of proof as to this element, and greatly prejudiced Defendant City of Chicago.

> 4. The Court Improperly and Erroneously Defined "Medical Need" in the Jury Instructions.

In the Court's Instruction No. 10, which is placed in the section of instructions relating to the claims against the City of Chicago, the Court refers to and defines a "medical need." The reference to any "medical need," as opposed to a "serious medical need," is error and misstates the law. Consequently, at the jury instruction conference, Defendants objected to this instruction No. 10. (Ex. 7: Oct. 29, 2013 Tr., pp. 16-21, 68- 75; Dkt. 66-76.) The Court gave this erroneous instruction over both parties' objections. (Ex. 7: Oct. 29, 2013 Tr., pp. 17-21.) This instruction improperly lowers Plaintiff's burden of proof in the case and is an abuse of

discretion. In cases like this one, involving an arrestee in detention, only serious injury or signs of serious injury amounts to a constitutional violation. *Gibson v. Dart*, No. 13 C 4379, 2013 WL 3490722, at *2 (N.D. Ill. July 11, 2013) ('The Due Process Clause prohibits deliberate indifference to the serious medical needs of a pretrial detainee."); *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir.2008) (same); *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir.2001) (same).

By giving this instruction, reducing the constitutional violation to simply "medical needs," the Court lowered Plaintiff's burden of proof significantly, thereby causing prejudice to all Defendants. Accordingly, the Court should grant a new trial in which the proper standard of constitutional violation can be given to the jury.

While the Court took the position that the "serious" dement could safely be dropped, this interpretation was at odds with clear Seventh Circuit authority, and undercut the equally important element that the individual defendants had to have known that Molina was in distress.

      B.    <u>The Instruction Setting out Plaintiff's Allegations of *Monell* Claims was Improper.</u>

The Court improperly allowed Plaintiff's Jury Instruction No. 19c (modified), although Defendants objected to the instruction in its entirety. (Ex. 7: Oct. 29, 2013 Tr., pp. 52-60; Dkt. 669.) First, the instruction, which purports to set out Plaintiff's specific claims against the City, was belatedly propounded by Plaintiff to the Court and Defendants mid-trial, thus depriving Defendants of the opportunity to tailor their defense to Plaintiff's ever-changing *Monell* claim. Second, although the instruction plainly states that "plaintiff claims that the following were standard operating procedures of the City Police Department," there was no evidence presented at the trial that any of the listed claims were actually "standard operating procedures." Finally, the enumeration of the claims is improperly argumentative and most likely influenced and

confused the jury as to what constitutes a constitutional violation.  Listing Plaintiff's various claims in this fashion in a jury instruction imparts the Court's approval of these allegations and implies that each of them is a possible constitutional violation.  It is very likely that had this instruction affected the outcome of the case.

## III.    THE COURT ABUSED ITS DISCRETION IN ITS RESPONSES TO JURY NOTES DURING DELIBERATIONS AND BY PROVIDING THE JURY WITH ADDITIONAL INSTRUCTIONS.

On November 4, 2013, after deliberating for over three full days, the jurors sent a note to the Court which stated:

> "Judge we seem to be at a gridlock (5 to 4).  Can you suggest anything to help us? Any further clarification on the term – terms 'deliberate indifference'?"

(Ex. 8: Nov. 4, 2013 Tr., p. 2.)  In response to this question, the Court sent back four additional instructions to the Jury which the Defendants objected to.  Within a few hours of receiving the additional instructions, the "gridlock" came to an end, and the jury reached a unanimous verdict on behalf of the Plaintiff as to all claims.  Defendants contend that the Court's four responses to the jury's single question were either misstatements of the law or repetitive and unnecessary instructions which were not responsive to the questions asked.  The cumulative result was a biased set of additional instructions that improperly favored Ortiz and unduly prejudiced Defendants.

### A.    The Court's Additional Instructions Nos. 1 and 3 Misstated the Law.

As noted *supra* in Section III.A, the Court's original instructions concerning deliberate indifference weakened the Plaintiff's "stringent standard" of proof.  The additional instructions Nos. 1 and 3 strayed even further from the requirements the Seventh Circuit has articulated. (Dkt. 662.)  In fact, these Additional Instructions unambiguously focused the jury on precisely

the two issues that Defendants found objectionable and erroneous: (1) that the Superintendent had to have known of a "substantial risk" of harm, rather than an actual pattern of harm, and (2) he disregarded the risk by "allowing it to continue," rather than by approving, acquiescing, or turning a blind eye to the pattern of harm or risk. "Deliberate indifference is a stringent standard of fault, requiring ***proof*** that a municipal actor disregarded a known or obvious consequence of his action.*" Bd. of the County Comm'rs*, 520 U.S at 410. In order to satisfy this "stringent standard of fault," a plaintiff must prove two elements of "deliberate indifference": (1) awareness of a pattern of constitutional violations; and (2) acquiescence in such a pattern. *See Canton*, 489 U.S. 378, 397 (1989) The Court rejected all of Defendants' suggestions for defining "deliberate indifference" in a way that would assist the jury and directly respond to their inquiry. (Ex. 8: Nov. 4, 2013 Tr., pp. 17-21) The Court addressed the jury and inquired "it would be helpful if I knew what tyour particular uncertainty about the concept is. Can you articulate that for me?" (*Id.* at 15.) The foreperson responded "I think one of the issues we're having is how much – how indifferent do you have to be … you know, how much do you have to be to prove deliberate indifference?" (*Id.*)

In response, the Court informed the jury for the third time that they did not need to find any individual liable to hold the City liable (Dkt. Nos. 659-1, 669 & 660; Ex. 9: Nov. 1, 2013 Jury Note; Ex. 10; Nov. 1, 2013 Tr., p. 4.) In addition the Court, over Defendants' objections, gave Additional Instructions No. 1 and No. 3 which are erroneous, and did not directly answer the jury's question. (*Id.*, pg. 17-21, 23-28). Defendants suggested language that directly addressed the question of how deliberately indifferent must the City be in order for Ortiz to prove liability, but the Court rejected those instructions. (Ex. 8: Nov. 4, 2013 Tr., pp. 18, 20, 23-26) Accordingly, Defendants respectfully request a new trial on this basis alone.

B.     The Court's Additional Instructions Nos. 2 and 4 Were Repetitive, Non-Responsive to the Juror's Questions, and Caused the Jurors to Confuse the Claims.

Although the jurors asked a single question about the definition of "deliberate indifference," the Court gave Additional Instructions 2 and 4. The instructions concern the City's liability even if no City employee acted objectively unreasonably, and the definition of a medical need. (Dkt. 662.) Each of these instructions unduly highlights specific provisions favorable to Plaintiff, and changed the instructions with which the jury had been deliberating for over three days.

Additional Instruction No. 2 was belatedly proposed by Plaintiff, and it highlighted an issue favorable to Plaintiff for the stalemated jury. With regard to the jury's question concerning "deliberate indifference," Plaintiff's counsel stated that "the relevant part starts at headnote 11 and the insight we would like to tell the jury is that they don't actually have to find that any particular person acted unreasonably if it was the City's policies that were unreasonable, and we think the case supports that and supports that further instruction to the jury." (Ex. 8, Nov. 4, 2013 Tr., pp. 3-4.) Defendants objected, stating then that "we would object that *Thomas* singularly can stand for any proposition and doesn't necessarily directly answer the question they're asking today, which is a clarification on the term 'deliberate indifference.' Not who or how you get there but how that term is defined." (*Id.* at 4:15-19). The court read the instruction over Defendants' objections because according to the Court, "this isn't simply repeating what I have said before is the result of additional research prompted by their question." (*Id.* at 7:20-22). However, the Court erred. The issue noted by *Thomas v. Cook County Sheriff's Dept.,* 604 F.3d 293 (7th Cir. 2010) was presented by both Plaintiff and Defendants in their proposed jury instructions, and the Court's original Instruction No. 16

24

encompassed the holding in *Thomas*. (Dkt. 669.) The Court's Additional Instruction No. 2 is

an unnecessary repetition of the Court's Instruction No. 16.

Seventh Circuit authority confirmed that the approach taken was improper. In *United*

*States v. Harris*, the Circuit examined a similar situation and noted:

> "[w]e think it was inevitable that the instructions as originally
> given and the supplemental instructions were such as to confuse
> the jury. When a jury makes explicit its difficulties a trial judge
> should clear them away with concrete accuracy. '* * * A
> rereading of a portion of that charge which was not clearly
> responsive to the jury's inquiry could scarcely have clarified the
> matter in the jurors' minds. Clearly error occurred, requiring
> reversal.' We hold error was committed in the manner in which
> the instructions were given, and in the Court's response to the
> questions asked by the jury."

*United States v. Harris,* 388 F.2d 373, 377 (7th Cir. 1967)(citing *Powell v. United States*, 347

F.2d 156, 158 (9th Cir. 1965)). As in *Harris*, this Court gave unnecessary instructions that were

not directly responsive to the jury's inquiry. The Court's Additional Instruction No. 2 was

unduly prejudicial to Defendants, and constitutes grounds for a new trial.

Additional Instruction No. 4 was given after the jurors asked the following question:

> Judge, when determining if a person has a medical need, as described on page 30
> [Court's Instruction No. 10], does that mean that the person has need for treatment at
> some point in time or at that specific moment?

The Court's additional instruction, that "a person has a medical need as described on page 30

when a medical need exists during confinement that must be attended to if the risk of harm is to

be avoided," misstates the law and is an incomplete description of what is required to find

liability as to the Defendants. (Dkt. 662.) First, the instruction on page 30 is purportedly for

claims against the City, and as noted above the law requires more than just a "medical need."

For a constitutional violation to occur there must have been notice of a **serious** medical need.

The Due Process Clause prohibits deliberate indifference to the serious medical needs of a

pretrial detainee. *Gibson*, 2013 WL 3490722, at *2.

Second, to the extent the jury erroneously believed this instruction to be applied to the claims against the individual defendants, the instruction does not encompass the fact that the medical need or serious medical need has to be symptomatic or noticeable. The Court itself noted in its Court's Instruction No. 10 that a medical need is something "so obvious that even a doctor would recognize it as requiring treatment" (Dkt. 669.), yet the additional instruction failed to include that language and instead lowers the bar further by allowing liability to be found even where there is simply a latent condition about which a lay person may not be aware. Defendants objected to this additional instruction and specifically argued that these additional instructions would confuse the jury and unduly influence them to come to a verdict on behalf of Plaintiff. (Ex. 8: Nov. 4, 2013 Tr., pp. 29-34.) The Court's Additional Instruction Nos. 2 and No. 4 were erroneous, prejudicial to Defendants as they suggested to the jurors that a verdict in favor of Plaintiff was appropriate. Accordingly, the Court should grant Defendants a new trial on this basis.

C. <u>The Additional Instructions Unduly Influenced the Outcome of the Case</u>.

Taken as a whole, the additional instructions helped push the jurors to a verdict in favor of Plaintiff. That these additional instructions unduly influenced the jury to come to a unanimous decision is evidenced by an unsolicited email that counsel for Defendants received from one of the jurors. The email reads in relevant part:

> It was a constant battle in that jury room. Before the judge changed the criteria that last time he spoke to us, everyone had decided that Jameson [sic] and Wallace were the only officers we might possibly find for the plaintiff and it was 50/50 for the city. Personally, I think May was responsible for her own death and I was very frustrated with the criteria

we were given.[5]

(Ex. 11: Nov. 6, 2013 E-mail from Juror Sweeting to John Gibbons.)  As previously noted, each of the additional instructions was erroneous and unduly highlighted the elements most favorable to the Plaintiff to exclusion of those that favored Defendants.  That the jury found these instructions so "changed" that it led a 5-4 jury to come to a unanimous decision against the individuals within a couple of short hours is telling and problematic, particularly because the additional instructions only related to the claims against the City and should have had no impact on the analysis pertaining to the individuals.

## IV.    THE COURT'S STATEMENT OF THE CASE WAS AN ABUSE OF DISCRETION.

The Court abused its discretion when it ignored the parties' previously negotiated and stipulated joint statement of the case and instead *sua sponte* delivered its own statement of the case containing inaccurate information.  Upon learning that the Court wanted to give the prospective jurors some background information about the case, the parties requested the opportunity to prepare a Joint Statement of the Case that the Court could read into the record. The parties tendered that statement to the Court on October 7, 2013.  (Ex. 12:  Joint Statement of Case; Ex. 5:  10/7/13 Tr., pp. 150-151.)  However, the Court did not utilize the Joint Statement, which the parties intentionally drafted to be neutral, and instead provided its own recitation of the facts.  This recitation was one-sided and highly prejudicial to Defendants.[6]  The Court's

---

[5] Due to the Court's order prohibiting counsel from contacting any juror in this case, Counsel did not respond to the juror's email message and thus did not (and could not) obtain additional clarifying information.

[6] While there was subsequent discussion that the Court would *voir dire* prospective jurors to elicit their opinions on issues such as illegal narcotics use, illegal narcotics sales, and diabetes, the parties at all times understood that the only factual background that would be provided to the jury was the information contained in the Joint Statement of the Case.

comments improperly prejudiced Defendants in the minds of the prospective jurors, both in the information that it provided and how the Statements were delivered.

For example, the Court erroneously stated that Molina was in lockup for approximately thirty-six hours (Ex. 1: Oct. 8, 2013 Tr., p. 99.) In fact, she was in lockup for only approximately twenty-two hours, a fourteen hour difference. The Court further informed the jury that Plaintiff would present evidence that Molina died from a diabetic coma and high blood pressure. (*Id.* at 104-105.) In fact, Plaintiff did not proffer any theory as to cause of death. This misinformation coming from a neutral, authoritative source misinformed the jury about the evidence that would be presented, and very well may have affected the jurors' attitudes toward Defendants. Perhaps most harmful was the Court's repeated emphasis to the prospective jurors about a detainee's right to medical attention regardless of the charge. However, the Court did not also instruct the prospective jurors at that time of their equally important obligation <u>not</u> to hold Defendants liable if they had no notice that Molina needed medical attention and/or if they provided reasonable care under the circumstances. These one-sided statements prejudiced Defendants by leaving jurors with the impression that wrongdoing had occurred before they had heard any evidence. (Ex. 1: Oct 8, 2013 Tr., pp. 105-107.) Nowhere in these preliminary statements did the Court indicate that his remarks did not constitute evidence. Although the Court did give a curative instruction in the jury instructions, at that point the jury pool had already been biased and started the trial with preconceived notions.

The Court may grant a motion for a new trial if the trial was not fair to one of the parties. *See Generac Power Sys., Inc. v. Kohler Co.*, 2013 WL 870630, at *4 (E.D. Wis. March 7, 2013) (*citing Marcus & Millichap Inv. Servs. V. Sekulovski*, 639 F.3d 301, 313 (7th Cir. 2011)). This showing can be made if a prejudicial error occurred. *See Generac*, 2013 WL 870630 at *4.

Here, factual inaccuracies regarding the evidence that was to be presented compromised Defendants' right to a fair trial by causing the jurors to begin the trial with an inaccurate notion about the length of Molina's detention. Similarly, the jury understood that Ortiz would present some theory as to cause of death, resulting in the exclusion of some jurors who had personal experience with high blood pressure and diabetes (*See, e.g.,* Ex. 1: Oct. 8, 2013 Tr., pp. 107-113; 150-151.) Moreover, statements like "…whether or not May Molina was selling heroin and whether or not she swallowed heroin, for whatever reason she might have swallowed it, doesn't affect her right to receive adequate medical attention for apparent serious medical needs from these defendants." (*Id.* at 106) left the jurors with the impression that Molina had an "apparent serious medical need," which was a hotly-contested issue in the case.

For these reasons, the Court's Statement of the Case prejudiced Defendants' ability to obtain a fair trial from any prospective juror, and their Motion for a New Trial should be granted.

## V.     THE COURT IMPROPERLY ALLOWED TESTIMONY OF PLAINTIFF'S EXPERT MICHAEL BRASFIELD REGARDING STATISTICS CREATED BY PLAINTIFF'S COUNSEL.

Ortiz's Police Practices Expert, Michael Brasfield, testified extensively on data derived from a spreadsheet created by Plaintiff's counsel in which one attorney, Elizabeth Wang, subjectively and unilaterally made the determination as to who within the sample set of Arrest Reports examined by both parties had an immediate medical need warranting hospitalization. Brasfield also testified extensively, over Defendants' objections, regarding statistics pertaining to time in lockup notwithstanding that he had no involvement in preparing these statistics and did not understand them. All of this information was derived from certain spreadsheets and statistical extrapolations created by Plaintiff's counsel. Each of Brasfield's opinions predicated

on this information spoon-fed to him by Plaintiff's counsel was improper and prejudiced Defendants. A new trial on that ground is warranted.

Defendants filed Motion *in Limine* No. 20 to Bar Any Expert Opinions Predicated on Plaintiff's Spreadsheets. (Dkt. No. 608.) The Motion detailed how one attorney from the law firm of Lovey & Loevy personally determined—without even reading each of the underlying arrest reports—who should have gone to the hospital based on the information on the Arrest Reports. (*Id.*) This analysis played "a significant role" in driving Brasfield's conclusion that there was a wholesale ignoring of arrestees' medical needs. (Dkt. 608, p. 4.) The Court denied Defendants' Motion. (Ex. 5: Oct. 7, 2013 Tr., pp. 142-144.) However, hours into Brasfield's testimony during the trial, the Court realized that it was improper for Brasfield to give opinions based on the data provided to him by Plaintiff's counsel and barred such opinions. Unfortunately, by the time the Court made its ruling, Brasfield had already been permitted to testify at length in front of the jury, and the damage was already done.

During Brasfield's direct examination, he testified for approximately an hour about how the statistics derived from the Arrest Reports supported his conclusion that the City had a widespread practice of ignoring the medical needs of arrestees. (Ex. 13: Oct. 15, 2013 Tr., p. 100.) Brasfield acknowledged that although he was not a statistician, he was not involved in pulling any of the Arrest Reports or coding who had an immediate need for medical attention, and he could not identify a single individual from the sample set who had suffered any physical harm he "reli[ied] on the data that got created" and concluded that only 23% of those arrestees who needed a medical screening were sent to the hospital. (Ex. 13: Oct. 15, 2013 Tr., pp. 108-110, 113-114, 122, 138, 186; Ex. 14: Oct. 16, 2013 Tr., p. 18.) Brasfield testified candidly that Plaintiff's counsel reviewed the Arrest Reports to make an initial calculation of how many

people should have been transported to a hospital based on "a legitimate need." (Ex. 13: Oct. 15, 2013 Tr., p. 117-118.) Nonetheless, Brasfield concluded that 79.6% of arrestees from the sample set should have been transported to the hospital and/or received a medical screening. (*Id.* at 130.) Finally, after extensive testimony about the alleged process by which the need for transportation to the hospital had been calculated, notwithstanding that Brasfield had minimal, if any involvement in that process, the Court correctly noted "This witness has not been able to testify that these people in fact had a need for medication or a need for hospitalization." (*Id.* at 184-185.) The Court further correctly noted that Brasfield did not know whether approximately 78% of the arrestees actually needed to be transported to the hospital while in detention.[7] (*Id.* at 134.) The Court struck the reference to a 79.6% transportation rate, but the damage already had been done.[8] (Ex. 13: Oct. 15, 2013 Tr., p. 130.) When defense counsel attempted to cross-examine Brasfield about the same information about which he had testified so extensively in his direct in order to make sure the jury understood the specious nature of his opinions derived from statistics he neither prepared nor understood, the Court would not allow the line of questioning. (*Id.* at 185-191.)

Notwithstanding the Court's purported exclusion of any statistics derived from Plaintiff's spreadsheets, witnesses—and on occasion the Court continued to testify about the very same statistics that were barred. Brasfield himself responded to a question on redirect "based on the 78 percent statistic" and opined that 80,000 arrestees who needed medical screening did not get it. (Ex. 14: Oct. 16, 2013 Tr., pp. 70-71.) Brasfield also testified that he "felt more comfortable" that some percentage of arrestees in the 70% range should have been transported to

---

[7] During Brasfield's direct examination, it appears that Plaintiff's counsel and Brasfield utilized the 79.6% and 78% statistics interchangeably.

[8] On redirect Brasfield testified that the practice at the Chicago Police Department was not to send anybody needing medication to the hospital. (Ex. 14: Oct. 16, 2013 Tr., pp. 68-69.) Since Brasfield's reliance on statistics was barred from this case, he had no basis to support this opinion.

the hospital, not the figure in the 80% range.[9]  (*Id.* at 80-82.)  Although he purported to base this opinion on his review of a mere 10-20% of the sample set of Arrest Reports, the Court had already concluded that Brasfield could not draw any such conclusions based on the Arrest Reports alone.  Yet, Brasfield was permitted to offer this opinion.  The Court noted days later over Defendants' objection to questions posed to an attorney who works for Plaintiff's counsel, Sean Goodwin ("Goodwin"), during his direct that "[w]e have been talking about 82 percent and 72 percent throughout this trial.  That's all this witness is saying, I think."  (Ex. 15: Oct. 21, 2013 Tr., p. 7.)  As detailed more fully below, Goodwin testified extensively about this figure, which varied somewhat, but that Goodwin pegged to be somewhere between 70% and 80%.  (*Id.* at 70.)  Plaintiff's counsel admitted to the Court that this number represented "the people left are the people that should have had a medical screening."[10]  (Ex. 14: Oct. 16, 2013 Tr., pp. 7-8.)

In addition, Brasfield was permitted to testify extensively on average times in lockup based on statistical extrapolations prepared by Goodwin.  Brasfield testified that arrestees were held in excess of eight hours over 50% of the time.  (Ex. 13: Oct. 15, 2013 Tr., p. 48.)  Brasfield further testified that the "average" time in lockup was 11 hours and 53 minutes.  (*Id.* at 50-51.)  Brasfield also testified, based on the statistical analyses performed by Goodwin that 97.2% of arrestees remained in lockup for  three to four hours, 80.81% remained in lockup for longer than four to five hours, and roughly 52% of arrestees remained in lockup for at least eight to nine hours.  Brasfield went on to testify that the statistics extrapolated from the spreadsheet containing a large amount of missing data confirmed that 32.5% of arresteees were in lockup for 11-12 hours and 12.5% of arresttees were in lockup between 19 and 20 hours.  (*Id.* at 52.)  These

_____

[9] The Court permitted Ortiz to ask these questions on redirect over Defendants' objections.  (Ex. 14: Oct. 16, 2013 Tr., pp. 4-18.)
[10] The Court correctly pointed out that Brasfield testified that approximately 70% of the arrestees from the sample set should have been taken to a hospital for medical attention, not merely been asked additional questions in a further medical screening.  (Ex. 14: Oct. 16, 2013 Tr., p. 9.)

extrapolations were done by Goodwin. (*Id.* at 92-193.) Brasfield testified in the guise of expert testimony notwithstanding his admission that it was impossible to determine the time in lockup for 53% of the arrestees. (*Id.* at 93-194.) Although ultimately the Court correctly concluded "…this witness doesn't know what the arrest records show about the length of time in custody," again that statement was made hours into Brasfield's testimony, and the Court never gave a specific curative instruction to the jury that they should disregard all of Brasfield's testimony pertaining to time in lockup. (*Id.* at 194-196.) Defense counsel specifically requested outside of the presence of the jury that the Court "instruct the jury that they should disregard all of Mr. Brasfield's testimony regarding time in custody." (*Id.* at 198.) The Court denied the request stating it had "already done that." (*Id.*) In fact, the Court gave no such instruction. The Court <u>only</u> instructed the jury to disregard testimony related to how many arrestees "required" medical attention while in lockup, and gave no limiting instructions regarding time in lockup.

Data upon which an expert relies in order to formulate an opinion must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. *Hayes v. Raytheon Co.*, 808 F. Supp. 1326, 1329 (N.D. Ill. 1992); *accord* FED. R. EVID. 703. "Thus, expert testimony must be rejected if it lacks an adequate basis." *Harris*, 808 F.Supp. at 1329 (excluding expert whose opinions were not based on sound methodology and rejecting plaintiff's counsel's efforts to substitute their own statements for the requisite sound methodology).

In addition, as the court stated in *Loeffel Steel Products, Inc. v. Delta Brands*, *Inc.*, the reasoning and methodology underlying an expert's testimony must be reliable: *Daubert*, 509 U.S. 579 requires that trial judges must ensure that any and all expert testimony is not only relevant, but reliable. To that end, a judge must undertake a preliminary assessment of whether

33

the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue. The judge must look behind the expert's ultimate conclusion and analyze the adequacy of its foundation. 387 F. Supp. 2d 794, 817 (N.D. Ill. 2005) (internal citations omitted); *Id.* at 807 (Rule 703 is "premised on an assumption that the expert's opinion will have a reliable basis"; absent that reliability, the opinion should be stricken).

In *Loeffel Steel*, the court addressed a similar situation and rejected an expert's opinion that was predicated on information fed to him by defense counsel. As the *Loeffel* court held:

> It is no answer to say that since Rule 703 allows an expert to base an opinion on inadmissible evidence, Mr. Dohmeyer must be allowed to testify, even though the basis of the information on which he relied came from the defendants. First, the defendants have made no effort to carry their burden of proving by a preponderance of the evidence that the kind of information given to Mr. Dohmeyer is the kind "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject...." ***

> Second, and more importantly, while Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.

*Id.* at 808 (*citing Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir.2002); *TK-7 Corp. v. The Estate of Barbouti*, 993 F.2d 722, 731-34 (10th Cir.1993); *In re: James Wilson Associates*, 965 F.2d 160, 173 (7th Cir.1992)).

After first denying Defendants' Motion *in Limine* No. 20 seeking to bar any expert testimony predicated on Plaintiff's data, the Court correctly ruled that Brasfield's testimony must be excluded, Unfortunately, that ruling was made <u>after</u> he testified, and the 70% plus statistic was reiterated to the jury multiple times despite the Court's ruling. These repeated references to the rate at which arrestees should have been sent to the hospital for medical attention, without a shred of evidence to support such a figure, was highly prejudicial to

Defendants. A new trial is warranted wherein such information can never be presented to the jury, and a consistent position is taken prohibiting any witness from testifying about how many arrestees in the sample set should have been transported for medical attention based solely on information from the Arrest Reports.

## VI. THE COURT IMPROPERLY ALLOWED EXPERT TESTIMONY FROM PLAINTIFF'S ATTORNEY SEAN GOODWIN, WHO ADMITTED HAVING NO RELEVANT EXPERTISE AND WAS NEVER DISCLOSED AS AN EXPERT.

Attorney Sean Goodwin works for Plaintiff's counsel on a contract basis. (Ex. 15: Oct. 21, 2013 Tr., p. 4.) He was called to testify regarding statistical analyses and extrapolations that he performed pertaining to the Plaintiff's Spreadsheet, most of which had been barred during Brasfield's testimony. Because Goodwin is a patent attorney, not a statistician, nor was he disclosed as an expert or fact witness at any time by Ortiz, his testimony should have been barred.

Goodwin originally was identified as a FRCP 30(b)(6) witness to testify as the person most knowledgeable to testify about Plaintiff's counsel's spreadsheet that purported to ascribe a numerical value to the number of arrestees who should have been transported to a hospital to receive medical treatment. However, Goodwin enlarged his role at trial by testifying instead about statistical analyses that he performed, Defendants and their experts' purported acquiescence to said analyses, and statistical extrapolations that he made to determine the time in lock up for 53% of arrestees whose time in custody was not reflected in their Arrest Reports. However, Goodwin is not a statistician, was never disclosed as a fact or expert witness by Ortiz pursuant to FRCP 26, and should never have been permitted to provide such testimony. Goodwin's testimony was overly prejudicial, and Defendants should be granted a new trial to cure the prejudice his testimony caused.

Goodwin holds a Bachelors of Science in Chemistry from Loyola University and a Juris Doctorate from John Marshall School of Law. (Ex. 15: Oct. 21, 203 Tr., p. 2.) He has no formal training in statistics or econometrics, and admitted that he was not a statistician, nor had he ever done any sort of analysis of this kind previously. (*Id.* at 38-39.)

Goodwin testified that based on a collaborative process between Plaintiff and Defendants, he configured a new calculation representing the number of arrestees who should have been transported to the hospital.[11] Ultimately he concluded, based solely on data contained in the Arrest Reports, that approximately 78% to 79% of arrestees were "not-treated" who should have been provided medical attention, such as by way of a medical screening or medication. (*Id.*, at 16-17, 22, 28-29, 32 & 58.) Plaintiff's counsel described the difference between the approximately 83% of arrestees who were not treated and the approximately 79% figure derived by Goodwin as "the marginal ones" who should not have been included in the approximately 83% of people who should have been sent for medical attention. Plaintiff's counsel characterized the 84% as "a little bit over-inclusive" and that the true number of people who should have been transported "should probably be in the high 70s," reflecting who "should have been cut from the sample" based on the "exercise" that Goodwin performed. (Ex. 16: Oct 18, 2013 Tr., pp. 3-6.) Of course this was the very same figure that the Court had excluded when Brasfield testified, but nonetheless permitted Goodwin to testify about extensively.

Goodwin took it a step further. Because over half of the data for time in lockup was missing, Goodwin performed an extrapolation to determine how many people with missing

---

[11] Defendants repeatedly made several objections whenever any of Plaintiff's witnesses purported to testify regarding Defendants or their experts' purported participation in Plaintiff's statistical analysis. (*See e.g.* Ex. 13: Oct. 15, 2013, pp. 128-130; Ex. 15: Oct. 21, 2013 Tr., p. 5.) Notably, Goodwin testified that he never spoke with Defendants' expert about whose analysis he testified so extensively. (Ex. 15: Oct. 21, 2013 Tr., pp. 46 & 56.) The Court would not allow Defendants to fully cross-examine Goodwin on Defendants' statistical experts' analysis of the spreadsheet, notwithstanding that he testified extensively about Defendants' interpretation of that very same analysis. (*Id.* at 58.)

information were in lockup for specified periods of time. (Ex. 15: Oct 21, 2013 Tr., pp. 25-30, 65-66.) Goodwin's extrapolation had no basis in scientific methods, and he was not qualified to make such an extrapolation or otherwise formulate conclusions regarding time in lockup for those arrestees where the necessary data points were missing. Goodwin further testified, over Defendants' objection, that his error rate was as low as 1%-2%. (*Id.*, p. 31.) Goodwin's only basis for providing this extrapolation was that he "had taken several classes of mathematics." (*Id.* Tr., p. 70.) None of this testimony was admissible.

The admissibility of expert testimony is governed by FRE 702 and *Daubert* and its progeny. FRE 702 provides that testimony by experts must be (1) based upon sufficient facts or data; (2) the product of reliable principles and methods; and (3) the witness must apply the principles and methods reliably to the facts of the case. An expert must be qualified as an expert by knowledge, skill, experience, training, or education; the court must find that the expert's scientific or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[12]; and the particular facts or data upon which an expert bases an opinion or inference must be of a type reasonably relied upon by experts in the particular field informing opinions or inferences upon the subject. *Porter v. Whitehall Labs, Inc.*, 9 F.3d 607, 610 (7th Cir. 1993). The adjective "scientific" implies a grounding in the methods and procedures of science. *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir. 1994); *See also Frost v. Teco Barge Line, Inc.*, Case No. 04-CV-752-DRH, 2007 WL 420152, *2 (S.D. Ill. Feb. 5, 2007). The word "knowledge" connotes more than subjective belief or unsupported speculation, but rather applies to any body of known facts or ideas from such facts

---

[12] This "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility. *Bradley v. Brown,* 42 F.3d 434, 437 (7th Cir. 1994). The facts of the case must fit the scientific analysis to which they are being applied. *Porter v. Whitehall Labs., Inc.,* 9 F.3d 607, 611 (7th Cir. 1993).

accepted as truths on good grounds. *Porter*, 9 F.3d at 610. "If an opinion lacks foundation and would not 'actually assist the jury in arriving at an intelligent sound verdict,' then it is inadmissible" *Porter*, 9 F.3d at 611. An expert's mere guess or conjecture must be excluded. *Id.*, at 611.

A trial court should strike opinions that are beyond a witness' expertise. In *Porter*, a court excluded an expert opinion because the physician acknowledged that his conclusion "was outside his area of expertise. Because [the doctor] did not possess the requisite scientific knowledge for his testimony to be helpful to the jury, his testimony was properly excluded." 9 F.3d at 615. Similarly, in *Frost*, the District Court excluded a large portion of an expert occupational therapist's testimony because he offered opinions regarding the proper standard of care and plaintiff's purported magnification of her symptoms, two areas beyond his expertise. 2007 WL 420152 at *4. Similarly, in *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 646 (7th Cir. 2011), the District Court properly excluded the "vast majority" of a witnesses' testimony on the grounds that he "attempted to provide expert testimony on matters beyond the scope of his…business knowledge." So too Goodwin, a purported fact witness with no professional or educational background in statistics, should have been barred from offering expansive testimony regarding statistical extrapolations he was not qualified to make.

The Court appeared to misunderstand the thrust of Goodwin's testimony, which was that some percentage of arrestees in the 70% plus range should have been taken to a hospital for treatment. This confusion was illustrated by the Court's comment that "All he has said is that the people who had questions answered in the affirmative were not taken to the hospital in a certain percentage." (Ex. 15: Oct. 21, 2013 Tr., p. 59.) If that were true, then there would have been no need for his testimony because all parties agreed that approximately 82% of arrestees

from the sample of Arrest Reports were not transported to the hospital. This was the only fact that all parties agreed unequivocally could be gleaned from the Arrest Reports because that information was based on objective criteria; either the arrestee received medical attention or she did not. Goodwin took it a step further and purported to create a figure based on Defendants' experts' critique of Brasfield and Plaintiff's correction health expert Dr. Nathaniel Evans ("Evans") and created a different number (somewhere in the upper 70% range) representing the number of arrestees who should have been taken to a hospital. This was done in large part using statistical extrapolations that Goodwin did not have the requisite qualifications to make.

Moreover, a spreadsheet that Goodwin created detailing the extrapolation was sent to the jury over Defendants' objections. (Ex. 17: Oct. 30, 2013 Tr., pp. 6-.11.) Thus not only did the jury hear the improper testimony, but it was reinforced in the form of a document that they had the opportunity to pour over at length.

Goodwin is not a statistican, nor does he have any other expertise required to give his testimony. Since Goodwin's testimony completely lacked foundation, it should have been barred. In fact Goodwin presented extensive testimony about matters that the Court did bar, notwithstanding Defendants' objections. Goodwin's testimony was improper and prejudicial. As a result, Defendants should be granted a new trial.

## VII. THE DEFENDANTS SHOULD HAVE BEEN PERMITTED TO IMPEACH JASMINE VACCARELLO'S TESTIMONY WITH HER HISTORY OF DRUG USE AND PRIOR ARRESTS.

Jasmine Vaccarello ("Vaccarello") had an extensive history of drug use in the years leading up to her arrest on May 25, 2004 shortly before Molina's death. Vaccarello testified by way of her deposition transcript that she heard Molina calling out for medical attention in the hours before her death, and that Vaccarello herself requested medical attention on Molina's

behalf.[13]  Vaccarello also testified that she had only been arrested four times in 2004.  In fact, she had been arrested 11 times.  (Ex. 18:  Vaccarello Rap Sheet.)  All of this information should have been presented to the jury so that they could make a determination as to her credibility armed with all of the relevant information.

A.  <u>The Court Erred in Excluding Testimony of Vaccarello's Drug Use</u>.

On October 15, 2013, the Court granted Ortiz's oral Motion to Bar Reference to Vaccarello's Prior Drug Use.  (Dkt. 643.)  As set forth more fully in Defendants' Response to Plaintiff's Motion *in Limine* to Bar Evidence of Plaintiff's Witness' Drug Use (Dkt. 632.), Vaccarello's drug use both in the years and hours leading up to her arrest were probative of her perception and ability to recall events.

Vaccarello testified under oath that she was affected and impacted by her drug use near the time of the events she purportedly recalled.  According to Vaccarello, she became addicted to drugs in 2002 and consistently abused drugs thereafter until 2005.  (Ex. 19: Vaccarello Dep., 25:16-26:3.)  Vaccarello experimented with heroin and crack cocaine (*Id.* at 26:17-27:1) and admitted that her chronic drug use affected her judgment and had caused her to lie.  (*Id.* at 31: 12-16; 32:11-18.)

By May 2004, when the events at issue occurred, Vaccarello was using approximately two bags of heroin a day and sharing one to two bags of crack cocaine several times a week.  (*Id.* at 38:16-39:3.)  She testified that this pattern was repeated on the day she was arrested.  Early that morning, Vaccarello abused heroin (*Id.* at 42:9-14) and she admitted that she could not remember any details of her arrest later that evening "because [she had] been doing drugs."  (*Id.* at 44:10-15.)  Vaccarello testified:

---

[13] Vaccarello's deposition transcript was read to the jury because she died prior to the trial.

Q: Describe the arrest for us.
A: They stopped us and I believe we were—I think we were walking through an alley at that time. I'm honestly not quite sure because I was arrested—okay.
Q: You're not quite sure because what?
A: Because I have been doing drugs. I have been stopped a couple of times so I don't remember exactly what happened when I was arrested. All I know is that I was arrested and taken to the 19th District, and I had, you know, a nickel on me.

(*Id.* at 44:10-19.)

Vaccarello admitted abusing drugs again shortly before Krista Simos ("Simos"), an OPS investigator assigned to investigate Molina's death, interviewed Vaccarello approximately two weeks later. Again, Vaccarello's memory was extremely vague and sketchy at her deposition and she testified that two different investigators interviewed her (one in her cell on May 26, 2004, immediately after Molina's death, and another on June 4, 2004):

Q: Do you recall if you had ingested any drugs on or about the morning of June 4, 2004?
A: What time was this at?
Q: It purports to be at 1430 which is 2:30 in the afternoon.
A: I don't remember the exact dates so I probably did like earlier that morning.
Q: You probably ingested drugs that morning. Why do you say that?
A: Well, because I was still using at that time. I guess they did come over. This is a different person and the other lady that asked me in there was a woman so, I guess.
Q: Let me ask you this.
A: I vaguely remember, sorry.

(*Id.* at 93:4-18.)

In fact, it had been Simos on both occasions, as confirmed by her testimony at trial.

The Seventh Circuit, in a series of decisions, has made clear that evidence of drug use, although inadmissible as evidence of character or propensity, is admissible to impeach credibility. *United States v. Romandine*, 289 Fed. Appx. 120, 128 (7th Cir. 2008) (drug use is "fodder for impeachment" "if the witness is under the influence of drugs when testifying or if there is reason to believe that drugs 'had seriously impaired his memory or had prevented him from understanding the events about which he testified when they took place'" (*quoting United*

*States v. Spano*, 421 F.3d 599, 606 (7th Cir. 2005)); *Kunz v. Defelice*, 538 F.3d 667, 677 (7th

Cir. 2008) ("Evidence that a witness has used illegal drugs may be probative of the witness'

possible inability to recollect and relate …. This evidence may be admitted where the memory or

mental capacity of a witness is legitimately at issue …." (*quoting United States v. Cameron*,

814 F.2d 403, 405 (7th Cir. 1987)); *United States v. Bailey*, 510 F.3d 726, 734 (7th Cir. 2007);

*United States v. Gallardo*, 497 F.3d 727, 732-33 (7th Cir. 2007).

In *Bailey*, defendant argued that the government's lay witnesses were unbelievable as a

matter of law because they were drug users at the time of the investigation. 510 F.3d at 733-34.

Rejecting this contention, the Seventh Circuit held:

> It is probably true that witnesses who were stoned during the relevant parts of the
> investigation did not have all their wits about them, making their memories fuzzy
> when they took the stand. This could, in turn, lessen the credence that is owed to
> their version of events. But it is for the jury to evaluate the credibility of the
> witnesses, including any cloudiness brought on by their drug use. *United States
> v. Wilson,* 31 F.3d 510, 514 (7th Cir.1994). *** A prophylactic rule that drug-
> using witnesses are *per se* unbelievable would derail most drug prosecutions
> which frequently involve, of necessity, the testimony of drug users. <u>These
> witnesses' shortcomings must be accounted for through cross-examination</u>, not an
> exclusionary rule.

*Id.* at 734 (emphasis added). Likewise, In *Gallardo*, although the Seventh Circuit affirmed the

District Court's refusal to admit expert testimony that past use of cocaine, marijuana, and

ecstasy by the government's witnesses would have an adverse effect on their ability to remember

the events about which they testified, it expressly approved the District Court's decisions to

allow limited cross-examination on the subject of the witnesses' addictions and to allow

extrinsic evidence of their drug use during the relevant time periods in defendants' case in chief:

> We find no error in the limits that the district court placed on cross examination.
> Defense counsel was allowed to ask the government's witnesses whether they
> were currently addicts, and whether they were addicts during the time period
> about which they testified. The defendants proffered no evidence that the
> witnesses were under the influence of drugs during the relevant events or that
> their prior drug use had affected their ability to recall particular events.

*Id.* at 733.

Finally, In *Hallett v. Richmond*, No. 05 C 50044, 2009 WL 5125628, at *2-3 (N.D. Ill. May 15, 2009), Plaintiff made a motion to bar evidence of his drug use. The *Hallett* court denied plaintiff's motion because the evidence was both probative of plaintiff's credibility, and also corroborative of the defendants' testimony regarding the events at issue:

> The court agrees that the extent to which defendant [sic] was under the influence of drugs or alcohol at the time of the incident is relevant because his perception and recall of the events in question may have been adversely affected by the substances. [internal cite omitted] The evidence may also corroborate defendants' testimony that plaintiff was acting erratically or aggressively. Consequently, the lab report is admissible to demonstrate the extent to which plaintiff was under the influence of alcohol and drugs, provided defendants can properly authenticate it and call the treating physician [to testify to its meaning].

*Id.* *3.

Based on Vacccarello's own testimony that her drug use impacted her ability to recall relevant events, as well as the Seventh Circuit's clear holdings that such evidence is admissible and highly probative, Vaccarello's prior drug history should have been admitted. Vaccarello's testimony was critical to the case. She provided extremely damaging testimony without the benefit of being cross-examined at trial or the jury having the opportunity to assess her credibility. Hearing her testimony in a vacuum without the whole picture prejudiced Defendants and deprived them of the right to a fair trial. The fact that Vaccarello's prior drug history was excluded warrants granting Defendants a new trial.

B. The Court Erred in Excluding Testimony of Vaccarello's Prior Arrests in 2004.

Similarly, the Court erred by excluding Vaccarello's prior arrest history in 2004. Vaccarello testified that she had only been arrested four times in 2004. In reality, she had been arrested 11 times. The Court prevented Defendants from presenting any testimony about her prior arrests or the fact that she lied during her deposition as not being probative. However, this

information was highly probative because the jury may have concluded that she lied about Molina requesting medical attention the evening that she died. Moreover, Vaccarello's other testimony against Defendants that painted them in a negative light (*e.g.* they failed to perform their 15 minute cell checks; they told Vaccarello to shut up using an explicative) could have occurred during a different arrest. By preventing Defendants from presenting to the jury the fact that she had been arrested previously or the frequency of those arrests Defendants were deprived of the opportunity to make those, and similar, arguments.

Cumulatively, the excluded testimony left the jurors with the false impression that Vaccarello was truthful with perfect cognitive ability and recollection. This was not the case. Excluding Vaccarello's testimony regarding prior drug use and arrest history prejudiced Defendants and warrants granting a new trial.

## VIII.   THE COURT'S RULING ON HEARSAY STATEMENTS WAS IN ERROR.

The Court allowed numerous hearsay statements in made by Vaccarello and another witness who was in custody at the same time as Molina, Diane Rice ("Rice.") For simplification purposes the Court ordered the parties not to object to each hearsay statement. Instead the Court recognized that Defendants had a standing objection, and the parties and the Court agreed that Defendants would submit transcripts after the trial with notations indicating their objections. (Ex. 14: Oct. 16, 2013 Tr., pp. 104-106; Ex. 17: Oct. 30, 2013 Tr., pp. 64-65; Ex. 20: Oct. 22, 2013 Tr., pp. 137-140..) Generally speaking both witnesses testified that Molina called out for medical assistance and the guards either ignored her or refused to provide medical assistance. (Ex. 19:  Vaccarello Dep. Tr.; Ex. 21:  Rice Dep. Tr.) [14]

---

[14] The portions that are highlighted were read to the jury.  Defendants' objections were noted in the margins.

The Court instructed the jury that the statements came in "for the question of what did the lockup keepers have notice of." (Ex. 20: Oct. 22, 2013 Tr., p. 139.) The Court further instructed the jury that the statements "were offered in an effort to show that the lockup keepers were on notice of May Molina's physical condition and alleged need for medication." (Ex. 14: Oct. 16, 2013 Tr. p. 106.) Both instructions were improper.

Hearsay is an out of court statement offered for the truth of the matter asserted. FED. R. EVID. 801. Here, the statements constituted double hearsay because the declarant was out of court testifying about witnesses' statements who also were out of court. Thus, an exception had to exist with respect to both levels of hearsay. FED. R. EVID. 805. The statements at issue were classic examples of hearsay because they were offered for the truth that Molina requested medical attention, and the guards refused to provide it to her.

Defendants are unaware of any exception to the hearsay rule that allows a hearsay statement to be admitted for the limited purpose of showing notice to the listener in this context. The exceptions to the hearsay rule appear in FRE 803, 804 and 807. None of them specify an exception pertaining to notice of a physical condition. Indeed this type of instruction appears to encompass the very situation the hearsay rule was intended to avoid since Vaccarello and Rice were permitted to testify by deposition about statements that Molina, a deceased person made, and the alleged responses of certain guards who were not present in the courtroom when the statements allegedly were made.

Vaccarello and Rice's statements were the only direct evidence that any City employee acted objectively unreasonably and intentionally ignored Molina's medical needs. These hearsay statements were not admissible, and their inclusion deprived Defendants of a fair trial. Defendants should be granted a new trial.

45

IX.     **THE COURT'S SUA SPONTE ORDER TO PRODUCE 10 YEARS OF FINANCIAL RECORDS IN RELATION TO EXPERT WITNESSES AND THEIR EMPLOYERS WAS ERROR.**

Plaintiff's Motion *in Limine* No. 4 sought to bar Defendants' experts from testifying unless they produced prior reports and testimony from other cases in which they testified on behalf of the City of Chicago. The Court issued a ruling on Plaintiff's Motion *in Limine* No. 4 requiring that Defendants produce reports, deposition transcripts, and billing information for each of their experts who had testified on behalf of the City of Chicago dating back 10 years. (Dkt. 578.) The Court's ruling was erroneous as it required Defendants to produce a substantial volume of documents and information, the majority of which was not within the scope of Plaintiff's discovery requests; and prejudicial to Defendant's by allowing Plaintiff to delve into 10 years' worth of Defendants' experts' financial records and testimony in other cases for impeachment purposes.

A.     <u>The Court's Ruling Requiring Production of Documents Outside the Scope of Plaintiff's Discovery Requests was Erroneous</u>.

Plaintiff served her Requests for Production to All Defendants on April 10, 2013, and sought the following:

> [A]ny and all Documents relating to any Rule 26 expert witnesses retained by Defendants in this matter, including but not limited to: (a) all Communications to/from said experts which are not otherwise protected as work product under Rule 26; (b) all Documents provided to or relied upon by said experts; (c) all notes, reports, and analysis by said experts; (d) <u>all bills, statements, or invoices of the hours spent and compensation paid to or billed by the experts for work</u> **on this matter**; and (e) any transcripts of prior testimony or Rule 26 reports of said experts. (emphasis added)

(Dkt. 630-1, p. 14.) Based on its plain language, while Request No. 5 sought the experts' billing records submitted in connection with this case, it did <u>not</u> request any billing information for

Defendants' experts for any other cases.

Accordingly, Defendants' production obligations related to financials or past testimony were limited to: (1) bills, statements, or invoices of the hours spent and compensation paid to or billed by the experts for work on this matter; and (2) transcripts of prior testimony or FRCP 26 reports of Roberts and Walton.

At the September 25, 2013 pre-trial status, Plaintiff's counsel asked this Court to order Defendants to produce all deposition transcripts and reports in the City's possession, custody or control dating back 10 years. Much of this information was not requested in the original Request for Production of Documents. Specifically, Plaintiff did not seek billing information for Roberts and Walton for any cases other than this one. In response, the Court *sua sponte* ordered Defendants to produce billing records for any matter in which the expert testified on behalf of the City of Chicago, notwithstanding that such request was never propounded in a document request to the City.

The Court erred by forcing the City to produce documents and records that Plaintiff never sought in discovery. *See Kedzior v. Talman Home Fed. Sav. & Loan Ass'n of Illinois,* No. 89 C 4188, 1990 WL 70855, *3 (N.D. Ill. May 10, 1990) ("[I]t is entirely inappropriate for this court to compel production of documents plaintiff has never formally requested. Plaintiff has failed to abide by the rules set out for conducting the discovery process and cannot now seek to circumvent those rules through a motion to compel which is both inappropriate with respect to the information requested and untimely made.") It was improper for the Court to enlarge Plaintiff's document request on its own, and those actions prejudice Defendants warranting a new trial.

B.    The Court's Ruling Requiring Production of Ten Years of Billings and Past
Testimony was Erroneous and Prejudicial to Defendants.

Plaintiff should not have been permitted to delve into ten years worth of billing information for Walton and Grant Thorton (Roberts' current employer) or 10 years' worth of prior testimony for cases the City of Chicago retained Walton or Roberts' for cross-examining Defendants' experts.  Specifically, for the billing information of Roberts', the Court allowed Plaintiff to have information that went beyond the time that Roberts' was employed at Grant Thorton, improperly allowing Plaintiff to cross-examine Roberts about amounts Grant Thorton billed to the City of Chicago – before she was even employed there.  This cross-examination was prejudicial to Defendants.

Courts generally limit a party's ability to inquire into an expert's testimony and compensation from other cases on cross-examination due to the speculative nature of this evidence, the significant potential for abuse, the intrusion into the expert's personal affairs, and the danger of unfair prejudice.  *See, e.g. Wisconsin Electric Power Co. v. Union Pacific Railroad Co.*, No. 06-C-515, 2008 WL 934431, at *1 (E.D. Wis. March 31, 2008) (denying motion to compel experts' personal financial information because plaintiff's argument that the experts' future compensation might be tied to the outcome of the litigation was too speculative); *Cary Oil Co. v. MG Refining & Mkt'g*, 257 F.Supp.2d 751, 757 (S.D.N.Y. 2003) (limiting discovery requests for prior expert testimony and financial information to circumstances in which the expert's opinion had materially changed from a prior case and reasoning that, without this limitation, expert discovery requests could be abused to distract and impede the other party rather than assist in the preparation of cross-examination).  Although there was little authority on this issue from the Seventh Circuit, a recent factually analogous Illinois opinion is instructive.  Illinois state courts generally limit inquiry into an expert's past testimony and

income from that testimony to the two-year period prior to trial. *See, e.g. Pontiac Nat. Bank v. Vales,* 993 N.E.2d 463, 469 (Ill. App. Ct. 4th Dist. 2013) (holding that any bias or financial interests of an expert could be adequately explored by questioning the expert on the two-year period prior to trial); *Trower v. Jones*, 520 N.E.2d 297, 300 (1988) (holding that inquiry into an expert's income for only the two years prior to trial was proper). In *Pontiac*, the Court reversed and remanded the case for a new trial reasoning that it was an abuse of discretion for the trial court to permit inquiry into eight years' worth of an expert's financial information. *Pontiac Nat. Bank*, 993 N.E.2d at 469. The court reasoned that "while cross-examination is permissible to expose bias, partisanship, or financial interest of the expert witness, there is a point beyond which the inquiry amounts to harassment or invasion of privacy and diverts the proceedings into the trial of a collateral matter." *Id.*

Like *Pontiac*, here the Court allowed Plaintiff to compel evidence which went beyond exposing bias or financial interest. Specifically, the evidence related to how much Grant Thorton was paid by the City of Chicago over the last 10 years – while Robert has only worked for Grant Thorton for a fraction of that time. Plaintiff's counsel used this information in his cross examination and it is likely that this information influenced the jury in their final determination of liability against the City of Chicago.

In regard to Walton, the Court's unfortunate ruling influenced the City's decision not to call Walton as a witness in this case. Although Walton is an expert in police practices and has a specialized knowledge of the City of Chicago's police department, given the Court's ruling, there was little doubt that if the City put Walton on the stand the Plaintiff's cross-examination would amount to "harassment" and an "invasion of privacy" that would seriously "divert[] the proceedings into the trial of a collateral matter." *Id.* Ortiz effectively exploited the City's

Hobson's choice not to call Walton during closing when his attorney hammered Defendants for not putting up a police practice expert. (Ex. 6: Oct. 29, 2013 Tr., p. 7.) The Court's erroneous ruling prejudices Defendants, warranting a new trial.

## X.  THE COURT ERRED BY ALLOWING JURY TO SEE INCOMPLETE PORTIONS OF EVIDENCE.

The Court erred by allowing the jury to receive an incomplete excerpt from Dr. Judith Roberts' expert report.

Over Defendants objections, the jury was permitted to receive a portion of Roberts' expert witness report in which she corrected a table that Ortiz's medical expert, Nathaniel Evans ("Evans") had created, and strongly criticized the methodology that Evans used to draw conclusions based on the subset of data contained in the table. (Ex. 22: PX 34-C; Ex. 23: Roberts' Rebuttal Report to Evans.) The Court admitted it because the figures on the table were technically correct, albeit taken out of context, the jury had already seen it, and Roberts had explained it on the stand. (Ex. 17: Oct. 30, 2013 Tr., pp. 11-15.) Of course, it is probable that the jury gave more weight to the table itself than Roberts' testimony given they had opportunity to examine the table several times, while they only heard Roberts testify one time at the end of a lengthy trial.

The evidentiary rule of completeness applies to documents partially entered into evidence. *U.S. v. Greene*, 497 F.2d 1068, 1082 (7th Cir. 1974). It typically applies to (1) explain the admitted evidence; (2) place the admitted portions in context; (3) avoid misleading the trier of fact; and (4) insure fair and impartial understanding of the evidence. *U.S. v. Haddad*, 10 F.3d 1252, 1259 (7th Cir. 1993). This doctrine is codified in FRE 106 which provides "If a party introduced all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in

fairness ought to be considered at the same time." The writing "must be relevant and is limited to the parts of a statement that qualify or explain the subject matter of the part the opponent offered. *U.S. v. Harvey*, 959 F.2d 1371, 1376 (7th Cir. 1992). The rule prevents the jury from being misled by a statement introduced out of its true context. *U.S. v. Price*, 516 F.3d 597, 604 (7th Cir. 2008).

Here, all of the factors weighed in favor of admitting Roberts' entire report. The omitted pages would have explained the table at issue and clarified that Roberts in no way determined that the information in the table was probative of anything. The report would have placed the admitted portions into context. Gaining access to the entire report would have insured that the jury was not misled by the evidence, and that they had a fair and impartial understanding of the evidence.

Obtaining a select excerpt from Roberts' report was misleading and prejudicial. It likely left the jury with the erroneous impression that Evans' analysis had some statistical relevance, when it had none. The Court's decision was reversible error and warrants granting Defendants a new trial.

## XI. PLAINTIFF DID NOT PROVE THE CITY OF CHICAGO WAS LIABLE UNDER *MONELL*.

For the reasons stated in Defendant's Motion for Judgment as a Matter of Law, Section I. *supra*, the jury's verdict finding the City of Chicago liable was inconsistent and contrary to the law. Defendant City of Chicago reasserts these arguments in support of its alternative motion for a new trial and incorporate section I., *supra* as if fully set out here.

## CONCLUSION

WHEREFORE, Defendants respectfully request this Honorable Court grant their motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b) because

Plaintiff failed to provide sufficient evidence to support the verdict. In addition, Defendants request that this Court grant their motion for a new trial pursuant to Federal Rule of Civil Procedure 59 for each of the foregoing reasons and because the cumulative impact of all trial irregularities made the trial unfair to Defendants.

Dated: December 3, 2013

Respectfully submitted,

By: /s/ *Tiffany S. Fordyce*

John F. Gibbons (Attorney No. 6190493)
Tiffany S. Fordyce (Attorney No. 235063)
Tanisha R. Reed (Attorney No. 6283173)
*Special Assistant Corporation Counsel
to the City of Chicago, Dept. of Law*
GREENBERG TRAURIG, LLP
77 W. Wacker Drive, Suite 3100
Chicago, Illinois 60601
T: (312) 456-8400
F: (312) 456-8435

**CERTIFICATE OF SERVICE**

I, Tiffany S. Fordyce, an attorney, hereby certify that, on December 3, 2013, I served the foregoing **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL** on all counsel of record via the Court's (ECF) electronic filing service.

*/s/ Tiffany S. Fordyce*
One of Defendants' Attorneys